Nos. 22-30168 & 22-30179

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee/Cross-Appellant,

v.

PAIGE A. THOMPSON,

Defendant-Cross-Appellant/Appellee.

On Appeal from United States District Court
Western District of Washington at Seattle
District Court Case No. 2:19-cr-00159-RSL
The Honorable Robert S. Lasnik
United States District Judge

**DEFENDANT-APPELLANT'S OPENING BRIEF**

Vicki W.W. Lai
Chief Appellate Attorney
Ann K. Wagner
Assistant Federal Public Defender
Attorneys for Paige Thompson
Federal Public Defender's Office
1601 5th Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100
vicki_lai@fd.org
ann_wagner@fd.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED...........................................................................1

STATEMENT OF THE CASE................................................................2

    I.    Factual Background................................................................2

        A.   The charges ................................................................2

        B.   Pre-trial motions........................................................4

        C.   Jury instructions ........................................................7

    II.   The Eight-Day Trial ..............................................................8

        A.   Introduction ...............................................................8

        B.   Ms. Thompson's initial web searches .............................12

        C.   The proxy scanner locates servers configured as open forward proxy servers. ...................................................13

        D.   Ms. Thompson used the open forward proxies to relay commands and queries to the Instance Metadata Service, which provided her, upon request, with the names of roles and credentials for those roles. ...................................................16

            1.   At Capital One's server, the IMS provided Ms. Thompson the security credential for the ISRM-WAF-Role, and she used the role to access data. ...................................................17

            2.   The other complainant companies similarly misconfigured their servers. ...................................................21

        E.   Cryptocurrency mining .................................................22

        F.   Capital One learns about the breach. .............................23

SUMMARY OF THE ARGUMENT .......................................................25

STANDARD OF REVIEW .....................................................................27

ARGUMENT ........................................................................................28

I. In a Gates Up, Gates Down Inquiry, No Rational Trier of Fact Could Have Found that Ms. Thompson "Intentionally Accessed Without Authorization a Computer." ...................................................28

    A. The Supreme Court has made clear that terms like "authorization" and "access" in the CFAA must be interpreted according to their technical meanings within the tech community. ...........................29

        1. "Authorization" turns on the response of a protected computer to the requests at issue. ...........................................31

        2. A contrary interpretation of the CFAA would mean the public could violate the law by entering areas of the web that the creators of those sites made publicly accessible, simply based on the unspoken intent of the creators that the public not access these areas. .................................................34

    B. No feature of the gates Ms. Thompson encountered alerted her to the fact that the computer owners did not intend for her to pass through them. ..................................................................35

II. There Is Insufficient Evidence to Support a Conviction for Wire Fraud Where There Was No Material Deceit and Traditional Property of the Victim Was Not the Aim of Any Scheme. ..............................................36

    A. Nothing about Ms. Thompson's coding was "deceptive." ............37

    B. No communication or representation by Ms. Thompson persuaded the victim companies to part with their property. ..........................40

    C. The object of Ms. Thompson's supposed deception was not a traditional property interest as defined by the states at the time of the statute's drafting. ....................................................41

CONCLUSION ...................................................................................45

STATEMENT OF RELATED CASES .................................................46

CERTIFICATE OF COMPLIANCE ....................................................47

STATUTORY ADDENDUM ................................................................48

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Carpenter v. United States*, 484 U.S. 19 (1987) ......................................................41

*Ciminelli v. United States*, 598 U.S. --, -- S. Ct. --, 2023 WL 3356526 (2023) .....41

*Durland v. United States*, 161 U.S. 306 (1896) ...................................................... 42

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022)............................7

*Jackson v. Virginia*, 443 U.S. 307 (1979) .......................................................... 1, 27

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ...................................................... 36

*McKeon v. Bisbee*, 9 Cal. 137 (1858) ................................................................... 42

*McNally v. United States*, 483 U.S. 350 (1987) .............................................. 40, 42

*Neder v. United States*, 527 U.S. 1 (1999) ...................................................... 36, 40

*Pasquantino v. United States*, 544 U.S. 349 (2005) ............................................. 42

*United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995) .................................... 28

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) ............................................. 44

*United States v. Auernheimer*, 748 F.3d 525 (3rd Cir. 2014) ............................... 34

*United States v. Cruz*, 554 F.3d 840 (9th Cir. 2009) ............................................ 27

*United States v. Lew*, 875 F.2d 219 (9th Cir. 1989) ............................................. 44

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) .......................................... 4

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) ........................................ 27

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ............................................ 41

*United States v. Shields*, 844 F.3d 819 (9th Cir. 2016) ........................................ 38

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) ................................. 40

*Van Buren v. United States*, 141 S. Ct. 1648 (2021) ............... 6, 28, 29, 30, 31, 33

**Statutes & Rule**

18 U.S.C. § 1028 ..................................................................................................... 4

18 U.S.C. § 1029 ..................................................................................................... 4

18 U.S.C. § 1030 ................................................................................................. 4, 48

18 U.S.C. § 1343 ................................................................................................. 2, 48

18 U.S.C. § 3231 ..................................................................................................... 1

iv

28 U.S.C. § 1291 ................................................... 1

Fed. R. App. P. 4 ................................................. 1

## Other

Butterfield, Andrew, et al., *A Dictionary of Computer Science*
(7th ed. 2016)...............................................31, 32

Hopwood, Shon, *Restoring the Historical Rule of Lenity as a Canon*,
95 N.Y.U. L. Rev. 918 (2020) ........................ 30

Kerr, Orin, *Norms of Computer Trespass*,
116 Colum. L. Rev 1143 (2016) ........................... 30, 34

Kerr, Orin, *Vagueness Challenges to the Computer Fraud and Abuse Act*,
94 Minn. L. Rev. 1561 (2010) ........................ 30

Mossoff, Adam, *The Use and Abuse of IP at the Birth of the Administrative State*,
157 U. Pa. L. Rev. 2001 (2009)...................................42

Scalia, A. & Garner, B., *Reading Law: The Interpretation of Legal Texts* 73
(2012)...................................................................30

Solove, Daniel J., *Identity Theft, Privacy, and the Architecture of Vulnerability*,
54 Hastings L.J. 1227 (2003)............................ 43

Story, J., Commentaries on Equity Jurisprudence § 195 (10th ed. 1870) .........36, 40

Walsh, Barbara, *Telephone and City Directories in the Library of Congress:
Non-Current (Old)* (Mar. 8, 2022)...............................43, 44

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of conviction and sentence in a criminal case following a jury trial. The district court, which had jurisdiction under 18 U.S.C. § 3231, imposed sentence and entered its judgment on October 4, 2022. The district court sentenced Ms. Thompson to time served on Count 1 with no supervised release to follow; five years of probation on Counts 2, 4, 5, and 8; and one year of probation on Counts 6 and 7, with all counts to run concurrently.

Ms. Thompson timely filed her notice of appeal on October 7, 2022. Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291.

Ms. Thompson is not in custody.

## ISSUES PRESENTED

1. Whether the evidence that Ms. Thompson "intentionally accessed a computer without authorization" was sufficient to support the CFAA counts 2 and 4 through 7 under *Jackson v. Virginia*, 443 U.S. 307 (1979).

2. Whether the evidence that Ms. Thompson made any material misrepresentation, or sought thereby a historically recognized "property" interest, was sufficient to support the wire fraud conviction under *Jackson*.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     The charges

The grand jury returned a ten-count second superseding indictment (indictment) on January 12, 2022.[1] ER-140. Count 1 charged Paige Thompson with wire fraud in violation of 18 U.S.C. § 1343. The indictment alleged that Ms. Thompson "with the intent to defraud, devised and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent representations and promises." *Id.* at ¶ 1.

Count 1 was based on two theories: that Ms. Thompson accessed cloud computing servers to mine cryptocurrency and that she downloaded private data from these cloud servers. The indictment alleged Ms. Thompson created proxy scanners[2] that allowed her to "scan the public-facing portions" of cloud servers owned and operated by Amazon Web Services (AWS), and rented or contracted by its customers. ER-142 at ¶ 12. Ms. Thompson allegedly concealed her location and identity by using VPNs (virtual private networks) and TOR (The Onion Router), which are commonly used technologies that facilitate online privacy and can conceal a user's identity and/or "IP" address. ER-143 at ¶¶ 17–18.

---

[1] The first superseding indictment was filed on June 17, 2021. Dkt. 102.

[2] The various technical computer terms used in the indictment are defined in the discussion of the trial below.

The indictment alleged that certain AWS customers had misconfigured their web application firewalls so they were publicly accessible, and the scanners allowed Ms. Thompson to "identify servers for which the web application firewall misconfigurations permitted commands sent from outside the servers." ER-142 at ¶ 12. Once the scanners identified the IP addresses for such servers, Ms. Thompson allegedly "transmitted commands to the misconfigured servers" asking for security credentials for particular accounts or permissions to perform other functions set up by AWS's customers. Ms. Thompson then allegedly used these "stolen credentials" to "copy data, from folders or buckets of data," which she then copied to her own server. This data included "personal identifying information from approximately 100,000,000 customers who had applied for credit cards from Capital One." ER-143 at ¶¶ 14–15; ER-144 at ¶¶ 21. The indictment further alleged that part of Ms. Thompson's scheme was using the "security credentials" to impermissibly use the computing power of Amazon's servers to mine cryptocurrency. *Id*. at ¶ 21.

Based on these alleged acts, the government also charged Ms. Thompson with violating the Computer Fraud and Abuse Act (CFAA). Counts 2[3] and 4 through 8 fell into two categories: downloads and damage. Counts 2 and 4 through 7 charged Ms. Thompson with "intentionally access[ing] a computer without

---

[3] The government asked the court to dismiss Count 3 during trial. ER-20.

authorization" and "thereby obtain[ing] information[,]" in violation of 18 U.S.C.
§ 1030(a)(2)(C) and (c)(2)(A). ER-145–146. Count 8 alleged that Ms. Thompson
"knowingly caused the transmission of a program, information, code, and
command . . . and, as a result of such conduct, intentionally caused damage without
authorization to protected computers[,]" causing loss aggregating at least $5,000 in
value, in violation of 18 U.S.C. § 1030(a)(5)(A) and (c)(4)(B)(i). ER-147.

Count 9 charged Ms. Thompson with access device fraud, in violation of
18 U.S.C. § 1029(a)(3), (b)(1), and (c)(1)(a)(i), and Count 10 charged her with
aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). Ms. Thompson
was acquitted of these two counts by the jury.

### B.    Pre-trial motions

The defense filed two separate motions to dismiss. Ms. Thompson first
moved to dismiss the wire fraud count (and Counts 9 and 10, which are not
relevant to this appeal), arguing that the first superseding indictment failed to state
a wire fraud offense because it failed to describe any misrepresentation of material
fact based on her use of legal technical processes or that she possessed the specific
intent required under the statute, *i.e.*, an intent to both "'deceive *and* cheat'" by
depriving "'the victim of money or property by means of deception.'" Dkt. 122 at
5 (citing *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020)).
Alternatively, Ms. Thompson asked that the court order the government to provide

a bill of particulars specifying the data downloaded and which virtual servers were allegedly used by Ms. Thompson for cryptomining. Dkt. 122 at 6–9.

The district court denied the motion, stating, in part, that while "[d]efendant's argument that her conduct as alleged in the indictment does not constitute a material misrepresentation presents a novel question in a highly technical context," it "was a question of fact to be resolved at trial." Dkt. 202 at 5. The court, however, granted Ms. Thompson's request for a bill of particulars, stating that because wire fraud requires that "the thing obtained must be property in the hands of the victim," not knowing what data she allegedly downloaded significantly hampered her ability to argue that the data was not "property" and thus she lacked specific intent. *Id*. at 15–16 (internal citation marks omitted).

In her second motion to dismiss, Ms. Thompson argued that Counts 2 and 4 through 7 of the CFAA counts should also be dismissed for failure to state a claim because, as a matter of law, the government could not prove under the facts alleged that her access of AWS's rented servers was "without authorization" as required by the CFAA.[4] Specifically, Ms. Thompson argued that because the entities' firewalls were misconfigured, she received automatic authorization when the misconfigured servers provided her with credentials in response to her legitimate commands.

---

[4] Ms. Thompson also raised Fifth Amendment due process and First Amendment arguments. Dkt. 123.

Dkt. 123 at 6. Ms. Thompson further argued that, once inside the servers, she "did not use another person's password or send 'brute force' commands to gain any further access." Dkt. 160 at 9. Rather, the system, by design, "granted her access" in response to a set of commands. *Id.* Relying on trespass law principles, the government countered that the computer servers gave Ms. Thompson the credentials by "mistake, not authorization," given that she "misrepresent[ed] [herself] as an authorized user." Dkt. 135 at 6.

The court denied Ms. Thompson's motion, concluding that "[a]ny argument that mistake or technological process rendered defendant 'authorized' is properly resolved by the trier of fact." Dkt. 226 at 6. Noting that, because the phrase "without authorization" is not defined in the CFAA, the court looked to case law, including *Van Buren v. United States*, 141 S. Ct. 1648 (2021), which instructed that liability under the CFAA "'stems from a gates-up-or-down inquiry—one can or cannot access a computer system.'" *Id*. at 4 (citing *Van Buren*, 141 S. Ct. at 1649). Under *Van Buren*'s "gates-up-or-down" inquiry, the district court observed, "[t]he question of whether accessing a server that is not meant to be public (unlike a public facing website) but nonetheless lacks protective authentication requirements constitutes acting 'without authorization' under the CFAA therefore exists in a gray area. However, the Court need not resolve this question here." Dkt. 226 at 8.

The court concluded that, "[w]hile using a proxy scanner to identify and initially access misconfigured servers may not qualify as a CFAA violation under the 'gates up' formulation expounded in *Van Buren*, the allegations that defendant obtained and used security credentials that did not belong to her, and that she was not authorized by the victims to use, adequately state an offense under the CFAA" and thus was not properly resolved by a pre-trial motion to dismiss. Dkt. 226 at 8.

The court thereafter rejected Ms. Thompson's motion for reconsideration of the court's order on Counts 2 and 4 through 7, ruling that the indictment's allegation that Ms. Thompson used "'stolen credentials'" to gain access to the servers was sufficient to allege that she was "without authorization" under *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022)—a case issued after the motion to dismiss was filed. Dkt. 271 at 6. The court also rejected Ms. Thompson's argument that the rule of lenity required the court to interpret the CFAA narrowly. Dkt. 271 at 7.

### C.    Jury instructions

For the CFAA counts, the elemental phrase "without authorization" was defined for the jury as follows:

> A person accesses a computer 'without authorization' when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer.

ER-13–17.

To find Ms. Thompson guilty of wire fraud, the court instructed the jury that the government was required to prove three elements, including that "the defendant knowingly devised and intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property from the one who is deceived by means of false or fraudulent pretenses, representations or promises[.]" ER-11.

## II.    The Eight-Day Trial

### A.    Introduction

AWS provides "cloud services" that allow companies to rent or contract for the use of "virtual computers" from Amazon. ER-23. Ms. Thompson is a self-educated, transgender woman with a talent for computers. The parties essentially agreed on how Ms. Thompson accessed the complainant companies' virtual servers but differed as to whether that access was "without authorization" and whether her technical processes amounted to "tricking" Amazon's systems by "impersonating [each company's] firewall" to obtain the credentials that allowed her to download the companies' data and to mine cryptocurrency. ER-131–132.

Ms. Thompson used common software tools to access the computers, including a scanning tool called a "proxy scanner,"[5] to search the Internet for IP addresses with AWS servers acting as open proxies, *i.e.*, publicly accessible

---

[5] A proxy scanner is a "tool for searching through a range of Internet addresses for computers that were acting as open proxies." ER-113.

servers. In its opening, the government likened a "proxy" to being "similar to what you might know in real life[,]" similar to when "someone sends someone to vote on their behalf, it's referred to as a proxy." ER-21. In the computer world, the government explained, a proxy acts in the same way: "an intermediary forward[s] on a request" from a source, the "destination gets whatever thing was requested, forwards it back to the proxy, and then back to the source." ER-21–22.

The parties agreed that, while most of the AWS servers' web application firewalls[6] denied her requests by responding with an "error" or "no authorization" response, the complainant companies' firewalls allowed her requests to go forward because they had been mistakenly configured to function as open proxies, making their servers publicly accessible. Ms. Thompson did not dispute accessing the publicly accessible data—its content unknown to her until it was downloaded[7]— but argued her access was not "without authorization" because the servers' web application firewalls allowed her access, as they were configured, with no need for a password or any other means of authentication to make use of the open forward proxies.

---

[6] A firewall is "a gate or a gatekeeper to determine what computers can connect." ER-27. A "web application firewall" is a type of firewall that "looks at web traffic, specifically, and decides to selectively forward web requests." ER-39; ER-58.

[7] *See* ER-86; ER-136.

9

The government mostly agreed with the technical mechanics of how Ms. Thompson was able to access the servers but emphasized that the companies did not intend for her to have access and contended that therefore she acted without authorization. The government acknowledged that Ms. Thompson accessed publicly available IP addresses and that the complainant companies had configured their firewalls to be publicly accessible. But the government argued what was relevant was that the companies did not want her to have access, emphasizing that "each of the witness companies was asked the question . . . : 'Did [company] intend for [Ms. Thompson] to have access to its code and all of its data'" with all responding in the negative. ER-128–129.

The government also emphasized Ms. Thompson's intent for both the wire fraud count and the CFAA counts, asserting she knew that she was not authorized to access the complainant companies' computers or to use their computing power, pointing to her text and Twitter messages, including ones in which Ms. Thompson talked about having stolen computer resources to mine cryptocurrency and personal data. ER-132; ER-133.

The defense's theory, in contrast, was that the companies' subjective intent in programming their web application firewall interfaces had no bearing on whether Ms. Thompson's access of those interfaces was "without authorization" as that technical statutory phrase is interpreted by the case law nor on whether

10

Ms. Thompson subjectively believed she was accessing those interfaces "without authorization." In urging the jury to reject the defense's theory in closing rebuttal, the government cautioned the jurors not to "buy into this hypertechnical argument that a machine executing commands by itself is authorization." ER-139. The government instead told the jury to use the "common meaning" of "without authorization," analogizing it to finding a spare house key under a doormat, arguing that this would not make the person's entry into the home authorized, because what matters is not that the person had the key to get in but the owner's intent in leaving the key. *Id.*

The wire fraud count was also affected by the CFAA's "without authorization" element, because the government's wire fraud theory required that Ms. Thompson impliedly misrepresented that she was authorized to send commands. Dkt. 131 at 6–7; ER-11. Ms. Thompson's position was that the companies had configured their web application firewalls in a way that granted overly permissive access to the public, which allowed her to access the systems from outside their network and thus there was "no false representation of a material fact." ER-134–135, 137. The government countered that Ms. Thompson falsely represented herself by "tricking the [companies'] firewall" to get the "firewall to pass the message" forward to Amazon's service and thereafter pass the information back. ER-130. The prosecutor asserted Ms. Thompson was able to get the Amazon

11

service to respond to her external requests by "impersonating the firewall[.]" ER-131. And, once she obtained the credentials and used them, she was "representing that she is a person who *should have* those credentials," and "that's the trickery, that's the misrepresentation." *Id.* (emphasis added).

On June 17, 2022, the jury convicted Ms. Thompson of the wire fraud and CFAA counts (Counts 1–2 and 4–8) and acquitted her on the access fraud and aggravated identity theft counts (Counts 9–10). Dkt. 335.

### B. Ms. Thompson's initial web searches

Ms. Thompson has been interested in computers for most of her life. She is largely self-educated, having never finished high school. ER-112. Despite having no formal education, Ms. Thompson worked at several technology companies as a software engineer, including at AWS from 2015 to 2016. ER-57. In March 2019, Ms. Thompson began a series of web searches.[8] She found a public document from AWS listing approximately 37 million IP addresses associated with AWS's servers. According to the government's computer expert, FBI Agent Waymon Ho, this document was "publicly accessible and available to the public and provided by Amazon." ER-95.

---

[8] During her searches, Ms. Thompson used two common tools to anonymize her IP address: TOR and a VPN named iPredator. Both tools are legal, freely available to download, and widely used. ER-92, 93, 94.

Ms. Thompson built a proxy scanner, "a tool for searching a range of Internet addresses for computers that were acting as open proxies." ER-113, 114, 100. According to Professor Halderman, "[a]n open forward proxy server, the kind of proxy server that Ms. Thompson's tool was looking for, is a server that's configured to allow any member of the public to request data from other servers." ER-113. In contrast to a reverse proxy server or a closed proxy server, an open proxy server "is configured to serve the public at large and is not locked down or closed with a password." *Id.*

The proxy scanner revealed only IP addresses—"computers are identified on the Internet by IP addresses"[9]—unintelligible strings of numbers separated by periods. ER-24. It had no ability to show an IP address's owner or purpose, and Ms. Thompson could see none of the computer owners' data until that data was downloaded. ER-74. All Ms. Thompson would know about the IP addresses after the scan was that their owners set them up to allow external commands from the public.

### C. The proxy scanner locates servers configured as open forward proxy servers.

The proxy scanner found hundreds of computer servers configured to be open proxies, *i.e.*, those accessible to the public. Professor Halderman explained

---

[9] ER-59–60.

they were open because "they were configured to act as forward proxies, and additional steps hadn't been taken to restrict them." ER-115. And, that "[t]his is exactly the way that the Apache software is designed to function, if you have that proxy request setting set to 'on.'" ER-117. When asked whether a password or any type of authentication was needed, Professor Halderman testified "[i]f it's open, then, no." ER-116.

Because the complainant companies' virtual server web application firewalls[10] were configured to act as open forward proxies, members of the public, including Ms. Thompson, were allowed to connect to them and to ask the firewalls to retrieve data from other servers, including a server operated by Amazon called the Instance Metadata Server (IMS).[11] Michael Fisk, Capital One's deputy chief information security officer at the time, testified that the effect of the misconfiguration of Capitol One's web application firewall "was that a specially formed request to the firewall would get proxied or relayed, on the requester's behalf, to a destination of the requester's choosing," in this case, "the Instance

---

[10] Michael Fisk testified that a "web application firewall" is "a type of firewall that focuses on web application. So it looks at web traffic, specifically, and decides to selectively forward web requests." ER-58.

[11] The IMS, an Amazon service, stores information, including credentials and "roles." ER-32; ER-59; ER-95, 96; ER-32, 38. A "role" is a way to assign groups of permissions, such as permission to access financial data. ER-29–30.

Metadata Service." ER-61. That request "was delivered as a web protocol request, and the Instance Metadata Service responded" and fulfilled the request:

Q:      Okay. And can you tell us what fulfilling the request meant?

A:      Well, in this case, the first request was to return the name of the role being used by the firewall, and so it did.

Q:      Okay. And after it did that, what happened next?

A:      Well, there was a subsequent request that asked for a copy of the key, the credential used to authenticate that role.

Q:      And when that information was returned, first the name of the role and then the credentials, where did those go?

A:      Those went back to the client computer, on the left here, under Ms. Thompson's control.

ER-62.

Steve Schuster, director of security incident response at AWS, agreed that the firewalls were "misconfigured" but characterized the complainants' misconfiguration of their firewalls as trickery on Ms. Thompson's part. According to Mr. Schuster, "once [Ms. Thompson was] able to look for that configuration of the firewall, they were then able to trick that firewall into querying the Instance Metadata Service to give—to give role credentials that could be assumed by the firewall." ER-32. But when asked by the prosecutor what he meant by the word "trick," Mr. Schuster stated "[b]ecause the firewall wasn't set up – the firewall was misconfigured." ER-33.

15

Professor Halderman explained that the Instance Metadata Service "by default" does not provide "valuable data to anybody," but that it can be configured, as had been done by the complainant companies, to give out certain credentials in response to requests made by the web application firewall. ER-118. And, because the web application firewall was configured "to act as an open forward proxy[,]" the public, including Ms. Thompson "could use it to make requests to any other servers, including IMS." *Id*.

Based on his review of Ms. Thompson's proxy scanner tool and the commands or web requests she made, Professor Halderman observed that Ms. Thompson "wasn't providing or guessing a password or any other kind of authentication to make use of those proxies." ER-117. Nor did she exploit a bug or a flaw in the code because "[t]his is exactly the way that the Apache software is designed to function, if you have that proxy request setting set to 'on.'" *Id*. The web application firewalls worked as they were programmed and configured to perform. *Id*. *See also* ER-61.

> **D.** **Ms. Thompson used the open forward proxies to relay commands and queries to the Instance Metadata Service, which provided her, upon request, with the names of roles and credentials for those roles.**

Professor Halderman explained that the next step taken by Ms. Thompson was using the open forward proxy to make a request to the Instance Metadata Service for the role credentials but that she could have acquired the same

credentials through her web browser. ER-123. He observed that "Ms. Thompson, or really anyone, could type in the IP address of the IMS system[,]" that the address was "publicly known, and it's in the Amazon documentation, 169.254.169.254. And then her browser would use that open forward proxy to make a request to the IMS." ER-122. Professor Halderman explained that typing the IP address by itself would provide different options, one of them being "metadata," and that if the full URL was put into the web browser, the credential for the ISRM-WAF-Role would "show[ ] up right in the browser." Professor Halderman stated:

> . . . after constructing that full URL that you see in blue at the top, the same one that Ms. Thompson's curl command enters, if you put that into the web browser and hit enter, the web browser will display this. This is the credential for that ISRM-WAF-Role, it's just showing up right in the browser.

> And if you copy and paste the pieces of this and put them into the Amazon—Amazon Web Services client software, then that client software will allow you to go and execute the different functions that this credential is allowed to do, like accessing the S3 bucket in this example.

*Id.*

### 1. At Capital One's server, the IMS provided Ms. Thompson the security credential for the ISRM-WAF-Role, and she used the role to access data.

Among others, Ms. Thompson was successful in communicating with Capital One (Count 2), Apperian (Count 4), Survox (Count 5), Biglass (Count 6), and 42Lines (Count 7). For Capital One, Ms. Thompson's computer requested a

copy of the security credential for the ISRM-WAF-Role.[12] Mr. Fisk referred to this as the "second configuration" (following the first configuration of the firewall as a proxy). ER-62. Mr. Fisk stated that this second configuration related to the role credential, which is "the way the computer will identify itself as being the firewall[.]" ER-63. Using the proxy, Ms. Thompson relayed a "curl" command, which Mr. Fisk referred to as a "web request." ER-64–65. *See also* ER-121 (Professor Halderman testifying that the curl command, which is installed in every Apple and probably most Windows computers, is "a very, very commonly used computer command that tells the computer to make a web request"). Specifically, she used "port 443"[13] "to talk to the proxy" and to ask that it retrieve the ISRM-WAF role from the IMS. ER-66. Mr. Fisk confirmed that the Instance Metadata Service's response to Ms. Thompson's curl command was "okay." ER-71.

Mr. Fisk testified that this particular role was intended to be used by firewalls, not people. ER-67. The government, however, provided no evidence that

---

[12] "ISRM" refers to the old name of the cybersecurity team at Capital One. "WAF" stands for "Web Application Firewall." ER-67. A "role" is created by AWS's customers. As explained by Steve Schuster: "When you create a role, you create explicit permissions that are allowed, and also explicit permissions that are denied within that role. So when you assume that role, it controls what services you can use, what data you can access, what buckets you can access or otherwise." ER-34.

[13] Mr. Fisk stated that an individual computer can have roughly 65,000 ports or services running and that a "port is what lets you direct traffic to a particular piece of software or service on a computer." ER-60.

18

Ms. Thompson would have known anything about the role before obtaining it, because a server does not describe a role or its intended uses. As Professor Halderman explained, a user with a role is "not presented with the policy that says what the role can do. You "can attempt commands and the server" will either "allow you to proceed or not." ER-124. Nor was there any evidence that, when given an unauthorized or forbidden message, Ms. Thompson ever attempted to "go past that point" or "somehow override those places." ER-125. Nor is a credential always assigned to a particular person. Rather, it can be shared with other individuals, including third parties, and even other services. ER-37–38.

After being given the ISRM-WAF-Role, Ms. Thompson was allowed access to Capital One's card production files stored on Amazon's cloud storage service, called "S3." ER-119. According to Mr. Fisk, once Ms. Thompson had the credential for the WAF and could "impersonate" it, "she could use that key directly to access the AWS S3 service—AWS makes that service available on the Internet to anyone with the right key—and could access, and she did access the data directly from S3 at that point." ER-63. And because the request succeeded, Ms. Thompson was returned a list of the Capital One buckets that could be seen with the ISRM-WAF-Role. ER-70. But the majority of the commands Ms. Thompson entered with the role failed, and when they failed she received the message "You are not authorized to perform this operation," or something similar.

ER-68–69. In those instances, the requests were denied and she made no further attempt to access the corresponding data. *Id.*

There was no dispute that Ms. Thompson could see none of the data in the S3 buckets until it was downloaded. ER-74; ER-120. Mr. Fisk confirmed that Ms. Thompson did not use or share Capital One's data and no credit card account numbers or log-in credentials were disseminated. ER-72–73. *See also* ER-138 (In closing, defense counsel confirmed that "Ms. Thompson never monetized this data, never disseminated it, never made any use of the data to financially benefit herself or harm Capital One's customers.").

S3 (Amazon's cloud storage service) by default does not require roles or credentials to read stored data. But a company can configure S3 to make the data readable only to those who have credentials for a certain role. ER-119. In Capital One's case, it configured S3 to allow access to its data to anyone holding the ISRM-WAF-Role credentials. ER-119–120. Professor Halderman reiterated that Capitol One could have configured it differently by "lock[ing] it down further or not assign those credentials to that data, but the fact is, they did configure it so that in response to a request that was bearing those credentials, bearing this string of letters and numbers, S3 was programmed to return this data on request." ER-120.

### 2. The other complainant companies similarly misconfigured their servers.

The situation at the other complainant companies was similar. Christopher Chan, for example, testified that Bitglass's servers were similarly misconfigured. Mr. Chan was Bitglass's SVP of engineering and operations in 2019. Bitglass, at that time,[14] provided software to assist customers with securing their applications stored in the cloud. ER-88. Mr. Chan testified that after being contacted by Amazon and after speaking with the FBI, he learned that external requests were passed to the Instance Metadata Service through one of Bitglass's servers. ER-89–90. Mr. Chan testified that one of the features of Bitglass's cloud security product was a proxy, which would allow its customers to proxy their requests "through Bitglass so that policies and data retention and things like that can be enforced." ER-89–90. Bitglass, however, did not intend for proxy requests to pass to the Instance Metadata Service. ER-90. Once Mr. Chan learned that external requests were being proxied to the Instance Metadata Service, he changed the configuration. *Id.*

Mr. Chan confirmed the downloaded files did not contain "a lot of data" and "had no value externally other than internal operational use." ER-89. Mr. Chan

---

[14] Bitglass was acquired by another company, Forcepoint, in 2021. ER-88.

21

also agreed that Ms. Thompson would not have been able to see the data until it was downloaded onto her computer. ER-91.

Apperian, the named complainant in Count 4, was bought by another company and now operates as Digital.ai. Apperian provided a mobile application management platform. ER-80. Matthew Pelaggi, then a product owner for Apperian, testified AWS servers do not automatically allow external users to send commands or to receive role information. He explained that Apperian changed its servers by installing Apache software. ER-82. And when Apperian configured Apache on its servers, it used the "default configuration." ER-83. A setting called "mod_proxy" was then enabled, which allowed any member of the public to request credentials. After requesting credentials, Ms. Thompson was able to access Apperian's databases and its software developers' source code. ER-83–84. After learning about the issue, Apperian removed mod_proxy from its configuration on its servers, which took away the public's access to its servers. ER-84.

### E.    Cryptocurrency mining

In addition to allowing downloads, some companies' servers permitted Ms. Thompson to use their computing power. The government argued at closing that, once Ms. Thompson obtained the role credentials, she not only used the role credentials to obtain data but to gain access to AWS's computing power to "do the cryptojacking." ER-130–131.

Agent Ho testified that the technical process used for obtaining data and cryptocurrency mining were the same except that the latter would use different permissions for the specific IAM role. ER-101. The AWS servers that provided scalable computing power are called Elastic Compute Cloud (EC2). ER-25–26. An Amazon "EC2 instance" is a virtual server in its EC2. ER-26. One of the permissions an owner of an Amazon account can assign to a role is to use the EC2 to launch or create new EC2 instances, including "instances that have higher-capacity compute power[.]" ER-28; ER-34; ER-102. Those instances can then be used for its computing power to cryptomine.

Cryptomining is not illegal and is not against AWS's use policies. *Id.* at 126. Agent Ho testified that no cryptocurrency was found on Ms. Thompson's computers. ER-43. AWS made billing adjustments for those customers that were charged for power they did not use. ER-103–104.

### F. Capital One learns about the breach.

Capital One learned of the misconfiguration of its firewall from Kristen (Kat) Valentine. Ms. Valentine has been interested in computers since she was very young and, like Ms. Thompson, is self-taught. She got her first tech job at 18 and, at the time of trial, she worked as an independent consultant for Bay Area companies, helping them with data security regulatory compliance. ER-40. Ms. Valentine testified that her Twitter account began gaining more followers after

she began designing and posting her "hacker shoes," footwear she designed with hacker themes. ER-41.

In June 2019, Ms. Valentine received private direct messages to her Twitter account from a woman she did not know, someone with the Twitter user name "Erratic," stating she was going to "dox" or "drop information" about herself. ER-42–44. The messages also contained a link to a "Github Gist."[15] ER-44. Because Ms. Valentine did not know the person who sent the DMs and viewed doxing oneself as "neutral" rather than negative, she did not click on the link. ER-45. She later revisited the messages with a friend and clicked on the Github gist link and saw a list of different S3 buckets, including one from Capital One that appeared to have been downloaded. ER-46. Ms. Valentine testified she later saw the messages as a cry for help. ER-49.

Ms. Valentine sent an email to Capital One on July 17, 2019, notifying it of the messages she received on Twitter and forwarding the link that referenced Capital One. Capital One responded to Ms. Valentine the next day. ER-47–48. Mr. Fisk testified that the link directed the viewer to a list of the company's S3 buckets containing private customer information. ER-50; ER-53. Capital One quickly identified a misconfiguration on its web application firewall and "replaced

---

[15] Github provides a platform for sharing code or data with others through a "gist," a repository for the information.

the [web application firewall] with a new one, which was a project that was under way anyway." ER-54. Mr. Fisk explained that the new software "was a different make and model that we had selected and were in the process of rolling out, and so we just went to that upgrade." *Id*. Law enforcement was not notified until July 20. ER-55–56. Mr. Fisk stated they were able to identify Ms. Thompson as the person creating the gist because her name was connected to the web address linked to the Github account. ER-56. Based on the breach, Capital One was ordered to pay an $80 million penalty to the U.S. Treasury as part of an agreement with the Office of the Comptroller of the Currency. ER-76–77.

After learning about Capital One's misconfiguration, AWS built its own scanner to see if other customers had similarly misconfigured their web application firewalls. ER-35. AWS found other customers with this same configuration issue. ER-36. Amazon then contacted those customers to let them know of the security issue and "to make sure that our customers intentionally configured their firewalls to function that way." *Id*.

## SUMMARY OF THE ARGUMENT

The Court should reverse Ms. Thompson's convictions for violating the CFAA and for wire fraud because they are based on insufficient evidence. Each CFAA count required proof that Ms. Thompson "intentionally accessed without authorization a computer." As defined by the jury instructions, "a person accesses

25

a computer 'without authorization' when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer." ER-13–17.

Under a technical definition of "authorization" as required by Supreme Court precedent and the jury instruction itself, Ms. Thompson's actions in utilizing the proxy settings of company firewalls to pass on commands, and in requesting *and receiving* credentials for computer "roles" that allowed her further access, do not suffice to show she acted "without authorization." Contrary to the government's theory that the subjective intent of companies controls the "authorization" term, the Supreme Court has made clear that authorization is a "gates up, gates down" inquiry that turns on the response of a computer to a user's attempt to gain access. Here, the computers allowed access to the data and computing power at issue; Ms. Thompson's use was "authorized" under the correct, technical understanding of the term.

Even if there is sufficient evidence for the CFAA counts, there is clearly insufficient evidence for multiple elements of wire fraud, a statute that was not drafted with cloud computing in mind and remains a very ill fit for the conduct at

issue here. Ms. Thompson engaged in neither deception nor persuasion in writing the relevant code; her supposed misrepresentation about her identity and/or authority to request data did not influence the computers to part with their data or computing power. Furthermore, neither the data nor the computing power that were the objects of the enterprise qualify as "property" under the definition supplied by a very recent definition of the Supreme Court.

## STANDARD OF REVIEW

In considering a preserved challenge to convictions based on sufficiency of the evidence, this Court first "must consider the evidence presented at trial in the light most favorable to the prosecution" and then "must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Ms. Thompson orally raised a motion for judgment of acquittal under Rule 29 "on all counts" at the close of the government's case-in-chief and renewed it following submission of all the evidence. ER-106–109; ER-126. Her sufficiency arguments are thus preserved. *See United States v. Cruz*, 554 F.3d 840, 844 & n.4 (9th Cir. 2009) (sufficiency-of-the-evidence claims preserved if raised at the end of the government's case-in-chief and renewed at the end of trial). This Court's sufficiency review may consider "all the evidence—including

the evidence presented by the defendant." *United States v. Alexander*, 48 F.3d 1477, 1490 n.10 (9th Cir. 1995).

## ARGUMENT

### I. In a Gates Up, Gates Down Inquiry, No Rational Trier of Fact Could Have Found that Ms. Thompson "Intentionally Accessed Without Authorization a Computer."

Although the government continually asked the jury to consider whether the companies "intend[ed] for her to have access to its computers," ER-85, the subjective intent of the companies when they configured their cloud servers was irrelevant under United States Supreme Court precedent. *See Van Buren v. United States*, 141 S. Ct. 1648, 1658 (2021) (rejecting a purpose-based reading of "authorization" and adopting instead an interpretation entailing a "gates-up-or-down inquiry"). The only evidence relevant to the question whether Ms. Thompson was authorized to access the computers was the sequence of events that occurred when she encountered an access gate: the credentials she was given were accepted and she gained entry. The gate was open to her, and thus she acted with "authorization" when she "access[ed]" (but did not monetize) the data at issue in CFAA counts 2 and 4 through 7.[16]

---

[16] Ms. Thompson is not challenging her CFAA conviction under Count 8, which concerns the unique element "intentionally impair[ing] without authorization" rather than "access[ing]." *See* Jury Instruction 23, Dkt. 330 at 25.

28

The government also faulted her for posing queries to the Instance Metadata Service via the companies' firewalls, which enabled her to obtain the credentials needed to pass the access gate. But again, these objections go to the subjective intent of the individuals who configured the firewalls. Internet users should not be subject to federal criminal liability based on the secret intent of a server's administrators. What matters is the choices the administrators made in configuring their server architecture. Here, each of the companies had chosen to configure (or mistakenly configured) their firewalls to have a functionality that is desired by some administrators and therefore made an option by Amazon Web Services: setting the firewalls to act as open forward proxy servers. *See* ER-116 (Professor Halderman testifying that some people intentionally set up open forward proxies, including for filtering information and for evading internet censorship); *see also* ER-36 (after discovering configuration issue, Amazon contacted customers "to make sure that our customers intentionally configured their firewalls to function that way").

### A. The Supreme Court has made clear that terms like "authorization" and "access" in the CFAA must be interpreted according to their technical meanings within the tech community.

This Court must "start where we always do: with the text of the statute." *Van Buren*, 141 S. Ct. at 1654. The CFAA's statutory text addresses a technical subject, so the usual rule that plain meaning controls is inapplicable. "[W]hen a statute, like

this one, is 'addressing a . . . technical subject, a specialized meaning is to be expected.' Consistent with that principle, our interpretation tracks the specialized meaning of [the relevant term] in the computer context." *Id.* at 1658 n.7 (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)) (elision in original); *cf.* Gov't closing rebuttal argument, ER-139 (warning jury not to "buy into this hyper-technical argument that a machine executing commands by itself is authorization").

The CFAA's technical text was drafted in 1986 and 1996, *see* Orin Kerr, *Vagueness Challenges to the Computer Fraud and Abuse Act*, 94 Minn. L. Rev. 1561, 1565–67 (2010), so Congress could not have anticipated its application to the cloud computing infrastructure at issue in this case. While some resort to analogy may be inevitable, *see* Orin Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev 1143, 1153–54 (2016), the technical terms used in the statute, the need for clear rules in the presumptively open-access environment of the internet, and the background principle of strict construction of federal criminal statutes (also known as the rule of lenity) urge a narrow reading of "without authorization" in this case. *See* Shon Hopwood, *Restoring the Historical Rule of Lenity as a Canon*, 95 N.Y.U. L. Rev. 918 (2020).

Thus, in *Van Buren*, the Supreme Court endorsed a conception of "authorization" as a "gates-up-or-down inquiry—one either can or cannot access a

computer system, and one either can or cannot access certain areas within the system." 141 S. Ct. at 1658–59. Under a technical reading of the relevant terms, a defendant does not act "without authorization" when the computer "gates" she encountered (1) permitted any member of the public to use a company's firewall as a proxy to communicate with the Instance Metadata Service, and (2) supplied her, upon request, with valid credentials that admitted her to further reaches of the server.

### 1. "Authorization" turns on the response of a protected computer to the requests at issue.

At closing, the government warned the jury not to "buy into this hyper-technical argument that a machine executing commands by itself is authorization." ER-139.

Instead, the government insisted that Ms. Thompson was "without authorization" because the companies never intended for her to use their proxies as she did or to access the data she did. ER-128–129. But the term "authorization" in the CFAA does not turn on the owner's subjective intent. Rather, "authorization" means "[a] process by which users, having completed an authentication stage, gain or are denied access to particular resources based on their entitlement." *A Dictionary of Computer Science* (Andrew Butterfield et al., eds., 7th ed. 2016); *see also* ER-13. It is a "gates-up-or-gates-down inquiry," *Van Buren*, 141 S. Ct. at 1658–59, turning on the response of the computer to the user, not on the computer

31

owner's beliefs about what a user should be able to access had the owner configured the computer's gates correctly.

Here, Ms. Thompson was able to query the Instance Metadata Service because the computers had been configured to allow outside users to employ their firewalls as proxies: this is the nature of an open forward proxy server. Indeed, A Dictionary of Computer Science defines a proxy as

> a device that handles network traffic on behalf of another: a client will send a request to a proxy, which will then make the same request to a server, to which the proxy appears to be a client. The response from the server is returned to the proxy and then passed to the original client. Proxies are often used as part of a firewall to allow complex protocols to be handled; they may also examine requests and responses, route requests to different servers or filter responses in accordance with some policy.

*A Dictionary of Computer Science.* In another example of analogic overreach, the government characterized the inherent character of proxy use as "impersonation." ER-63; ER-130–131 ("And Mike Fisk used an interesting word when he testified. He said that she was impersonating the firewall. That's really what's happening. The Instance Metadata Service thinks it is responding to a firewall, because Ms. Thompson is impersonating the firewall, and so it provides that information."). But one does not impersonate a proxy when using it for a proxy's inherent purpose: relaying commands such that they appear to be coming from the proxy and not the end user.

The Instance Metadata Service then supplied Ms. Thompson with valid credentials for a role that, again, was not restricted to a particular individual's identity, but was defined by the permissions attached to it. ER-29–31. Using these credentials, she was again permitted access to additional data buckets on the server.

At neither stage did Ms. Thompson encounter a message that told her she was not authorized to access the data she ultimately accessed. The majority of the commands Ms. Thompson entered with the role failed, and when they failed she received the message "You are not authorized to perform this operation," or something similar. ER-68–69. In those instances, the requests were denied and she made no further attempt to access the corresponding data. *Id.* Furthermore, she never occupied a role that was specific to an individual person whose identity was not her own. Rather, she relayed queries she was permitted to relay, and occupied abstract roles whose meaning was entirely based on the permissions they were granted. Based on roles and credentials she asked for and was given, "gates" were open to her, and she passed through them. *See Van Buren*, 141 S. Ct. at 1658–59. In the technical terminology used by the CFAA, therefore, she was authorized to access the data she did.

//

//

33

**2.      A contrary interpretation of the CFAA would mean the public could violate the law by entering areas of the web that the creators of those sites made publicly accessible, simply based on the unspoken intent of the creators that the public not access these areas.**

Using the contrary, subjective standard, the government has already

prosecuted another defendant for accessing publicly accessible areas of the

internet—a prosecution condemned by scholars. In *United States v. Auernheimer*,

the government prosecuted individuals for creating a program to automatically

guess different letter combinations for URLs that led to personalized webpages that

automatically filled in prior users' email addresses. 748 F.3d 525 (3rd Cir. 2014).

Although the Third Circuit did not have an opportunity to reach the issue of

whether this constituted lack of authorization, Professor Orin Kerr argued that, had

it reached the merits, the court should have held that accessing publicly accessible

websites, no matter how intricate the method of reaching them, should not be

considered a CFAA violation. Kerr, 116 Colum. L. Rev. at 1164. The defendant

never faced an authentication stage, so he could not have been denied

authorization, no matter how much the website designer wanted him to be

excluded. *Id.*

Similarly, here, authorization does not turn on the intent of the companies

whose firewalls were misconfigured. The rules governing cyberspace are not

sufficiently clearly established to infer intent from the fact that a firewall has been

set up to act as an open forward proxy—a mechanism some entities may affirmatively desire. Basing authorization on an undisclosed and unknowable intent fails to provide notice to benign researchers, allows companies to free ride on the indiscriminate deterrent effects of the criminal law instead of taking care of customers' data directly, and causes the law relating to one access gate to vary from that of another identically configured gate. Such random liability is intolerable in federal criminal law and should not be sanctioned here.

**B.    No feature of the gates Ms. Thompson encountered alerted her to the fact that the computer owners did not intend for her to pass through them.**

In addition to requiring Ms. Thompson to access the data without authorization, the jury instructions required her to do so "intentionally." *See* ER-13. Unlike many prosecutions under the CFAA, this case does not involve an authorization stage requiring that an individual must enter a username and/or password, which would have signaled that authorization for this access point turned on identity (such as a user name or email address) and private information (such as a password). Such a request communicates to a user that they must identify themselves in a manner understood by the computer owner. But while the government often tried to characterize Ms. Thompson's actions in a similar fashion, the roles at issue here were not limited to an individual, and Ms. Thompson had no reason to think they were. *See* ER-37–38 (role credential

not always assigned to a particular person. Rather, it can be shared with other individuals, including third parties, and even other services). They were simply bundles of permissions.

And while Ms. Thompson's texts and tweets may have alluded to nontechnical terms like "stealing," they do not shed light on her intent regarding the meaning of "authorization" under the CFAA because that term is, according to the Supreme Court, *not* the ordinary meaning people use in everyday conversation.

## II. There Is Insufficient Evidence to Support a Conviction for Wire Fraud Where There Was No Material Deceit and Traditional Property of the Victim Was Not the Aim of Any Scheme.

Ms. Thompson's conviction pursuant to 18 U.S.C. § 1343 also cannot stand absent sufficient evidence that she pursued a deceptive scheme, facilitated by a wire transmission, to deprive a victim company of money or property. *See Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). Furthermore, the deceptive nature of the scheme must be material, that is, it must "[have] a natural tendency to influence, or [was] capable of influencing, a person to part with money or property." ER-11; *see Neder v. United States*, 527 U.S. 1, 22–23 (1999) (quoting J. Story, Commentaries on Equity Jurisprudence § 195 (10th ed. 1870)) ("In the first place, the misrepresentation must be of something material, constituting an inducement or motive to the act or omission of the other party"). But once the technical steps of Ms. Thompson's conduct are understood, Ms. Thompson's

"scheme" involved no deception, much less potentially persuasive deception, and was not aimed at the traditional property of any victim as understood at the time the wire fraud statute was enacted. If nondeceptive, unpersuasive lines of code seem like a bad fit for the wire fraud statute, that is because they are. The wire fraud convictions must be reversed.

## A. Nothing about Ms. Thompson's coding was "deceptive."

The internet is a place where anonymity is not the exception, but the rule. As a popular New Yorker cartoon put it as early as 1993, "On the internet, nobody knows you're a dog." Reproduced in Fleishmann, Glenn, *Cartoon Captures Spirit of the Internet*, New York Times at G8 (Dec. 14, 2000), https://www.nytimes.com/2000/12/14/technology/cartoon-captures-spirit-of-the-internet.html. The government nonetheless suggested that the use of anonymizing tools such as VPNs and TOR were deceptive misrepresentations, and that merely sending commands that the administrators do not intend for members of the public to send communicates a false representation about one's identity. *See* Gov't Resp. to Mtn to Dismiss, Dkt. 131 at 2–3; ER-131. But none of the government's theories disclosed a deceitful scheme or representation under the statute.

The wire fraud statute imposes no inherent duty to disclose one's identity while making a representation. Rather, this Court has held that non-disclosure "can support a wire fraud charge only when there exists an independent duty that has

been breached by the person so charged." *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016). And the evidence at trial established that the use of anonymizing tools such as TOR and iPredator is widespread and does not inherently communicate anything about the intent or identity of the user. ER-92, 93, 94. Because there is no independent duty of self-disclosure on the internet, it is not deceitful to proceed anonymously.

Neither is it deceitful to use a proxy to relay commands. As discussed *supra* at page 32, the inherent character of a proxy is that it relays commands as though they were coming from the proxy and not from the end user. To prevent the public from using the firewalls of the victim companies as proxies, the companies could have turned off proxy capabilities, but the claim that the inherent character of a proxy connotes deceit about one's identity is simply untenable. *See* Gov't closing argument, Dkt. 346 at 43 ("The Instance Metadata Service thinks it is responding to a firewall, because Ms. Thompson is impersonating the firewall, and so it provides that information.") Various witnesses' testimony that relaying queries via a firewall acting as a proxy meant that the user was "impersonating" the proxy was misleading, given the purpose of a proxy. Such loaded characterizations cannot render a technical process "fraudulent" where it does not entail misrepresentation as that term is understood for liability purposes.

Furthermore, merely occupying a role which, according to the government's own witnesses, was comprised solely of bundles of permissions and not tied to any individual person, is not deceitful. *See* Gov't closing argument, ER-131 ("[I]n using those credentials, she is representing that she is a person who should have those credentials, that she is a legitimate user of those credentials. She has to be a legitimate user for that to work, and so she is representing that, and that's the trickery, that's the misrepresentation."). Such roles inherently make no claims about identity, and while the computers did check that the role had the relevant permissions, they were not concerned with whether the end user was legitimate in some metaphysical sense. *See*, *e.g.*, ER-75 (Mr. Fisk agreeing that a computer does not assess motive; it only assesses whether "you have a credential that has permission….").

Finally, it is not deceitful to send a command one has not been given explicit verbal permission to send. Internet users send commands that have not been approved in advance every day, including by taking such ordinary actions as typing a URL into the address bar of a web browser. Sometimes such requests fail; the convention on the internet is for computers to be programmed to send failure notices in response, such as "address not found" or "log in required" or "you are not authorized to visit this page." The convention is emphatically not that one is

subject to federal criminal prosecution for not disclosing one's actual identity while sending such commands.

In short, there was nothing resembling deceit here and no reasonable juror could have found this element proved beyond a reasonable doubt.

### B. No communication or representation by Ms. Thompson persuaded the victim companies to part with their property.

Lines of code cannot "constitut[e] an inducement or motive to the act or omission of the other party." *Neder*, 527 U.S. at 22–23 (quoting J. Story, Commentaries on Equity Jurisprudence § 195 (10th ed. 1870)). Code is not capable of influence or persuasion. It is capable only of sending commands and queries. The computers with which Ms. Thompson was communicating via code, moreover, were not persuadable entities. They were indifferent to her actual identity, and would have responded the same if she had disclosed her identity—for example, by including it in inactive coding "comments"—as they would have responded if she had not.

Courts interpreting the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987) (abrogated by statute as to honest services fraud), and its progeny, have limited the wire fraud statute "only to those schemes in which a defendant lies about the nature of the bargain itself." *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016). Thus, they draw a distinction "between schemes that do no more than cause their victims to enter into transactions they

would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Here, because Ms. Thompson did not engage in persuasion, there was no bargain reached or proposed. To the extent the computers' automatic responses to her code could be termed "transactions," it is clear the companies would have rather avoided them. But her anonymity and/or actual identity did not have any influence on the commands being executed. These facts fall far short of the requirement that the misrepresentation at issue be key to the bargain itself.

**C.      The object of Ms. Thompson's supposed deception was not a traditional property interest as defined by the states at the time of the statute's drafting.**

As held in a recent decision of the United States Supreme Court, in order to qualify as property for the purpose of the wire fraud statute, "an interest" must have "'long been recognized as property' when the wire fraud statute was enacted." *Ciminelli v. United States*, 598 U.S. --, -- S. Ct. --, 2023 WL 3356526, at *2 (2023) (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). The Supreme Court explicitly disdained the notion that "[t]he economic value of ... knowledge" was a sufficient interest under the mail or wire fraud statutes. *Ciminelli*, 2023 WL 3356526, at *4 n.4. Neither personally identifiable

41

information nor computing power (used to mine cryptocurrency) qualifies as "property" under this definition.

The mail fraud statute was enacted in 1872 to cover "any scheme or artifice to defraud" and was amended in 1909 in light of *Durland v. United States*, 161 U.S. 306 (1896), to add the phrase "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *McNally*, 483 U.S. at 356–57. Act of June 8, 1872, ch. 335, § 301, 17 Stat. 323; Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130. Congress enacted the wire fraud statute in 1952, Act of July 16, 1952, ch. 879, § 18(a), 66 Stat. 722, and it used "identical language" in the wire fraud statute, reflecting its intent to adhere to the meaning of property embodied in the mail fraud statute. *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005) (reading the mail and wire fraud statutes "*in pari materia*"). Furthermore, "[t]he long-standing definition of property in American law [is that] 'property is the exclusive right of possessing, enjoying, and disposing of a thing.'" Adam Mossoff, *The Use and Abuse of IP at the Birth of the Administrative State*, 157 U. Pa. L. Rev. 2001, 2014 & n.54 (2009) (quoting *McKeon v. Bisbee*, 9 Cal. 137, 143 (1858)).

As for personally identifiable information, it did not accrue the value it has today until the late 20th century, and was certainly not recognized as property when the mail fraud statue (on which the wire fraud statute was based) was

enacted. Social Security numbers, perhaps the most concerning of the data that Ms. Thompson ended up obtaining (though there was no allegation that she knew the bucket contained personally identifiable information until she obtained it, *see* ER-74; ER-90; ER-120) "were created in 1936 as part of the Social Security System and were not designed to be used for a general identifier. Indeed, for many years, the social security card stated that it was "NOT FOR IDENTIFICATION." Daniel J. Solove, *Identity Theft, Privacy, and the Architecture of Vulnerability*, 54 Hastings L.J. 1227, 1252 (2003). Only much later did the SSN begin to be used by the private sector for commercial purposes, becoming a "powerful number, for with it a person can open and close accounts, change addresses, obtain loans, access personal information, make financial transactions, and more." *Id.* at 1253.

Even today, there is no exclusive right to possess or enjoy personally identifiable information such as Social Security numbers, birthdates, and addresses. Companies (such as the victims in this case) collect this information without the explicit consent of the individuals; people must share their own information to obtain credit. But it was certainly not an interest traditionally recognized as property in the late 19th and early 20th centuries, when such information either did not exist (SSNs), was not used commercially (birthdays), or was not considered particularly private (addresses, phone numbers, *see generally* Barbara Walsh, *Telephone and City Directories in the Library of Congress:*

43

*Non-Current (Old)*,

https://www.loc.gov/rr/genealogy/bib_guid/telephonnoncurr.html (Mar. 8, 2022)).

Thus it does not qualify as "property" for the purposes of the wire fraud statute.

Similarly, to the extent that Ms. Thompson's scheme was aimed at obtaining computing power to mine cryptocurrency,[17] computing power does not qualify as an interest long recognized as property in the late 19th and early 20th centuries. To state the obvious, computers capable of mining cryptocurrency were not invented at the time the mail fraud statute was enacted. Furthermore, the first computers were owned by universities or governments, and "computing time" was not generally individually possessed or disposed of, but only borrowed or shared. *See* The Modern History of Computing, *Stanford Encyclopedia of Philosophy* (last revised 2006), https://plato.stanford.edu/entries/computing-history/. Only very recently has the private ownership of computers been possible, and thus computing power was not a traditional property interest at the time the mail and wire fraud statutes were enacted.

---

[17] The government's theory at trial was that Ms. Thompson had stolen computing power. Any attempt to argue that the cryptocurrency itself was money or property would have failed because of the well-established convergence requirement, meaning the money or property must be that of the victim. *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989); *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010).

## CONCLUSION

The Court should reverse the CFAA counts (Counts 2 and 4 through 7) and

the wire fraud count (Count 1) and remand for resentencing.

Dated this 22nd day of May 2023.

Respectfully submitted,

s/ *Vicki W.W. Lai*
Chief Appellate Federal Public Defender

s/ *Ann K. Wagner*
Assistant Federal Public Defender

Attorneys for Paige Thompson

45

## STATEMENT OF RELATED CASES

The undersigned attorney or self-represented party states the following: I am

unaware of any related cases currently pending in this Court.

Dated this 22nd day of May 2023.

s/ *Vicki W.W. Lai*
Chief Appellate Federal Public Defender
Attorney for Paige Thompson

46

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party. This brief contains 10,420 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated this 22nd day of May 2023.

s/ *Vicki W.W. Lai*
Chief Appellate Federal Public Defender
Attorney for Paige Thompson

## STATUTORY ADDENDUM

**18 U.S.C. § 1030(a)(2) (Fraud and related activity in connection with computers):**

(a) Whoever —

    (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

        (A) information contained in a financial record of a financial institution, or a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act 915 U.S.C. 1681 et seq.);

        (B) information from any department or agency of the United States; or

        (C) information from any protected computer;

**18 U.S.C. § 1343 (Fraud by wire, radio, or television)**:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.