Nos. 22-30168 & 22-30179

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee/Cross-Appellant,

v.

PAIGE A. THOMPSON,

Defendant-Cross-Appellant/Appellee.

---

On Appeal from United States District Court
Western District of Washington at Seattle
District Court Case No. 2:19-cr-00159-RSL
The Honorable Robert S. Lasnik
United States District Judge

---

**EXCERPTS OF RECORD – VOLUME 1 OF 1**

---

Vicki W.W. Lai
Chief Appellate Attorney
Ann K. Wagner
Assistant Federal Public Defender
Attorneys for Paige Thompson
Federal Public Defender's Office
1601 5th Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100
vicki_lai@fd.org
ann_wagner@fd.org

## VOLUME 1 OF 1 - INDEX

Judgment
Filed October 4, 2022
Docket No. 386 ...................................................................................4

Excerpt, Final Jury Instructions
Filed June 16, 2022
Docket No. 330 .................................................................................10

Excerpt, Reporter's Transcript (June 8, 2022)
Filed June 24, 2022
Docket No. 340 .................................................................................18

Excerpt, Reporter's Transcript (June 9, 2022)
Filed June 24, 2022
Docket No. 341 .................................................................................51

Excerpt, Reporter's Transcript (June 10, 2022)
Filed June 24, 2022
Docket No. 342 .................................................................................78

Excerpt, Reporter's Transcript (June 13, 2022)
Filed June 24, 2022
Docket No. 343 .................................................................................97

Excerpt, Reporter's Transcript (June 14, 2022)
Filed June 24, 2022
Docket No. 344 ...............................................................................105

Excerpt, Reporter's Transcript (June 15, 2022)
Filed June 24, 2022
Docket No. 345 ...............................................................................110

Excerpt, Reporter's Transcript (June 16, 2022)
Filed June 24, 2022
Docket No. 346 ...............................................................................127

Second Superseding Indictment
Filed January 12, 2022
Docket No. 166 ........................................................................................140

Amended Notice of Criminal Appeal
Filed December 20, 2022
Docket 402 ..............................................................................................151

District Court Docket Sheet ....................................................................152

**ER-3**

AO245B  (Rev. 09/19) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Western District of Washington

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **v.** | |
| Paige Thompson | Case Number:    2:19CR00159RSL |
| | USM Number:    49619-086 |
| | Mohammad Ali Hamoudi, Nancy Tenney, Brian Klein, Melissa Meister |
| | <sub>Defendant's Attorney</sub> |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☒ was found guilty on count(s)    1, 2, 4, 5, 6, 7, 8 of the Second Superseding Indictment
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | 7/29/2019 | 1 |
| 18 U.S.C. § 1030(a)(2) | Unlawfully Obtaining Information of a Card Issuer | 7/29/2019 | 2 |
| 18 U.S.C. § 1030(a)(2) | Unlawfully Obtaining Information from a Protected Computer | 7/29/2019 | 4 |
| 18 U.S.C. § 1030(a)(2) | Unlawfully Obtaining Information from a Protected Computer | 7/29/2019 | 5 |
| 18 U.S.C. § 1030(a)(2) | Unlawfully Obtaining Information from a Protected Computer | 7/29/2019 | 6 |
| 18 U.S.C. § 1030(a)(2) | Unlawfully Obtaining Information from a Protected Computer | 7/29/2019 | 7 |
| 18 U.S.C. § 1030(a)(5) | Transmitting a Program, Information, Code, or Command to a Computer, Intending to Cause Damage | 7/29/2019 | 8 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s)    9, 10

☐ Count(s) _____ ☐ is ☐ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

_____
<sub>Assistant United States Attorney</sub> Andrew Friedman

October 4, 2022
<sub>Date of Imposition of Judgment</sub>

_____
<sub>Signature of Judge</sub>

Robert S. Lasnik, United States District Judge
<sub>Name and Title of Judge</sub>

October 4, 2022
<sub>Date</sub>

**ER-4**

AO245B    (Rev. 09/19) Judgment in a Criminal Case
         Sheet 4 — Probation

Judgment — Page **2** of 6

DEFENDANT:     **Paige Thompson**
CASE NUMBER:     2:19CR00159RSL

## PROBATION

The defendant is hereby sentenced to probation for a term of : _1 year for Counts 6 & 7_ _5 years for Counts 2, 4-5 and 8_ Count 1: a sentence of imprisonment of time served, with no supervision to follow ☞ all counts concurrent

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of the day you were sentenced and at least two periodic drug tests thereafter, as determined by the court.
    - ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.  *(check if applicable)*
4.  ☒  You must cooperate in the collection of DNA as directed by the probation officer.  *(check if applicable)*
5.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense.  *(check if applicable)*
6.  ☐  You must participate in an approved program for domestic violence.  *(check if applicable)*
7.  ☒  You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664.  *(check if applicable)*
8.  You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9.  If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10.  You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached pages.

AO245B    (Rev. 09/19) Judgment in a Criminal Case
Sheet 4A — Probation

DEFENDANT:      **Paige Thompson**
CASE NUMBER:    2:19CR00159RSL

# STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at www.uscourts.gov.

Defendant's Signature    _____    Date    _____

AO245B     (Rev. 09/19) Judgment in a Criminal Case
           Sheet 4D — Probation

DEFENDANT:     **Paige Thompson**
CASE NUMBER:     2:19CR00159RSL

## SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall allow a probation officer to inspect any personal computer owned or operated by the defendant.

2.  The defendant shall comply with the requirements of the U.S. Probation and Pretrial Services Computer Monitoring Program as directed. The defendant shall consent to the U.S. Probation and Pretrial Services Office conducting ongoing monitoring of his/her computer(s), hardware, and software, and any/and all electronic devices/media. The monitoring will include the installation, at the defendant's expense, of hardware or software systems that allow evaluation of his/her computer use. Monitoring may also include the retrieval and copying of all data from his/her computer(s) or any/and all other electronic devices/media. The defendant may be subject to quarterly polygraph testing at his/her expense, solely to ensure compliance with the requirements of the monitoring program. The defendant hereby consents to U.S. Probation and Pretrial Services' use of electronic detection devices to evaluate the defendant's access to Wi-Fi (wireless fidelity) connections.

3.  The defendant shall notify the probation officer of all computer software owned or operated by the defendant at the commencement of supervision, and report any additional software purchase, acquisition, or use during the course of supervision.

4.  The defendant shall provide the probation officer with access to any requested financial information including authorization to conduct credit checks and obtain copies of the defendant's federal income tax returns.

5.  The defendant shall disclose all assets and liabilities to the probation office. The defendant shall not transfer, sell, give away, or otherwise convey any asset, without first consulting with the probation office.

6.  If the defendant maintains interest in any business or enterprise, the defendant shall, upon request, surrender and/or make available, for review, any and all documents and records of said business or enterprise to the probation office.

7.  The defendant shall maintain a single checking account in his or her name. The defendant shall deposit into this account all income, monetary gains, or other pecuniary proceeds, and make use of this account for payment of all personal expenses. This account, and all other bank accounts, must be disclosed to the probation office.

8.  The defendant shall participate as directed in a mental health program approved by the United States Probation Office. The defendant must contribute towards the cost of any programs, to the extent the defendant is financially able to do so, as determined by the U.S. Probation Officer.

9.  The defendant shall be prohibited from incurring new credit charges, opening additional lines of credit, or obtaining a loan without approval of the defendant's U.S. Probation Officer.

10. Restitution in the amount of $ _TBD_ *at restitution hearing* is due immediately. Any unpaid amount is to be paid during the period of supervision in monthly installments of not less than 10% of his or her gross monthly household income. Interest on the restitution shall not be waived.

11. The defendant shall submit his or her person, property, house, residence, storage unit, vehicle, papers, computers (as defined in 18 U.S.C.§1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States probation officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. *as approved by probation*

12. 50 hours of community service each year for next 5 years,

13. The defendant shall participate in the location monitoring program with Radio Frequency technology for a period of 3 years. The defendant is restricted to her residence at all times except for employment, religious services, medical or legal reasons, or as otherwise —

Case 22-30150, 01/23/2023, ID: 12623865, DktEntry: 9, Page 8 of 93

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page 5 of 6

DEFENDANT: **Paige Thompson**
CASE NUMBER: 2:19CR00159RSL

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment[*] | JVTA Assessment[**] |
|---|---|---|---|---|---|
| TOTALS | $ ~~100~~ 550 | $ | $ | $ N/A | $ N/A |

☒ The determination of restitution is deferred until _Dec. 1, 2022_ . An *Amended Judgment in a Criminal Case (AO 245C)*
_at 9:00 a.m._
will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss[***] | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:
    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution
    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

☒ The court finds the defendant is financially unable and is unlikely to become able to pay a fine and, accordingly, the imposition of a fine is waived.

   [*]  Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
  [**]  Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
 [***]  Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

*approved by the location monitoring specialist. The defendant shall abide by all program requirements, and must contribute towards the costs of the services, to the extent financially able as determined by the location monitoring specialist.

**ER-8**

AO245B    (Rev. 09/19) Judgment in a Criminal Case
          Sheet 6 — Schedule of Payments

Judgment — Page **6** of **6**

DEFENDANT:        **Paige Thompson**
CASE NUMBER:      2:19CR00159RSL

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

☒    PAYMENT IS DUE IMMEDIATELY.  Any unpaid amount shall be paid to
     Clerk's Office, United States District Court, 700 Stewart Street, Seattle, WA 98101.

     ☒    During the period of imprisonment, no less than 25% of their inmate gross monthly income or $25.00 per quarter,
          whichever is greater, to be collected and disbursed in accordance with the Inmate Financial Responsibility Program.

     ☒    During the period of supervised release, in monthly installments amounting to not less than 10% of the defendant's gross
          monthly household income, to commence 30 days after release from imprisonment.

     ☐    During the period of probation, in monthly installments amounting to not less than 10% of the defendant's gross monthly
          household income, to commence 30 days after the date of this judgment.

     The payment schedule above is the minimum amount that the defendant is expected to pay towards the monetary
     penalties imposed by the Court. The defendant shall pay more than the amount established whenever possible.  The
     defendant must notify the Court, the United States Probation Office, and the United States Attorney's Office of any
     material change in the defendant's financial circumstances that might affect the ability to pay restitution.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary
penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through
the Federal Bureau of Prisons' Inmate Financial Responsibility Program are made to the United States District Court,
Western District of Washington. For restitution payments, the Clerk of the Court is to forward money received to the
party(ies) designated to receive restitution specified on the Criminal Monetaries (Sheet 5) page.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

     Case Number
     Defendant and Co-Defendant Names                                    Joint and Several      Corresponding Payee,
     *(including defendant number)*              Total Amount                Amount              if appropriate

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☒    The defendant shall forfeit the defendant's interest in the following property to the United States:

Court orders forfeiture of proceeds of Counts 1, 8, and of property
that facilitated Counts 2, 4-7, the details of which will be
determined in an amended judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment,
(5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA Assessment, (9) penalties, and (10) costs, including cost of
prosecution and court costs.

**ER-9**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

             Plaintiff,

      v.

PAIGE A. THOMPSON,

             Defendant.

Case No. CR19-159-RSL

COURT'S INSTRUCTIONS
TO THE JURY

DATED this 16th day of June, 2022.

*Robert S. Lasnik* (signature)

_____

Robert S. Lasnik
United States District Judge

**INSTRUCTION NO. 17**

The defendant is charged in Count 1 of the indictment with wire fraud in violation of Section 1343 of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

*First*, beginning in or before March 2019, and continuing until on or about July 17, 2019, the defendant knowingly devised and intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property from the one who is deceived by means of false or fraudulent pretenses, representations, or promises;

*Second*, the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

*Third*, the defendant acted with the intent to defraud; and

*Fourth*, on or about March 22, 2019, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out an essential part of the scheme.

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that her acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

In determining whether a scheme to defraud exists, you may consider not only the defendant's words and statements but also the circumstances in which they are used as a whole.

An intent to defraud is an intent to deceive and cheat, that is, an intent to deprive a victim of money or property by deception.

1    A wiring is caused when one knows that a wire will be used in the ordinary course of

2    business or when one can reasonably foresee such use.

3

4    It need not have been reasonably foreseeable to the defendant that the wire

5    communication would be interstate or foreign in nature.  Rather, it must have been reasonably

6    foreseeable to the defendant that some wire communication would occur in furtherance of the

7    scheme, and an interstate or foreign wire communication must have actually occurred in

8    furtherance of the scheme.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COURT'S INSTRUCTIONS TO THE JURY - 19

**ER-12**

**INSTRUCTION NO. 18**

The defendant is charged in Count 2 of the indictment with unlawfully obtaining information of Capital One in violation of Section 1030(a)(2) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

*First*, between on or about March 12, 2019, and on or about July 17, 2019, the defendant intentionally accessed without authorization a computer;

*Second*, by accessing without authorization a computer, the defendant obtained information contained in a financial record of a card issuer; and

*Third*, the value of the information obtained exceeded $5,000.

A person accesses a computer "without authorization" when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer.

The term "card issuer" means any person who issues a credit card, or the agent of such person with respect to such card.

**INSTRUCTION NO. 19**

The defendant is charged in Count 4 of the indictment with unlawfully obtaining information from Apperian's protected computer in violation of Section 1030(a)(2) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

*First*, on or about March 7, 2019, the defendant intentionally accessed without authorization Apperian's computer; and

*Second*, by accessing without authorization Apperian's computer, the defendant obtained information from a computer that was used in or affecting interstate or foreign commerce or communication; and

*Third*, the value of the information obtained exceeded $5,000.


A person accesses a computer "without authorization" when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer.

COURT'S INSTRUCTIONS TO THE JURY - 21

**INSTRUCTION NO. 20**

The defendant is charged in Count 5 of the indictment with unlawfully obtaining information from Survox's protected computer in violation of Section 1030(a)(2) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

*First*, on or about March 12, 2019, the defendant intentionally accessed without authorization Survox's computer; and

*Second*, by accessing without authorization Survox's computer, the defendant obtained information from a computer that was used in or affecting interstate or foreign commerce or communication; and

*Third*, the value of the information obtained exceeded $5,000.


A person accesses a computer "without authorization" when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer.

COURT'S INSTRUCTIONS TO THE JURY - 22

**ER-15**

**INSTRUCTION NO. 21**

The defendant is charged in Count 6 of the indictment with unlawfully obtaining information from Bitglass' protected computer in violation of Section 1030(a)(2) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

*First*, on or about March 5, 2019, the defendant intentionally accessed without authorization Bitglass' computer; and

*Second*, by accessing without authorization Bitglass' computer, the defendant obtained information from a computer that was used in or affecting interstate or foreign commerce or communication.


A person accesses a computer "without authorization" when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer.

COURT'S INSTRUCTIONS TO THE JURY - 23

**INSTRUCTION NO. 22**

The defendant is charged in Count 7 of the indictment with unlawfully obtaining information from 42 Lines' protected computer in violation of Section 1030(a)(2) of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

*First*, on or about March 28, 2019, the defendant intentionally accessed without authorization 42 Lines' computer; and

*Second*, by accessing without authorization 42 Lines' computer, the defendant obtained information from a computer that was used in or affecting interstate or foreign commerce or communication.

A person accesses a computer "without authorization" when (1) the computer is protected by a generally applicable rule regarding access permissions, such as a username and password requirement, credential requirement, or other authentication system that prevents the general public from accessing the computer, and (2) the person circumvents that rule regarding access permissions to gain access to the computer.

Case: 22-30016, 01/09/2023, Document 34-5, DktEntry: 6.5, Page 8 of 203   Case 2:19-cr-00159-RSL Document 405 Filed 06/24/22 Page 1 of 191

1

```
                 UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,            )
                                     )
               Plaintiff,            ) CASE NO. CR19-00159-RSL
                                     )
v.                                   ) Seattle, Washington
                                     )
PAIGE A. THOMPSON,                   ) June 8, 2022
                                     ) 9:12 a.m.
               Defendant.            )
                                     ) JURY TRIAL, Vol. 2 of 9
_____


               VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT S. LASNIK
               UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:      ANDREW C. FRIEDMAN
                          JESSICA M. MANCA
                          TANIA M. CULBERTSON
                          United States Attorney's Office
                          700 Stewart Street, Suite 5220
                          Seattle, WA 98101


  For the Defendant:      MOHAMMAD ALI HAMOUDI
                          NANCY TENNEY
                          Federal Public Defender's Office
                          1601 5th Avenue, Suite 700
                          Seattle, WA 90071

                          BRIAN E. KLEIN
                          MELISSA A. MEISTER
                          Waymaker LLP
                          515 S Flower Street, Suite 3500
                          Los Angeles, CA 90071



  Reported by:            Nancy Bauer and Marci Chatelain
                          Official Federal Court Reporters
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
```

INDEX

EXAMINATION OF                                              PAGE

STEVE SCHUSTER          DIRECT EXAMINATION          62
                        BY MR. FRIEDMAN

                        CROSS-EXAMINATION           118
                        BY MR. KLEIN

                        REDIRECT EXAMINATION        137
                        BY MR. FRIEDMAN

KRISTEN VALENTINE        DIRECT EXAMINATION          143
                        BY MS. MANCA

                        CROSS-EXAMINATION           168
                        BY MR. HAMOUDI

                        REDIRECT EXAMINATION        178
                        BY MS. MANCA

                        RECROSS-EXAMINATION         178
                        BY MR. HAMOUDI

MICHAEL FISK             DIRECT EXAMINATION          179
                        BY MR. FRIEDMAN

GOVERNMENT'S OPENING STATEMENT BY MS. MANCA     20
DEFENSE'S OPENING STATEMENT BY MR. KLEIN        46

1    pleadings --

2              THE COURT:  Yeah.

3              MR. FRIEDMAN:   -- but, yeah, the -- based on our

4    ability to get cooperation from an overseas victim, we would ask

5    the Court to dismiss Count 3.

6              THE COURT:  So the government's moved to dismiss

7    Count 3, and I'll grant that motion.

8              MR. FRIEDMAN:  Thank you, Your Honor.

9              THE COURT:  Okay.  So we now have 1, 2, 4 through 10.

10             MR. FRIEDMAN:  Yes, Your Honor.

11             THE COURT:  Okay.  Great.

12        And I am going to read some of the advance instructions.

13   I'm not going to go into a great deal of detail on the elements

14   of the crimes, we're going to end up arguing about that and do

15   that later.  I'm just going to use the titles of the crime, and

16   in the statement of the case, more of a generic kind of

17   explanation of what's going on here.

18        So then, defense, Mr. Klein, do you have an objection to

19   something that the government intends to do in opening?

20             MR. KLEIN:  Yes, I do, Your Honor.

21             THE COURT:  Tell me about that.

22             MR. KLEIN:  Your Honor, I don't know if Your Honor has

23   the slides with you.

24             THE COURT:  I have the packet, yeah.

25             MR. KLEIN:  Okay.  And they're not numbered, so I'll

1   Web Services' cloud platform.  And so Amazon Web Services has a

2   user account that you might be more familiar with, with a user

3   name and password.

4       Role credentials are a little different in that they're

5   permissions to do certain things with services and resources in

6   the cloud environment.  So they can be used by people, but more

7   often they're used by machines.

8       So a company can create something called a billing role,

9   and they can assign it to this application right here.  So let's

10  say this is a billing application that needs to generate

11  invoices for -- for customers or for a client, they -- the

12  billing application will go to the database and say, I need your

13  customer information to generate these billing invoices, here's

14  my IAM Role credential, give me access to this customer data.

15  And the database says, sure, billing application, I see your IAM

16  Role, I see your credentials, here's the customer information.

17      And this is happening in the background of machines, you

18  know, services, applications talking to each other with these

19  credentials over and over and over again, millions of times a

20  day in the background, right?

21      Next term, proxy.  Okay.  Proxy is very similar to what you

22  might know in real life.  Someone sends someone to the meeting

23  to vote on their behalf, it's referred to as a proxy.  That's

24  what a proxy is is an intermediary forwarding on a request.  So

25  a source says, you know, hey, I want, you know, this thing, and

1  the proxy sends it to the destination.  The destination gets

2  whatever thing was requested, forwards it back to the proxy, and

3  then back to the source.  It's just an intermediary forwarding

4  things on.

5       And where that comes up is in something called a reverse

6  proxy.  So when you open up Internet Explorer, let's say you

7  want to check your driver's license, so you go to the DOL

8  website, you will likely interact with a reverse proxy.  The

9  reverse proxy will send your request to the internal server that

10 actually has that information, serve it back up to the reverse

11 proxy, and then the reverse proxy serves it back up to you on

12 your computer screen in your web browser.

13      Another term, web application firewall -- oh, getting back

14 to this point, why would a company want a reverse proxy, as

15 opposed to just having their external device connect with their

16 internal server directly, right.  The reason is that it provides

17 an extra layer of protection from the Internet.  So by having

18 that intermediary, that intermediary step just gives the

19 internal server an extra layer so it's not getting hit by the

20 Internet traffic directly, that's why you do it.

21      Another layer of protection that companies can add is a web

22 application firewall.  The web application firewall sits on the

23 web server, right, so related to the drawing I just showed you,

24 and it acts like a filter for the web server, letting traffic

25 through, you know, filtering other traffic out.

1    A.    I was there just under 11 years.

2    Q.    And when did you leave?

3    A.    November of 2013.

4    Q.    Did you switch to another job after you left Cornell?

5    A.    I did.  I joined Amazon Web Services.

6    Q.    What job did you take at Amazon Web Services?

7    A.    I took the director of security incident response --

8    security incident and response and engineering.

9    Q.    Okay.  Now, Amazon Web Services is part of another company;

10   is that correct?

11   A.    It's part of Amazon, correct.

12   Q.    And what part of Amazon -- when we think of Amazon, what do

13   most people think of?

14   A.    They think of the retail side of the business, ordering

15   books and other products.

16   Q.    Is that what Amazon Web Services does?

17   A.    We do not.

18   Q.    What does Amazon Web Services do?

19   A.    Amazon offers a set of services and infrastructure called

20   "the cloud" that companies can use to host their services or

21   products.

22   Q.    Okay.  Computer services, basically?

23   A.    Typically, yes.

24   Q.    Okay.  And you said -- I think you said you were the

25   incident response leader; is that correct?

**ER-23**

1    address, like a home.

2         So each computer has an address, which is four numbers that

3    are separated by periods, and that tells the routers how to

4    direct the traffic between two computers that sit, potentially,

5    on opposite ends of the Internet.  Very, very similar to your

6    home address, where each home address has to have a street

7    number, a street name, a town in order to route postal traffic.

8    So the Internet works in a very, very similar way using IP

9    addresses.

10   Q.   And "IP address" stands for Internet Protocol address?

11   A.    Internet Protocol address, yes.

12   Q.   People use the abbreviation?

13   A.   Almost always.

14   Q.   Going back 20 years to when you were at Cornell, in that

15   era, how did large institutions, companies, how did they handle

16   their need for computing power?

17   A.    Up until recently, almost all companies would have to build

18   their own data centers.  So a data center could be an entire

19   floor of a building, or sometimes an entire building, and in

20   there they would put large computers called "servers."  They'd

21   put a large number of them in storage components, and they would

22   have to make sure they had appropriate cooling and power.

23        And, of course, all the networks that went into a facility

24   is called a "data center."  And then you had people that would

25   maintain the data center and make sure that the devices were

**ER-24**

1   so something significantly bigger than what you might have at

2   home or your laptop or otherwise.  These are very, very large

3   computers.

4       Because they're so large, we can actually run smaller

5   computers within that same piece of very large hardware

6   computer.  And those are called "virtual machines" or "virtual

7   images."

8       So you can decide what type of computer you want to run on

9   your behalf, all housed in that one physical server.

10  Q.   This is labeled "hypervisor," and there is a label

11  "hypervisor" on there.  Can you explain what a hypervisor is?

12  A.   The hypervisor is, kind of, the brain of the physical

13  computer.  So it keeps track of how many virtual computers are

14  running on it, who owns those computers, who is leasing those

15  computers, what the configuration of those computers are.  It

16  actually helps isolate those computers so they are assigned to a

17  specific customer.

18  Q.   And then when we look at right-hand side, are those some of

19  virtual computers on the physical computer in this example?

20  A.   They are, and they're also examples of AWS services.

21  Q.   So the top two are labeled "EC2 instance."  What does that

22  stand for?

23  A.   EC2 stands for "Elastic Compute Cloud."  And so it is

24  Amazon's service, or AWS's service, to do the computing part of

25  the computer.  So computers have both a computing part and a

1  storage part.  This part is the computing part.

2  Q.    You said it stands for "Elastic Compute Cloud"?

3  A.    It does.

4  Q.    Does "elastic" refer to the fact these are scalable?

5  A.    Scalable, you can grow them, you can get rid of them, you

6  can include more, you can grow as the business grows, so it's

7  scalable, yes.

8  Q.    And I also see the word "instance."  What does "instance"

9  mean?

10  A.    Instance would be one -- one virtual computer is considered

11  an instance of EC2.

12  Q.    Is that largely an Amazon term?

13  A.    Yeah, but I think it's more widely adopted as well now.

14  Q.    Okay.  And then at the bottom we have something that does

15  not have a screen and is labeled "S3 bucket" --

16  A.    Uh-huh.

17  Q.    -- to what does that refer?

18  A.    So much like I said, when you think about computing,

19  there's the computing side and then the storage side.  "S3

20  bucket" stands for "Simple Storage Service."  Basically, you can

21  think about it as a hard drive or a place to store files,

22  images, anything you want to store up into the cloud.

23  Q.    And you've looked at Exhibit 104 before testifying?

24  A.    I have.

25  Q.    Would that help you explain the concept of a bucket?

Case 2:19-cr-00155-RSL Document 340 Filed 06/24/22, Page 27 of 201
Case 2:19-cr-00155-RSL Document 273 Filed 06/14/22, Page 30 of 201
Steve Schuster - Direct by Mr. Friedman          June 8, 2022          80

1   Q.   (By Mr. Friedman)  So what, in general terms, is a

2   firewall?

3   A.   So a firewall, essentially, is a gate or a gatekeeper to

4   determine what computers can connect.  So a firewall is thought

5   of a front side of the firewall and the back side of the

6   firewall.  The back side of the firewall represented in the

7   cloud here on the right-hand side are all the devices behind the

8   firewall that the firewall is protecting.

9        So the firewall is, essentially, a gate that controls what

10  computers can come and access those devices that sit behind it

11  that it's protecting, and who is allowed to do that.

12  Q.   Okay.  Is it fair to say it directs and monitors traffic?

13  A.   Yes.

14  Q.   Does a firewall allow all the traffic to pass through?

15  A.   Typically, no.

16  Q.   How does a firewall know what to do?

17  A.   The firewall is configured with rules.  We talked about IP

18  addresses earlier.  So a simple rule would be, this one IP

19  address is able to connect to every device that passes here, or

20  I might be able to say this one IP address can connect to no

21  computers that sit behind it.  So it controls that.  It's a

22  configuration.

23  Q.   Are there also more complicated rules?

24  A.   Oh, absolutely.

25  Q.   Does Amazon design and supply firewalls to customers?

1    those accounts to their employees.

2    Q.    Are user accounts generally assigned to members of the

3    public or people not associated with the client?

4    A.    Outside the customer --

5              MR. KLEIN:  Objection, Your Honor; calls for

6    speculation.

7              THE COURT:  Just in your general understanding.  You

8    can answer.

9         Overruled.

10   A.    Typically not, no.

11   Q.    (By Mr. Friedman)  Say someone is assigned a user account.

12   Does a user account start with any permission to do anything?

13   A.    If it's just a blank user account, no.

14   Q.    How does a person with user account get permission to do

15   things?

16   A.    The owner of the account who is setting up the user account

17   would then assign permissions to that and what they're allowed

18   to do, based on their needs.

19   Q.    What types of things might these permissions be?

20   A.    What services they can use in AWS, what resources they can

21   access, what data stores they can access.

22        So thinking about our previous example, they could be

23   assigned to use EC2 to launch or create new EC2 instances.  They

24   might also be able to access or not access buckets, S3 buckets

25   that we talked about earlier.

Case 2:19-cr-00155-RSL Document 340-5 Filed 06/24/23 Page 36 of 201
Case 2:19-cr-00155-RSL Document 273-7 Filed 06/24/22 Page 29 of 193
Steve Schuster - Direct by Mr. Friedman          June 8, 2022          86

1  Q.   Are you familiar with something called "the principle of

2  least privilege"?

3  A.   I am.

4  Q.   What is that?

5  A.   It's a way to think about how to only assign permissions

6  that are absolutely required to do the job for that account.

7  Q.   And why is that a principle that people talk about in the

8  computer-security business?

9  A.   It prevents the potential for abuse, if an account were to

10  be compromised or lost or otherwise.

11  Q.   Is it a little like need to know --

12  A.   Need to know, uh-huh.

13  Q.   Who decides what permissions a user account receives?

14  A.   The customer or the account owner.

15  Q.   Not AWS?

16  A.   Not AWS.

17  Q.   Now, that was the left-hand side of this chart.  The

18  right-hand side seems to refer to something called a "role."

19  What is a role?

20  A.   So a role is another way to assign permissions.  So where,

21  on the left side, the user account might be assigned to a

22  person, we also have a way to define groups of permissions or

23  roles.

24       So, for example, many employees in companies might wear

25  multiple hats.  So an employee might be part of the finance

Case 2:19-cr-00155-RSL Document 234 Filed 06/24/22 Page 37 of 201
Case 2:19-cr-00155-RSL Document 240 Filed 06/24/22 Page 87 of 201
Steve Schuster - Direct by Mr. Friedman          June 8, 2022          87

1    department, but also might be part of an audit department or
2    otherwise.  And so a role is a way to collect like permissions.
3    So you can say if you are part of the finance department, you
4    have permissions to access financial data, financial services,
5    et cetera, when you have that role.
6    Q.   Okay.  Why does it make sense to have that functionality or
7    that ability built into the system?
8    A.   It's much easier to configure correctly.  So, for example,
9    customers are able to think very concisely about what they want,
10   say, the financial people to be able to do, and then that can be
11   assigned to the users.
12        If we didn't have that, companies would have to think,
13   perhaps, about millions or thousands of users, and then think
14   about what department they're in, what access do they need.  It
15   would be higher prone to error.
16   Q.   Okay.  This diagram depicts a couple people next to the
17   role and a couple of computers or servers.  Why is that?
18   A.   So role -- people can assume a role.  So the example I used
19   was the finance department or a person assigned to the finance
20   department.  But also computers can be assigned a role.
21        And so, for example, a computer can say I need to be able
22   to access, say, an S3 budget to understand what my configuration
23   should be, what rules I should run under, or things like that.
24   And so they can assume a role to be able to access a specific
25   bucket for data that the computer needs to know and how to run.

1   Q.    When a customer creates a role, does it start with any

2   permissions or powers?

3   A.    It does not.

4   Q.    How does it get permissions or powers?

5   A.    The customer or account owner who created the role assigns

6   permission within that role.

7   Q.    And is that similar to the permissions we talked about for

8   user names and user accounts?

9   A.    Yes.

10  Q.    In your experience, for whom are roles generally created?

11  A.    Roles are typically created for people that have accounts

12  within a company.  And so for a large company, they would

13  understand all of their accounts that are within the company

14  domain, assigned to employees, and the computers they use, and

15  then they would think about assigning to those groups of people.

16  Q.    In your experience, are roles generally available or

17  assumable for members of the public not connected to a client?

18          MR. KLEIN:  Objection, Your Honor; calls for

19  speculation.

20          THE COURT:  In his experience.  He's not speculating.

21  He's giving his response on his experience.

22      The objection is overruled.  Go ahead.

23  A.    Typically not.

24  Q.    (By Mr. Friedman)  So down below that, we see the term

25  "role name."  What is a role name?

1          The left side is the computer that was used by the attacker

2     to get access to the logs -- or to the files themselves.

3          So the very first step that that computer would have done

4     was scanned or looked for a specific configuration of that

5     firewall that could potentially be exploited.

6     Q.   Okay.  So the computer communicated with the firewall?

7     A.   The computer, yeah, communicated with the firewall, and

8     then connected to it.

9          The second step was, once they were able to look for that

10    configuration of the firewall, they were then able to trick that

11    firewall into querying the Instance Metadata Service to give

12    up -- to give role credentials that could be assumed by the

13    firewall.

14    Q.   Okay.

15    A.   The third step is that, once the role credentials were

16    obtained and then passed through the firewall to the attacker,

17    then that firewall passed those role credentials back to the

18    attacker.  And then from there, the attacker was able to use

19    those credentials to access the S3 buckets.

20    Q.   Could that outside computer have communicated directly with

21    the Instance Metadata Service to get this information?

22    A.   No.

23    Q.   And why is that?

24    A.   There are security controls in place that requires only

25    instances running on the hardware to query the Instance Metadata

1    Service.

2    Q.   Okay.  You used the word "trick" a moment ago.  Why did you

3    use that?

4    A.   Because the firewall wasn't set up -- the firewall was

5    misconfigured.  It wasn't set up to pass requests from an

6    outside person to the Instance Metadata Service.

7    Q.   Okay.  And so why did the Instance Metadata Service respond

8    to the request?

9    A.   Because it thought that the request was coming from the

10   firewall -- by the firewall.

11   Q.   You talked about the fact that this resulted in the

12   credentials going to the outside computer, correct?

13   A.   Yes.

14   Q.   Does Exhibit 108 help you show what that computer was able

15   to do once it had those credentials?

16   A.   Yes.

17            MR. FRIEDMAN:  Government offers Exhibit 108.

18            MR. KLEIN:  No objection, Your Honor.

19            THE COURT:  108 is admitted in evidence and can be

20   displayed.

21            (Government Exhibit 108 admitted.)

22   Q.   (By Mr. Friedman)  What does Exhibit 108 show?

23   A.   So Exhibit 108, the bottom little cloud in the larger cloud

24   is what we were looking at within AWS.  That includes the

25   firewall and the EC2 instances.

Case 2:19-cr-00159-RSL Document 273 Filed 06/24/22 Page 101 of 201
Case 2:19-cr-00159-RSL Document 347-05 Filed 06/24/23 Page 101 of 191
Steve Schuster - Direct by Mr. Friedman                     June 8, 2022

101

1   instances"?

2   A.    Yes.

3   Q.    Why is that there?

4   A.    Because the AWS CLI can also access EC2 instances as well.

5   Q.    And would the role's permission determine what the attacker

6   could do with respect to EC2 instances?

7   A.    Yes.

8   Q.    And can you explain how that is?

9   A.    When you create a role, you create explicit permissions

10  that are allowed, and also explicit permissions that are denied

11  within that role.  So when you assume that role, it controls

12  what services you can use, what data you can access, what

13  buckets you can access or otherwise.

14        So absolutely, depending on the permissions assigned to

15  that role, controls what you can do.

16  Q.    Okay.  Are you aware of where within the United States

17  Capital One has data centers?

18  A.    Generally, yes.

19  Q.    I think I asked that incorrectly.

20        Are you aware of where AWS has its data centers?

21  A.    I am.

22  Q.    And are you aware, generally, of which of those data

23  centers Capital One's information is stored at?

24  A.    Generally, yes.

25  Q.    Can you tell us?

1  A.   It can allow access to anything you want it to allow access

2  to.  Typically, it's just for protected resources that you want

3  to make available.

4  Q.   To the public?

5  A.   To the public sometimes, yes.

6  Q.   Okay.  Would -- in your experience, have those been limited

7  resources, as opposed --

8  A.   Very limited resources and explicitly allowed.

9  Q.   Are there easier ways, if you want to set up to make

10 resources public, to do that than to proxy them through your

11 firewall?

12 A.   Absolutely.

13 Q.   Okay.  Are you aware of any instance in which a large

14 Amazon client has set up its firewall deliberately to allow

15 proxy into internal resources and data?

16 A.   I am not.

17 Q.   Did that contribute -- is that one of the reasons Amazon

18 was concerned that other customers might have this configuration

19 or misconfiguration?

20 A.   It is.

21 Q.   Okay.  What steps did Amazon take to alert other customers?

22 A.   Well, much like what the scanner -- the attacker did, we

23 created a scanner that looked across our customers specifically

24 looking for this configuration of this firewall to identify if

25 there were other customers that had a similar misconfiguration.

Case 2:19-cr-00085-RSL Document 437 Filed 06/24/23 Page 36 of 201
Case 2:19-cr-00085-RSL Document 273-7 Filed 06/24/23 Page 166 of 201
Steve Schuster - Direct by Mr. Friedman                    June 8, 2022                116

1    Q.    When you built that scanner, did you find other customers

2    with this configuration?

3    A.    We did.

4    Q.    And what did Amazon do once it found those customers?

5    A.    We reached out and notified them.

6    Q.    Okay.  Why did you notify each of those customers?

7    A.    Because at this point the -- the issue was more widely

8    known.  We were concerned for copycat attackers.  Once you know

9    of a security issue, it becomes easier to attack in the same

10   way.  And we also wanted to make sure that our customers

11   intentionally configured their firewalls to function that way.

12   Q.    Okay.  During the course of this case, did Amazon also

13   receive information about other customers that Ms. Thompson may

14   have accessed their computers?

15   A.    We did.

16   Q.    From whom did you receive that information?

17   A.    We received it directly from Capital One.

18   Q.    Okay.  And what did Amazon do with that list of customers?

19   A.    We also reached out to those customers.  I believe those

20   customers, we tried to initiate phone calls, as opposed to

21   emails or other types of connection.

22   Q.    To warn them that they appeared to have misconfigured

23   service?

24   A.    Yes.

25   Q.    Prior to the time that Ms. Thompson was arrested, was the

1   didn't know that.

2        All right.  So everyone can see this now just...

3   Q.   (By Mr. Klein)  Mr. Schuster, I want to talk to you for a

4   moment about credentials, which you testified earlier about.

5        Just to clarify, credentials aren't a user name, are they?

6   A.   Credentials are made up of a user name.

7   Q.   But it's not a user name like when you log into your email;

8   correct?

9   A.   It -- that's one part of a credential is a user name that

10  can be --

11  Q.   Is there a password associated with a credential?

12  A.   There is, typically, a password or a token or...

13  Q.   A token, right.

14       So what is associated with a credential, let's start there?

15  A.   So a credential would be a user name, which would be like

16  your email, or an authentication process, which can be a

17  password or a smart card or a token, another way to authenticate

18  the user.

19  Q.   Okay.  And a credential is not always assigned to a

20  specific person, is it?

21  A.   Correct.

22  Q.   And it can be shared; right?

23  A.   Yes.

24  Q.   And it can be even given -- the person who it's shared with

25  can have the ability to share with other people; correct?

1  A.   Yes.  It's not the best practice.

2  Q.   I'm not asking you if it's the best practice, but it can be

3  shared with other people?

4  A.   Yes.

5  Q.   And it can be shared with other services?

6  A.   Yes.

7  Q.   And it can be even shared with third parties?

8  A.   Yes.

9  Q.   Okay.  You testified about how authorized people can call

10  up IMS.  Do you recall that?

11  A.   Yes.

12  Q.   What is IMS again?

13  A.   Instance Metadata Service.

14  Q.   So that's what's on the bottom of Exhibit --

15       THE COURT:  I think it was.

16  Q.   (By Mr. Klein)  -- 103?

17  A.   It is.

18  Q.   All right.  And what is the Instance Metadata Service

19  again?

20  A.   It gives information about the instances that are running

21  on the computer, on the hardware.

22  Q.   Okay.  So in addition to people, can't any services on an

23  EC2 instance call up an IMS?

24  A.   Yes.

25  Q.   Okay.  And can't those same services or software call up on

1  query the service.

2  Q.    Let me phrase it in a different way, it was programmed to

3  allow external requests, how about that?

4  A.    Yes.

5  Q.    Okay.  So an outsider could make a request to that web

6  application firewall?

7  A.    Yes.

8  Q.    And Ms. Thompson's request was identified as an external

9  request; correct?

10  A.    Yes.

11  Q.    So Capital One's web application firewall operated as it

12  was programmed, it identified an external request and allowed it

13  to go forward?

14  A.    It identified the external request.  I can't speak to

15  whether it went through the firewall or stopped at the firewall.

16  Q.    But it was set up to permit external requests?

17  A.    That's what firewalls do.

18  Q.    Okay.  So other AWS customers could configure their web

19  application firewalls differently; right?

20  A.    Yes.

21  Q.    They can set up their firewalls not to allow certain types

22  of external requests; correct?

23  A.    Correct.

24  Q.    In fact, they can set up their firewalls to deny requests

25  from -- that come in through TOR; correct?

1   A.    Well, as a teenager, I attended 2600 meetings, technology
2   enthusiasts hacking community kind of thing.
3         And then at 18 I got my first tech support job at -- and
4   from there I was a NOC analyst or network operations center
5   analyst.  Then I was a Cisco -- like a Cisco VoIP engineer for a
6   little while.  And then I pivoted into information security
7   versus a vulnerability researcher; and then doing compliance,
8   which is much more general, and as an auditor for the payment
9   card industry at first, but other stuff later.
10  Q.    So you're self-taught with all your technology skills?
11  A.    Yeah.  And I had a friend of mine teach me Slackware when I
12  was 17, but, yeah, mostly.
13  Q.    And what do you do now?
14  A.    Right now I'm an independent consultant.  I consult a lot
15  of Bay Area companies, big companies, small startups, things
16  like that, on SOC2, HIPAA, PCI compliance, that sort of thing.
17  Q.    What do you help those companies do?
18  A.    I help them understand the data security standards for each
19  compliance regiment.  Mostly, I act as a translator for folks
20  that are engineers, like so I can identify what about their
21  current architecture doesn't meet standards, what they would
22  need to improve, gap assessments, things like that, as well as
23  teach like the lawyers of those organizations what these rules
24  mean and how it can affect them risk assessment-wise.
25              THE COURT:  So when you say SOC 2, what does that

1    interests, like hack freak, artist, that kind of thing.

2    Q.   In -- you know, around the summer of 2019, do you remember

3    just generally what kind of topics you were posting about?

4    A.   Yeah.  So I'd actually had my account -- kind of some

5    important context.  I had my Twitter account since 2009, but I

6    didn't really use it all that much until I -- I was working a

7    startup, quit my job, and decided that I wanted to do something

8    a little more artistic than technical that particular summer.

9    So I made -- I designed hacker shoes, and it's three shoes, and,

10   uhm -- that kind of celebrated the culture a little bit.  And I

11   knew that a lot of Infosec people and hacker people were on

12   Twitter, and that's where everybody kind of went to.  So even

13   though it wasn't my norm, I went on with the designs and said,

14   hey, if -- does anyone even like these mockups?  But if so, like

15   I'll make 'em, and if not, cool, but it gained some traction and

16   attention.

17        And so that's what I was doing on Twitter in the summer.

18   Q.   So it kind of increased your Twitter profile through

19   posting these shoes?

20   A.   Yeah.

21   Q.   And if someone had looked at the kind of things you were

22   posting about other than shoes, would it have been sort of

23   technical information, security type topics?

24   A.   Yeah, it would have been.  Yeah.

25   Q.   Around that time, you know, June 2019, did you receive any

Case 2:19-cv-00085-SFR/2020 Document 1734070 Filed 06/24/23, Page 180 of 201
Kristen Valentine - Direct by Ms. Manca                    June 8, 2022

150

1    Q.    So what's in the upper left-hand corner?

2    A.    Erratic.  That would be a display name that the user could

3    set for themselves.

4    Q.    And what about -- there's a photograph of a woman.  Did you

5    -- can you tell us what that photograph is?

6    A.    It's a photograph of a woman.

7    Q.    Did you recognize the person by sight?

8    A.    No.

9    Q.    And what's the name for that person on a Twitter profile?

10   A.    An Avatar or profile pic.

11   Q.    Can you tell us how you reviewed these messages as they

12   came in?

13   A.    Yeah.  Because I didn't really use Twitter, I didn't have

14   it like set up to notify me immediately when I got like messages

15   and stuff, it was more I'd check it once a day, especially since

16   there was a lot of traffic coming in from the shoes that I

17   posted.  So I didn't like live-check it or anything, like I

18   would just check messages once a day.  I mostly hung out on

19   Facebook.

20   Q.    So we're going to be going through some of these lines, you

21   know, one at a time.  But is that the way that you were

22   reviewing and receiving these messages, one line at a time?

23   A.    No.  No.  It would be like chunked, basically.  So it would

24   be like I'd, you know, hop on, and there was like a wall of

25   messages or wall of texts waiting.

1      MS. MANCA:  Agent, can you highlight the line, I'm

2  gonna dox myself.

3  Q.    (By Ms. Manca)  So we highlighted this line, I'm going to

4  dox myself.  Did you understand what it meant to dox?

5  A.    Yeah.  I'm going to drop information on myself.

6  Q.    And does dox typically have a public -- or, I'm sorry, a

7  positive or a negative connotation in technology?

8  A.    It typically has a negative connotation, but it's pretty

9  neutral -- used neutrally here.

10  Q.    What makes you say that it's used neutrally?

11  A.    The negative -- the negative context usually for the word

12  "dox" is usually a person, A, is dropping information like a

13  name, you know, a real name and a phone number, an address,

14  things like that, I mean, on person B, when person B wouldn't

15  want that kind of information dropped online, so that's why it

16  has a negative connotation normally.  But somebody dropping

17  information on themselves, consider it kind of neutral; right.

18      MS. MANCA:  Yeah.

19  Q.    (By Ms. Manca)  can we pull out of that and go to --

20  there's a link in here to a GitHub Gist.  Did you understand at

21  the time you received these messages what a GitHub Gist was?

22  A.    I know -- I knew what GitHub was, but I didn't know what a

23  gist was at the time.

24  Q.    Okay.

25  A.    Namely because I work in compliance, it's kind of the

1  softer side of Infosec, whereas GitHub is where a lot of coders

2  hang out, and I'm not a coder.

3  Q.   Can you tell us what your understanding was of GitHub?

4  A.   It's a -- it's a code -- it's a platform that allows coders

5  to have repositories of code.  That allows other coders to take

6  a look at the author's code and make -- make changes to it,

7  proposed changes.  And then the original author can approve

8  those things, and it goes into -- and that goes -- gets merged

9  into their repository.

10 Q.   Do you now know what a gist is?

11 A.   Yeah.

12 Q.   And what is it?

13 A.   It's similar to a paste bin where you can just put command

14 line text there quickly for somebody else to review, or maybe

15 even a couple-line script, something that doesn't need like

16 collaboration and change management, you can just paste it

17 there.

18        MS. MANCA:  Agent, can you go to the next page?

19 I'm sorry, same exhibit, but page down.

20 There we go.

21 Would you mind highlighting that first tweet?

22 Q.   (By Ms. Manca)  So this statement, jacked, and then the

23 link, all available S3 buckets, certs.

24 When you read that, did you understand what that meant?

25 A.   Yeah.  I understood jacked to mean like stole.  All

1   basically, I was just living my life at this point, and then I

2   blocked her.

3   Q.   Is that why it says you can no longer send messages to this

4   person?

5   A.   Yeah.

6   Q.   So you go about your life at this point after having

7   blocked her on Twitter?

8   A.   Yeah.

9   Q.   Do you think anything more about these messages at that

10  point?

11  A.   No.  Like I said, there's outlandish claims made on the

12  Internet all the time, so didn't really believe it, didn't click

13  on the links, so had no reason to take it seriously.

14  Q.   And at some point you go back and you revisit these

15  messages; is that right?

16  A.   Yeah, that's right.

17  Q.   Without getting into any conversations you had with other

18  people, can you tell us about how you went back and revisited

19  those messages?

20  A.   Yeah.  So about two weeks later, it was July 4th, and I

21  remember that because July 4th a friend of mine -- an old

22  associate of mine sent me a Twitter DM saying, hey, take a look

23  at this tweet.  And so it was like a public tweet.  And she's

24  like a bit of a gossip and things like that.  So I took a look

25  at the tweet and I said, hey, give me a crumb of context what

1  A.    I thought that it was a list of the different S3 buckets.

2  And I think at one point my associate and I even commented that

3  one says Cap One or something like this.  And, uhm, we both came

4  to the conclusion that this was legitimate.

5          MS. MANCA:  And so if we could scroll to the very last

6  page of this document, which is, I think, 47.

7          Agent, can you expand that last comment?

8          Thank you.

9  Q.    (By Ms. Manca)  Did you get to the end of this GitHub Gist,

10  what I've expanded on the screen right now?

11  A.    Yeah.

12  Q.    And is this part of the gist with all of those buckets or

13  is this something else?

14  A.    Yeah.  This is a -- this is a command.

15  Q.    And when you looked at this command, did you understand

16  what it did?

17  A.    I got the gist.  Did a little Googling on sync to make sure

18  it meant downloading, basically, and then concluded that

19  probably these S3 buckets were downloaded.

20  Q.    And which was the command that made you think it had been

21  downloaded?

22  A.    Sync.

23  Q.    S-y-n-c?

24  A.    Yeah.

25  Q.    So once that you realized that these buckets had probably

Case 2:19-cr-00159-RSL Document 273-7 Filed 06/24/23, Page 162 of 201
Case 2:19-cr-00159-RSL Document 127-7 Filed 06/24/23, Page 162 of 201
Kristen Valentine - Direct by Ms. Manca          June 8, 2022          162

1    A.    Yeah, it has --

2    Q.    You called them something else, rules of engagement?

3    A.    Rules of engagement, yeah.

4    Q.    Okay.  And then Out of Scope Vulnerabilities, what are

5    those?

6    A.    Out of scope -- it looked like -- so every -- every

7    disclosure program is usually -- it's different, it's usually

8    tailored to the organization, and there's like -- they're

9    generally the same, but they have little differences here and

10   there.  So out of scope is what that particular company

11   considers out of scope, they're not interested in, et cetera, or

12   they don't want you to do.  So, for example, like DDoSing their

13   servers or something, yeah.

14   Q.    And is there an email address at the very bottom?

15   A.    Yeah.

16   Q.    And is that the address that you emailed?

17   A.    Yep.

18   Q.    I'm going to call your attention, then, to Exhibit 201, if

19   we could publish that.

20         Is this the email that you sent to that email address?

21   A.    Yes.

22   Q.    Okay.  And what link were you sending them?

23   A.    So there were -- in total in the DMs, I think there were

24   like four or five links.  And it referenced other companies, but

25   this one is the one with the Capital One says three buckets.  So

1    I was just sending them the link relevant to them.

2    Q.    Okay.  And how quickly did you get a response back from

3    someone in Capital One?

4    A.    The next day.

5              MS. MANCA:  Okay.  And if you could call up Exhibit

6    202.

7    Q.    (By Ms. Manca)  Is this a copy of the email exchange that

8    you had with Capital One after they responded to you?

9    A.    Yeah.

10   Q.    And who is Kate Torelli?

11   A.    She's an employee at Capital One.  My understanding, I

12   could be wrong on this, is that she's like an incident response

13   manager.  But I could be wrong, I don't know.

14   Q.    And she's the one you spoke to?

15   A.    On the phone, yeah.

16   Q.    Okay.  And so how did you talk to Kate Torelli, which

17   methods of communication did you use?

18   A.    At first, she just emailed me back, as you can see at the

19   bottom there, saying we're looking into this, we have a couple

20   of questions.

21        I think I responded back with like a, yeah, I have time

22   this afternoon.  I gave my phone number, I think.

23        Either way, we ended up exchanging information; connecting

24   on the phone, sometime in the afternoon in my afternoon PSD,

25   so...

Case 2:19-cr-00159-RSL Document 340-5 Filed 06/24/23, Page 168 of 201
Case 2:19-cr-00159-RSL Document 73-5 Filed 06/24/22, Page 49 of 191
Kat Valentine - Cross by Mr. Hamoudi                June 8, 2022          168

```
1              THE WITNESS:  Okay.

2              THE COURT:  And then we'll let you go, okay?

3              THE WITNESS:  All right.  Thank you.

4              THE COURT:  Thanks for coming up.

5         I think it's safe to go out now.

6              (Court in recess 3:03 p.m. to 3:24 p.m.)

7              THE FOLLOWING PROCEEDINGS WERE HELD
               IN THE PRESENCE OF THE JURY:
8

9              THE COURT:  Okay.  Your cross-examination of

10   Ms. Valentine, Mr. Hamoudi?

11                       CROSS-EXAMINATION

12   BY MR. HAMOUDI:

13   Q.   Good afternoon, Ms. Valentine.  You thought this was a cry

14   for help, didn't you?

15   A.   I did later, yes.

16   Q.   Your Twitter profile, it had a link to your LinkedIn

17   profile?

18   A.   No, but I have a pretty unique name, so it's easy to search

19   on LinkedIn.

20   Q.   So your LinkedIn profile, I want to talk to you about your

21   professional background.

22   A.   Sure, yeah.

23   Q.   Okay.  All right.  And just for references, this profile is

24   used for professional networking and career development?

25   A.   Yes.
```

**ER-49**

 1    A.    I left in 2018.

 2    Q.    Where did you go?

 3    A.    Capital One.

 4    Q.    What job did you take at Capital One?

 5    A.    I took a role as deputy chief information security officer

 6    and vice president.

 7    Q.    And in general terms, what are your responsibilities?

 8    Well, when I say "what are," are you still at Capital One?

 9    A.    No, I left earlier this year.

10    Q.    Where did you go then?

11    A.    I now work for Meta.

12    Q.    Are you also involved in cyber security there?

13    A.    Yes.  I'm still a deputy chief information security officer

14    and head of security engineering for financial technologies

15    products.

16    Q.    And Meta is the company we all love that used to be

17    Facebook?

18    A.    Correct.

19    Q.    Is it fair to say you were at Capital One as the deputy

20    CISO from 2018 through early 2022?

21    A.    Correct.

22    Q.    In general terms, what were your responsibilities at

23    Capital One?

24    A.    It varied, but it included cyber architecture, mergers and

25    acquisition, our line of business, information security

```
                      UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,           )
                                    )
                   Plaintiff,       ) CASE NO. CR19-00159-RSL
                                    )
v.                                  ) Seattle, Washington
                                    )
PAIGE A. THOMPSON,                  ) June 9, 2022
                                    ) 9:00 a.m.
                   Defendant.       )
                                    ) JURY TRIAL, Vol. 3 of 9
_____

                   VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE ROBERT S. LASNIK
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:        ANDREW C. FRIEDMAN
                            JESSICA M. MANCA
                            TANIA M. CULBERTSON
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


  For the Defendant:        MOHAMMAD ALI HAMOUDI
                            NANCY TENNEY
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 98101

                            BRIAN E. KLEIN
                            MELISSA A. MEISTER
                            Waymaker LLP
                            515 S Flower Street, Suite 3500
                            Los Angeles, CA 90071



  Reported by:              Nancy Bauer and Marci Chatelain
                            Official Federal Court Reporters
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
```

2

INDEX

EXAMINATION OF                                            PAGE

MICHAEL FISK          DIRECT EXAMINATION cont.   6
                      BY MR. FRIEDMAN

                      CROSS-EXAMINATION          71
                      BY MR. HAMOUDI

                      REDIRECT EXAMINATION        98
                      BY MR. FRIEDMAN

                      RECROSS-EXAMINATION        103
                      BY MR. HAMOUDI

                      REDIRECT EXAMINATION       105
                      BY MR. FRIEDMAN

ZACHAREY HANSEN       DIRECT EXAMINATION         108
                      BY MS. MANCA

                      CROSS-EXAMINATION          120
                      BY MR. KLEIN

                      REDIRECT EXAMINATION       127
                      BY MS. MANCA

JOEL MARTINI          DIRECT EXAMINATION         129
                      BY MR. FRIEDMAN

                      CROSS-EXAMINATION          178
                      BY MR. HAMOUDI

JOSEPH ADAM BALEDA    DIRECT EXAMINATION         198
                      BY MS. CULBERTSON

                      CROSS-EXAMINATION          204
                      BY MR. KLEIN

Case 2:19-cr-00155-RSL Document 247-05 Filed 06/24/22, Page 50 of 207
Case 22-30145, 11/28/2022, ID: 12574105, DktEntry 12, Page 53 of 207
Michael Fisk - Direct continued by Mr. Friedman

10

1    that command.

2    Q.    Okay.  And let's look at Exhibit 204.

3          Is that the gist?

4    A.    Yes.

5    Q.    And if we look at the second page of that, what do you see

6    there?

7    A.    Those are a list of Capital One buckets from AWS, places

8    where data are stored.

9    Q.    Okay.  We'll come back to the details of it, but was there

10   also code in this gist?

11   A.    There was command lines that were executed.

12   Q.    And did that contribute to how you tried to replicate the

13   vulnerability?

14   A.    Yes.

15   Q.    Were you able to replicate what those command lines

16   indicated was the vulnerability?

17   A.    Yes.

18   Q.    Once Capital One had confirmed -- did that confirm the

19   vulnerability for you?

20   A.    Yes.

21   Q.    Once Capital One had confirmed that vulnerability, what did

22   it do?

23   A.    We needed to understand what made that command work.  We

24   confirmed vulnerability was there, but you need to understand

25   the nature for the vulnerability and how to fix it, and then fix

11

1   it.

2   Q.    And was Capital One able to do that?

3   A.    Yes.

4   Q.    By when had you confirmed the vulnerability and fixed it?

5   A.    The 18th.

6   Q.    So the day after this email came in?

7   A.    Yes.

8   Q.    And how did Capital One fix the vulnerability?

9   A.     In this case, we -- well, identified that there was a

10  misconfiguration on a WAF, a web application firewall, and we,

11  actually, just replaced that WAF with a new one, which was a

12  project that was under way anyway.

13  Q.    When you say "a new one," is this like my air conditioner

14  gets old and stops working, or is it more complicated than that?

15  A.     I mean, it's software, so it doesn't necessarily stop

16  working like your air conditioner.  But it was a different make

17  and model that we had selected and were in the process of

18  rolling out, and so we just went to that upgrade.

19  Q.    More quickly than it would have happened?

20  A.    Yes.

21  Q.    Okay.

22       In addition to -- we've gone partway through the thing, and

23  stopping this, was Capital One continuing to communicate with

24  Kat Valentine?

25  A.    Yes.

1  Q.   And what does the last line, the next Tweet say?

2  A.   Well, it says, "Their SSNs with full name and DOB," which I

3  interpret to mean there are Social Security numbers with full

4  names and date of births.

5  Q.   Was Capital One concerned when it received this attachment?

6  A.   Yes, very.

7  Q.   And why is that?

8  A.   Well, it indicates that there could be an exposure of our

9  customers' private data to the public.

10 Q.   As part of your investigation, was Capital One able to

11 confirm whether data had, in fact, been taken out of Capital

12 One?

13 A.   Yes.

14 Q.   And what was the answer?

15 A.   It was taken, yes.

16 Q.   By when did Capital One confirm that?

17 A.   On the 18th, I believe, we confirmed -- or the 19th, I

18 think, we confirmed that data was successfully taken, and then

19 on the 20th, we had identified that there were things like

20 customer privacy information in the data.

21 Q.   What did Capital One do once it had confirmed that?

22 A.   Well, several things, but one was to notify law

23 enforcement.

24 Q.   Do you recall, generally, what law enforcement you

25 notified?

1    A.    The FBI, I believe.

2    Q.    Okay.  By the time that Capital One notified law

3    enforcement on the 20th, did you believe you had identified the

4    person responsible for this?

5    A.    Yes; since the initial tip provided some strong

6    indications, yes.

7    Q.    Let's go to Exhibit 201, and tell me what you're calling an

8    "indication."

9    A.    So the URL, the link there to GitHub, the thing after

10   "GitHub.com" says "Paige Adele Thompson," and then, in GitHub,

11   posts are owned by a user, and that part of that URL is what has

12   the user name for the person who posted the information.

13   Q.    So did you believe it was someone named Paige Adele

14   Thompson?

15   A.    Certainly that was the hypothesis, given the name, yes.

16   Q.    Okay.  Did you or people working with you go to linked

17   sites, sites that were linked or connected to this GitHub site?

18   A.    Yes.

19   Q.    Where did you go?

20   A.    One of them was a link to GitLab, which is a similar sort

21   of publishing site.

22   Q.    Okay.  And from GitLab, was there anywhere particular that

23   you went?

24   A.    Yeah.  On that site, we found a resumé for Paige Thompson.

25   Q.    Would you take a look at Exhibit 206 and tell me if you

1    years.

2    Q.    And then above that, do you see the top section that talks,

3    I guess, about skills or proficiencies?

4    A.    Yes.

5    Q.    Let's look at the section related to AWS.  What are the

6    first three proficiencies listed there?

7    A.    S3, the Simple Storage Service; EC2, which is the elastic

8    computer virtual server service; and IAM, which is Identity and

9    Access Management service.

10   Q.    Okay.  Mr. Fisk, do you have an understanding, from your

11   work with the breach, of how this breach took place?

12   A.    Yes.

13   Q.    And in general terms, did it relate to misconfigurations or

14   configurations of different things at Capital One?

15   A.    Yes.

16   Q.    Were there two principal ones?

17   A.    Yes.

18   Q.    Would looking at Exhibit 111 -- this has not been offered

19   so it will just be on your screen -- would that help explain

20   your understanding?

21   A.    Yes.

22           MR. FRIEDMAN:  Government offers Exhibit 111.

23           THE COURT:  Any objection?

24           MR. HAMOUDI:  No, Your Honor.

25           THE COURT:  It is admitted and can be published.

1       (Government Exhibit 111 admitted.)

2   Q.   (By Mr. Friedman)  Mr. Fisk, this is titled "Web

3   Application Firewall."  What is a -- well, let's start with:

4   What's a firewall?

5   A.   A firewall is something that sits in the network and

6   screens traffic going across it and decides to permit traffic

7   that is meant to be delivered to what's behind the firewall and

8   to block traffic that could be malicious traffic or undesired

9   traffic.

10  Q.   And in this case, it says not just firewall but "web

11  application firewall."  Why is that?

12  A.   Web application firewall is a type of firewall that focuses

13  on web application.  So it looks at web traffic, specifically,

14  and decides to selectively forward web requests.

15  Q.   Okay.  So this diagram depicts two things between an

16  external device and the internal server or cloud.  Can you tell

17  us what each of those is and what its role is?

18  A.   Yes.

19       In front of the firewall, as we say, or to the left on the

20  diagram, is a thing called an elastic load balancer, which is

21  another AWS service that is used when you need to support a lot

22  of traffic for a popular site; for example.  You actually have

23  more than one internal server, they're identical, and more than

24  one WAF that are identical, and the load balancer just kind of

25  steers traffic evenly to the different WAFs and servers so that

1    they can keep up.

2    Q.    And then behind that, we see the web-facing server and WAF?

3    A.    Yes.

4    Q.    And how does the purpose of that differ from the load

5    balancer?

6    A.    So the load balancer just sort of directs the traffic to

7    the WAF.  The WAF makes that filtering/screening decision I

8    described, and then if it permits the traffic, it delivers it to

9    the internal server.

10   Q.    I'm going to ask you to look at Exhibit 107, and this has

11   been admitted.  Do you recognize that?

12   A.    Yes.

13   Q.    And does that explain what actually happened in this case?

14   A.    Yes.

15   Q.    Okay.  Can you walk me through that, step by step?

16   A.    Yeah.  So the firewall here, which is the same as the WAF

17   in the previous picture, is what had the configuration issue,

18   and it allowed a specially formed request from the client, on

19   the left here, to go through the firewall and be proxied or

20   relayed to the Instance Metadata Service on the lower right.

21   Q.    Okay.  Can I stop you there for a second and ask, are you

22   familiar with something called a port?

23   A.    Yes.

24   Q.    Is what is a port?

25   A.    So computers are identified on the Internet by IP

Case: 22-30001, 05/23/2023, DktEntry: 34.1, Page 60 of 207
Case 2:19-cr-00155-RSL Document 241 Filed 06/24/22, Page 20 of 207
Michael Fisk - Direct continued by Mr. Friedman
20

1   addresses, and then on an individual computer, you can have

2   multiple ports or services running.  And so the port is what

3   lets you direct traffic to a particular piece of software or

4   service on a computer.

5   Q.   Okay.  You said you can have multiple ports on an IP

6   address; is that correct?

7   A.   Yes.  A computer can be both a web server and an email

8   server, for example.

9   Q.   So how would being both a web server and an email server,

10  how does relate to the concept of ports?

11  A.   So the web server listens on one port; for example, 443 is

12  the port used for encrypted web traffic, customarily.  And an

13  email server would listen on port 25, which is the standard port

14  for email delivery.

15  Q.   So the same computer but listening in two different

16  directions or ways?

17  A.   Yes.

18  Q.   How many different ports can there been on a computer?

19  A.   65,000, roughly.

20  Q.   64,000 --

21  A.   64,000, yeah.

22  Q.   All right.  In this case, did the misconfiguration relate

23  to a particular port?

24  A.   Yes.

25  Q.   And to which port did it relate?

1 A.   443.

2 Q.   To your knowledge, were the other ports on this server --

3 or firewall configured correctly?

4 A.   Yes.

5 Q.   And port 443, I think you said it relates to web traffic.

6 Does it relate to some, or all web traffic?

7 A.   It is the primary port used for encrypted web traffic, so

8 if you ever see "https" in the URL, it's likely going over port

9 443.

10 Q.   Is there a different port for unencrypted web traffic?

11 A.   Yes.  Port DD is the standard port for that.

12 Q.   What was the effect of misconfiguration?

13 A.   The effect was that a specially formed request to the

14 firewall would get proxied or relayed, on the requester's

15 behalf, to a destination of the requester's choosing.

16 Q.   Okay.  And in this case, what destination was that?

17 A.   The Instance Metadata Service.

18 Q.   Are external computers supposed to be able to communicate

19 to the Instance Metadata Service?

20 A.   No.

21 Q.   What happened when the communication reached the Instance

22 Metadata Service?

23 A.   It was delivered as a web protocol request, and the

24 Instance Metadata Service responded.

25 Q.   And why did the Instance Metadata Service respond?

1   A.   It viewed the request as coming from the local system, from

2   the firewall, and that is -- the one and only kind of request

3   the Metadata Service will answer to is a request from the local

4   computer.

5   Q.   So it misinterpreted the source of the request?

6   A.   Yes.

7   Q.   Once it did that, what did the Instance Metadata Service

8   do?

9   A.   It fulfilled the request.

10  Q.   Okay.  And can you tell us what fulfilling the request

11  meant?

12  A.   Well, in this case, the first request was to return the

13  name of the role being used by the firewall, and so it did.

14  Q.   Okay.  And after it did that, what happened next?

15  A.   Well, there was a subsequent request that asked for a copy

16  of the key, the credential used to authenticate that role.

17  Q.   And when that information was returned, first the name of

18  the role and then the credentials, where did those go?

19  A.   Those went back to the client computer, on the left here,

20  under Ms. Thompson's control.

21  Q.   Okay.  So that's one configuration, the configuration of

22  the firewall.

23       To what did the second configuration relate?

24  A.   It relates to what information the key that was stolen had

25  access to.

1  Q.   When you say "key," to what are you referring?

2  A.   The role credential.  So the way the computer will identify

3  itself as being the firewall, in this case, is a key or a

4  credential.

5  Q.   To what kind of data does a firewall normally need to have

6  access?

7  A.   It would be to have access to its own configuration

8  information and ability to write logs for what it sees.

9  Q.   Do firewalls generally need access to bank customer credit

10  information?

11  A.   No.

12  Q.   Did this credential have permission to read, at least, some

13  customer and credit information?

14  A.   Yes.

15  Q.   Would you look at Exhibit 108, which has been admitted, and

16  tell me if that helps explain what happened next?

17  A.   Yes.

18  Q.   How is that?

19  A.   So once Ms. Thompson had the key for the WAF and could

20  impersonate the WAF, she could use that key directly to access

21  the AWS S3 service -- AWS makes that service available on the

22  Internet to anyone with the right key -- and could access, and

23  she did access the data directly from S3 at that point.

24  Q.   Okay.  I'm going to refer -- the gist that you saw,

25  originally, on the Internet.  I'm going to refer to that as the

1    Exhibit 204?

2    A.    Yes.

3              MR. FRIEDMAN:  The government offers Exhibit 205.

4              MR. HAMOUDI:  No objection.

5              THE COURT:  205 is admitted.

6                   (Government Exhibit 205 admitted.)

7    Q.   (By Mr. Friedman)  Mr. Fisk, I'm going to ask you to relate

8    some of the things in this document to the methodology you just

9    described with those diagrams.

10   A.    Okay.

11   Q.    And if we could focus on the top, say, eight to ten lines.

12         In the top right-hand corner, do you see a date?

13   A.    Yes.

14   Q.    And can you tell us what that date is that you see?

15   A.    Yeah.  The 21st of April 2019.

16   Q.    Okay.  And then if we drop down a couple lines to the first

17   full line, there is a line that has the second word "CURL"?

18   A.    Yes.

19   Q.    What does "CURL" mean?

20   A.    CURL is a command line tool that you can use to submit web

21   requests.

22   Q.    And when you say "web requests," what does a "web request"

23   mean?

24   A.    You probably would think of a web browser, where you make a

25   web request.  This is a command line tool that lets you sort of

1  do that a little bit more manually.  But, basically, submit

2  something to the web server asking it to return something.

3  Q.   The next line starts with the word "proxy."

4  A.   Yes.

5  Q.   And then "https," and then a whole bunch of digits.  Can

6  you tell us what -- what does "proxy" mean there, first?

7  A.   Yeah.  This is an option in the curl command that says send

8  your traffic through a proxy.

9  Q.   Okay.  And does this line tell you where the traffic is

10  going first?

11  A.   Yes.  The statement right after "dash, dash, proxy" is the

12  system to be used as the proxy.

13  Q.   Okay.  And are you familiar with -- this, basically, the

14  first four numbers there, 35.162.65.136, are you familiar with

15  what that is?

16  A.   Yes.

17  Q.   What is that?

18  A.   That was an IP address that belonged to AWS but was used by

19  Capital One at the time for one of our web applications, and it

20  relayed the load balancer and WAF in front of it.

21  Q.   Okay.  And is that the one that has the misconfiguration?

22  A.   Yes.

23  Q.   And then there's a colon and the number 443.  What does

24  that mean?

25  A.   That is saying that the proxy is on port 443.

1    Q.    Okay.  To use that channel to communicate?

2    A.    Yeah, to use port 443 to talk to the proxy.

3    Q.    So if this command is asking or instructing it to go to

4    that web address at that channel as a proxy, does it say where

5    it wants to go after that?

6    A.    Yeah, that's the line after that.

7    Q.    Can you explain, I guess, the beginning of that line?

8    A.    Yeah.  So that line and a little bit of the fourth line is

9    a URL, like you would see in a web browser, that is being

10   requested.  In this case, the server that's being accessed is

11   the 169.254.169.254 address.

12   Q.    Do you know what 169.254.169.254 is?

13   A.    Yeah.  In an AWS environment, that is how you talk to the

14   Instance Metadata Service.

15   Q.    Okay.  Does this command also say or instruct what is to be

16   done when it gets to the Instance Metadata Service?

17   A.    Yes.  The rest of the line describes the action being

18   requested.

19   Q.    Okay.  Before we go into that:  Should an external computer

20   be able to get to the Instance Metadata Service in this way?

21   A.    No.

22   Q.    And why is that?

23   A.    Well, it enables attacks like this, so the Instance

24   Metadata Service only accepts traffic locally, and you work hard

25   to ensure that there is no way to relay traffic to a Metadata

1   Service.

2   Q.    What command of this code instruct to happen when the

3   traffic gets to the Instance Metadata Service?

4   A.    In this case, it is requesting a copy for the security

5   credential for the ISRM-WAF-Role.

6   Q.    What is the ISRM-WAF-Role?

7   A.    Well, I'll explain the acronym first, I guess.

8         "ISRM" is the old name for the Cyber Organization at

9   Capital One, Information Security Risk Management team.  "WAF,"

10  as we've described, is Web Application Firewall.  So this is a

11  role that was designed to be used exclusively by the WAFs.

12  Q.    By firewalls?

13  A.    Yes.

14  Q.    Now, can you tell anything from the fact that this command

15  includes the name of that role?

16  A.    Yes.  You would need to have done something before this to

17  identify the name of that role.

18  Q.    So already to have internal access?

19  A.    Yes.

20  Q.    Is the name of that role even something that was generally

21  public at the time?

22  A.    No.

23  Q.    And I think you said this command asks for the credentials

24  for that role; is that correct?

25  A.    Yes.

1    Q.    And then are you aware if this particular command

2    succeeded?

3    A.    I think if you scroll to the right, you can see an error

4    column that will tell you whether or not it succeeded, and this

5    one did not.

6    Q.    Why do you say that?

7    A.    In the error message column, you can see the response, "You

8    are not authorized to perform this operation."

9    Q.    When you say that was the response, was that a response

10   that would have been sent to Ms. Thompson?

11   A.    Yes.

12   Q.    So she would have received that text saying, "You are not

13   authorized"?

14   A.    I believe so.

15   Q.    If we go back to column Q and scroll down, are you able to

16   tell from that whether the majority of the commands that

17   Ms. Thompson entered failed or succeeded?

18   A.    Yes.  It looks like the majority failed.

19   Q.    And I see the message, "You are not authorized to perform

20   this operation," in a lot of these rows.

21   A.    Yes.

22   Q.    Are there some rows, specifically, the bottom one, and then

23   the rows that follow, that have slightly different text?

24   A.    Yes.

25   Q.    Scrolling to the right, what is that text?

1  A.   Well, rows 48 through 53 is just a different form of
2  not-authorized message.
3  Q.   Okay.  And would that be text that would have gone to
4  Ms. Thompson?
5  A.   I believe so.
6  Q.   Okay.  The language that this role is not authorized to
7  perform whatever the command is?
8  A.   Yeah.  That's meant to be an error message delivered to the
9  user.
10  Q.   Can we go back and look at the dates in column A, and I
11  want to focus on the period from March 22nd to March 23rd.
12  There should be ten rows.
13      Do you see that list of ten rows that took place between
14  March 22nd and March 23rd?
15  A.   Yes.
16  Q.   What commands was Ms. Thompson issuing during that period?
17  A.   Get caller identity, describe instance, several list-bucket
18  commands.
19  Q.   What does "get caller identity" ask a computer to do?
20  A.   It tells you the name that corresponds to the credential
21  that you have, sort of a who-am-I command.
22  Q.   Okay.  Is that information as having the ability -- let's
23  go to the right and see if those commands succeeded.
24  A.   The lack of an error message tells me the get caller
25  identity, for example, succeeded.

1    Q.    Would that be enough information that Capital One would be

2    interested in having a responsible disclosure, that someone had

3    been able to do this and get this information?

4    A.    Yes.  Just getting a credential stolen outside of our

5    environment alone would be definitely something that we'd want

6    to know about and act on.

7    Q.    Did Capital One receive a reasonable disclosure about this

8    in March of 2019?

9    A.    No.

10   Q.    The other commands here listed in that two-day window are

11   list-buckets primarily; is that correct?

12   A.    Yes.

13   Q.    And what does list-buckets do, again?

14   A.    This corresponds to things like we saw before, where it

15   will just return a list of the Capital One buckets that can be

16   seen by that role and credential.

17   Q.    And did those commands succeed?

18   A.    Yes.

19   Q.    Now, does Capital One have other logs that tell what was

20   going on during this period, things that are not reflected in

21   this particular chart?

22   A.    Yes.  There's a second type of log that AWS provides that's

23   higher in volume, and so it's provided separately, called

24   "CloudTrail data event logs," and we used those in the

25   investigation as well.

```
1    the AWS customer.
2    Q.   So I'm going to ask the question again.  "Yes" or "no,"
3    wasn't Capital One's server's response to Ms. Thompson's curl
4    command "okay"?
5    A.   She received an "okay" response, yes.
6    Q.   Okay.  And that's from the server; correct?
7    A.   AWS Instance Metadata Service.
8    Q.   And it could have responded forbidden or unauthorized?
9    A.   Yes.
10   Q.   And if Ms. Thompson set her --
11            MR. HAMOUDI:  Let's go back to the top where -- http
12   169, yes, if you could zoom that up.
13   Q.   (By Mr. Hamoudi)  and you gave some testimony about the
14   http -- and what is http?
15   A.   It's the Hypertext Transfer Protocol.  We think of it as
16   the protocol for the web.
17   Q.   And it doesn't have an S after the P; correct?
18   A.   Correct.
19   Q.   And that distinction is important; correct?
20   A.   It can be.
21   Q.   And why is that distinction important?
22   A.   So http without the S implies that the traffic is not
23   encrypted.
24   Q.   Okay.  So if Ms. Thompson set her web browser to use
25   Capital One's web access firewall as a proxy, couldn't she have
```

1    A.   It was all encrypted as it was stored.  And additionally, a

2    lot of the information is further tokenized or encrypted.  But

3    what was taken was taken in decrypted form.

4    Q.   So the data that was taken, before it was taken, it was not

5    encrypted; correct?

6    A.   No.  It was encrypted and stored encrypted in S3.

7    Q.   Okay.  But the data, the content, the substance of the data

8    was not encrypted; correct?

9    A.   No, it was encrypted.

10   Q.   Which data was encrypted?

11   A.   All of it.

12   Q.   Okay.  Are you dis- -- is there a distinction between

13   tokenized and encrypted?

14   A.   Yes.

15   Q.   Okay.  You're not aware that Ms. Thompson ever used or

16   shared Capital One's data with anybody; correct?

17   A.   I'm not aware of that, that she did, no.

18   Q.   Okay.  And if Capital One learned of that, they would have

19   immediately informed regulators; correct?

20   A.   Correct.

21   Q.   And she didn't have to decrypt the data as she took it;

22   correct?

23   A.   S3 decrypted it for her because she had the credential.

24   Q.   Okay.  And you're not -- strike that.

25        I want to go back and talk about the data, since we're on

```
1    that.
2         No credit card account numbers or login credentials were
3    compromised; correct?
4    A.   Correct.
5    Q.   And over 99 percent of the Social Security numbers were not
6    compromised; correct?
7    A.   Correct.
8    Q.   And the largest category of information was routinely
9    collected information; correct?
10   A.   I'm not sure what you're referring to by "routinely
11   collected."
12   Q.   Routinely collected in the course of business, name,
13   address, phone number, date of birth; correct?
14   A.   Yeah.  I mean, I would say all of this information was
15   collected in the course of business.
16   Q.   Okay.  And then when we talk about data, the total number
17   of data was -- it was upwards of 1.7 terabyte; correct?
18   A.   Yes, something -- it was large, yeah.
19   Q.   Okay.  So when we're talking about data, the 1.7 terabyte,
20   how much of that data was the data that is represented on
21   Exhibit 715?
22   A.   In terms of storage space, it was probably a relatively
23   small fraction.  Some of the individuals -- you know, an
24   individual's name, for example, may have occurred multiple times
25   in multiple files, so this is a unique count per person.
```

1    Capital One to change this configuration so that it was no
2    longer available or -- to anyone; correct?
3    A.    Our discovery of the actions, yeah.
4    Q.    Okay.  And so between March 12th, when I believe the first
5    access was -- you testified to on a log, until July, other than
6    Ms. -- other -- was there anybody else that let Capital One know
7    that its servers were accessible?
8    A.    No.  The only notice we received was that note.
9    Q.    Okay.
10   A.    Sorry, the responsible -- the email note from Kat Valentine
11   I'm referring to.
12   Q.    Ms. Thompson could not see the data before she downloaded
13   it; right?
14   A.    She could see file names, she could not see what was in the
15   file.
16   Q.    And Ms. Thompson did not -- okay, that's fine.  Let me move
17   to the next.
18        The gist file, do you remember looking at the gist file?
19   A.    Yes.
20   Q.    You mentioned personally reviewing the gist Ms. Thompson
21   posted onto GitHub; correct?
22   A.    Yes.
23   Q.    And it was easy for Capital One to reproduce the
24   vulnerability with the information Ms. Thompson provided on
25   GitHub; right?

```
 1         I --
 2    Q.    No, that it was accessible --
 3    A.    Would the public have known that there was -- that there
 4    was a vulnerability where someone could get the credentials, is
 5    that what you're asking?
 6    Q.    Yes.
 7    A.    Sorry.  Don't mean to be obtuse.
 8    Q.    You're not being obtuse.  I think I'm just not asking a
 9    very clear question.
10    A.    I will grant that.
11    Q.    I will take responsibility for that.
12          All right.  You discussed the keypair on direct.  Do you
13    remember that?
14    A.    Yes.
15    Q.    Okay.  The keypair does nothing without permission from the
16    server; right?
17    A.    Creating a keypair is creating a permission.
18    Q.    But the server does that; correct?
19    A.    The server will execute a keypair creation request if an
20    authorized user presents a credential that allows them to do so.
21    Q.    I guess the computer doesn't make a distinction between
22    authorized and unauthorized, it doesn't assess motive; correct?
23    A.    Correct; it just assesses, do you have the credential --
24    Q.    And then if you have them, it will give them to you?
25    A.    If you have a credential that has permission to create a
```

1   A.    Correct.

2   Q.    And in 2020, do you recognize this document, this is an

3   annual report issued by Capital One?

4   A.    Yes.

5   Q.    Okay.  I want to turn your attention to a term on the next

6   page up top.  And in that report, it describes a cyber security

7   incident; correct?

8   A.    Yes.

9   Q.    And what does it say?

10  A.    It says Cyber Security Incident:  The unauthorized access

11  by an outside individual who obtained certain types of personal

12  information relating to people who had applied for our credit

13  card products and to our credit card customers that we announced

14  on July 29th, 2019.

15  Q.    Okay.  And then if you go to the next page, and in the

16  yellow, if you can read that out loud, the two paragraphs?

17  A.    Yes.  Sorry.  Governmental Inquiries, sort of a heading

18  font.  We have received inquiries and requests for information

19  relating to the cyber security incident from Congress, federal

20  regulators, relevant Canadian regulators, the Department of

21  Justice, and the offices of approximately 14 state Attorneys

22  General.  We are cooperating with these offices and responding

23  to their inquiries.

24        The second paragraph says, In August 2020, we entered into

25  consent orders with the Federal Reserve and the OCC resulting

 1   from regulatory reviews of the cyber security incident and

 2   relating to ongoing enhancements of our cyber security and

 3   operational risk management processes.  We paid an $80 million

 4   penalty to the U.S. Treasury as part of the OCC agreement.  The

 5   Federal Reserve agreement did not contain a monetary penalty.

 6           MR. HAMOUDI:  Okay.  And then mark next Exhibit 1008.

 7        Offer 1008.

 8           MR. FRIEDMAN:  Your Honor, I think we've already

 9   offered that same document this morning.

10           THE COURT:  I don't know that you actually offered it.

11   You used it, but you didn't, so...

12           MR. FRIEDMAN:  We certainly have no objection.

13           THE COURT:  It's the content; right?

14           MR. HAMOUDI:  Yes, yes.

15           THE COURT:  1008 will be admitted into evidence, sure.

16               (Defense Exhibit 1008 admitted.)

17   Q.   (By Mr. Hamoudi)  And if you go to the second page, the

18   annual report referenced a consent decree.  Do you recall the

19   $80 million penalty?

20           THE COURT:  Yeah.  We just heard that.

21           MR. HAMOUDI:  Oh, yes.  Okay.

22   Q.   (By Mr. Hamoudi)  And go -- just reread the first

23   paragraph, please, Article II, number 1.

24   A.   Right.  Under the part where it says, The bank neither

25   admits or denies the following?

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE.

_____

)
UNITED STATES OF AMERICA,          )
                                   ) CASE NO. CR19-00159-RSL
                    Plaintiff,     )
                                   ) Seattle, Washington
v.                                 )
                                   ) June 10, 2022
PAIGE A. THOMPSON,                 ) 9:02 a.m.
                                   )
                    Defendant.     ) JURY TRIAL, Vol. 4 of 9
                                   )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiff:        ANDREW C. FRIEDMAN
                            JESSICA M. MANCA
                            TANIA M. CULBERTSON
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101

  For the Defendant:        MOHAMMAD ALI HAMOUDI
                            NANCY TENNEY
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 90071

                            BRIAN E. KLEIN
                            MELISSA A. MEISTER
                            Waymaker LLP
                            515 S Flower Street, Suite 3500
                            Los Angeles, CA 90071


  Reported by:              Nancy Bauer and Marci Chatelain
                            Official Federal Court Reporters
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101

INDEX

EXAMINATION OF                                                    PAGE

MATTHEW PELAGGI        DIRECT EXAMINATION        5
                       BY MR. FRIEDMAN

                       CROSS-EXAMINATION         16
                       BY MR. HAMOUDI

CHRISTOPHER CHAN       DIRECT EXAMINATION        23
                       BY MS. CULBERTSON

                       CROSS-EXAMINATION         36
                       BY MR. KLEIN

VINCENT KENNEY         DIRECT EXAMINATION        40
                       BY MR. FRIEDMAN

                       CROSS-EXAMINATION         75
                       BY MR. KLEIN

                       REDIRECT EXAMINATION      88
                       BY MR. FRIEDMAN

                       RECROSS-EXAMINATION       90
                       BY MR. KLEIN

WAYMON HO              DIRECT EXAMINATION        91
                       BY MS. MANCA

1   Q.   And are you -- do you work on that business?

2   A.   Yes.  I'm the product owner for that product still.

3   Q.   What is a product owner?

4   A.   We prioritize futures from customers, resolve customer

5   bugs, and work with the development teams to produce a better

6   product.

7   Q.   Okay.  What business did you say that Apperian was in?

8   A.   Apperian is a mobile application management company.

9   Q.   Okay.  So who -- what type of person would be an Apperian

10  customer?

11  A.    It's usually enterprise companies that want to distribute

12  their applications -- their internal applications to their

13  employees, and they don't want them to be listed in the public

14  stores.

15  Q.   So is this for companies that are not supplying computers

16  or phones to their employees, the employees are bringing their

17  own, kind of bring your own device?

18  A.   Yeah, if it's a BYOD or bring your own device companies

19  that are using this software.

20  Q.   Okay.  And what service does Apperian provide to those

21  companies?

22  A.   Apperian provides a portal that allows administrators to

23  upload their applications there and apply different things to

24  them.

25        And then we also provide a -- what we call an app catalog.

1  It's basically like the Apple App Store or Google Play store,

2  but it's branded and internal only and delivers applications to

3  their employees.

4  Q.   Okay.  So if I worked for IBM, if I worked for IBM, and if

5  IBM were a customer of yours, I could go to this app store and

6  download apps that would let me do whatever my job is?

7  A.   Yeah.  If you were at IBM, people would provide you a link

8  to download the app store, and then you'd have access to all the

9  internal applications that your company wanted you to have

10  access to.

11  Q.   And then does Apperian provide ongoing support and records

12  of which employees have downloaded what versions of what app and

13  help them use it?

14  A.   Yes.

15  Q.   Mr. Pelaggi, how long have you been at, let's say, Apperian

16  and then its successors?

17  A.   Since 2015.

18  Q.   Are you aware of a breach that took place in 2019?

19  A.   I am.

20  Q.   Okay.  And where does Apperian -- how does Apperian do its

21  own computing?  Does it have any relationship with AWS?

22  A.   Yes.  We have most of our services on AWS.

23  Q.   Okay.  What's your understanding of the breach?

24  A.   My understanding is that on our servers we use products by

25  a company called Apache, specifically something called Apache

Case: 22-36061-00169-42520 23-10-12-07-2347-05-File-06/24/22 Page 88 of 212

1   httpd, which monitors like communications that go into the

2   server and responds accordingly.

3   Q.   Can I slow you down a moment?

4   A.   Yes.

5   Q.   Because, among other people in the room, there's a court

6   reporter in front of you who has to take down what you and I

7   say.  And if you speak a little more slowly, it will make that

8   easier.

9   A.   Yes.

10  Q.   Okay.

11          THE COURT:  And if you spoke English instead of

12  whatever you're saying, that would be nice, too.

13  Q.   (By Mr. Friedman)  Okay.  So --

14          THE COURT:  You used a lot of abbreviations.  It would

15  be great if you could just sort of slowly tell us what they

16  mean.

17          THE WITNESS:  Absolutely.

18      So Apache is basically an open-source company that provides

19  software for different companies to use.

20  Q.   (By Mr. Friedman)  Okay.  And so Apperian used Apache

21  software?

22  A.   Yes.  We have web servers that host our data and things

23  like this, and we used Apache products on that server.

24  Q.   Okay.  And there was a particular part of the Apache

25  products that was involved in this?

1   A.    Yes.  So when we configured Apache on our servers, we used

2   the default configuration recommended by them.  And there's a

3   module on there called mod_proxy.

4   Q.    Okay.  So let me slow you up again.

5         So what is a default configuration?

6   A.    Just out of the box, like if you were to set up your phone,

7   just like how it is set up by default without making any

8   changes, is what we did with the modules we installed via

9   Apache.

10  Q.    Okay.  Okay.  And I cut you off.

11  A.    No, that was it.

12  Q.    All right.  And so you -- the company used the default

13  configuration for, what was this product?

14  A.    It's called Apache httpd.

15  Q.    Okay.  And how did that relate to the breach?

16  A.    It's my understanding that that specific module called

17  mod_proxy was exploited in some way to gain access to our AWS

18  system, and then retrieved credentials.

19        And once those credentials were retrieved --

20  Q.    Can I stop you again?  What do you mean by credentials?

21  A.    It's basically user name and password or some other form of

22  allowing our servers to verify that you're a user who has

23  access.

24  Q.    And then what happened once the credentials were retrieved?

25  A.    Once the credentials were retrieved, data from our

1  databases were taken, as well as our source code and things like

2  that.

3  Q.    Okay.  Did -- do you know how Apperian first learned that

4  this had happened?

5  A.    We -- one of our employees had just seen an article posted

6  that showed a list of companies that were possibly impacted by a

7  data breach and just the name Apperian was in the list.

8  Q.    Okay.  And once Apperian found out that there was a victim

9  or possible victim of this, did it take any steps relating to

10  mod_proxy?

11  A.    Yes.  We went back and removed mod_proxy from our

12  configurations on our servers.

13  Q.    Okay.  And what did changing the configuration mean?

14  A.    Just removing the mod_proxy module from the configuration.

15  Q.    Did that take away the method of access that had been used?

16  A.    Yes.

17  Q.    Have you reviewed some data in this case?

18  A.    I have.

19  Q.    Okay.  And was that data provided by the FBI to your

20  company?

21  A.    It was.

22  Q.    What's your understanding of what the source was of that

23  data?

24  A.    The source of that data was basically taking information

25  from our AWS account, so our database and our source code.

1   Q.   Did Ms. Thompson have any business relationship or

2   employment relationship with Apperian?

3   A.   Not that I'm aware of.

4   Q.   Did Apperian intend for her to have access to its code and

5   all of its data?

6   A.   We did not.

7   Q.   Did Apperian intend for her to have access to its

8   computers?

9   A.   No, we did not.

10  Q.   Did Apperian intend for her to have access to any

11  credentials to use those computers?

12  A.   No, we did not.

13  Q.   Did Apperian ever authorize her to use its computers or

14  access them or take data?

15  A.   No.

16       MR. FRIEDMAN:  Thank you.  I have no further

17  questions.

18       THE COURT:  Mr. Hamoudi will ask you some questions

19  now on behalf of Ms. Thompson.

20                    CROSS-EXAMINATION

21  BY MR. HAMOUDI:

22  Q.   Good morning, Mr. Pelaggi.

23  A.   Good morning.

24  Q.   In March 2019, didn't Apache's website state that you

25  should not enable your proxy until your server is secured?

1   downloaded; correct?

2   A.   Correct.

3   Q.   And you don't even know whether she viewed it; correct?

4   A.   No, I don't.

5   Q.   Okay.  So I want to kind of walk you through the process

6   that you went through looking at the data.

7              MR. HAMOUDI:  Can we bring up defense marked next in

8   order, Defense Exhibit 1015?

9   Q.   (By Mr. Hamoudi)  So you were provided a file by the United

10  States Attorney's Office; correct?

11  A.   Correct.

12  Q.   And I put up on the screen an Excel spreadsheet.  Do you

13  recognize this spreadsheet?

14  A.   I do.

15  Q.   And this spreadsheet represents what?

16  A.   Different servers in our systems and different backups of

17  those -- the data on those servers.

18  Q.   Okay.  So let's go back to Exhibit, I believe it was, 720,

19  which is previously admitted.

20       And so I'm going to walk you through this.  The Excel

21  spreadsheet that I just --

22              MR. HAMOUDI:  I move to admit the Excel spreadsheet,

23  Your Honor.

24              THE COURT:  1015, Defense Exhibit 1015 --

25              MR. FRIEDMAN:  No objection, Your Honor.

1

2            THE COURT:  Please have a seat up here.

3            THE CLERK:  If you could please state your first and

4    last names, and spell your last name for the record.

5            THE WITNESS:  Sure.  I'm Christopher Chan, C-h-a-n.

6            THE COURT:  And, Mr. Chan, you can either leave your

7    mask on or take it off while you testify, totally your call,

8    okay.

9            THE WITNESS:  All right.  Thank you.

10           THE COURT:  Okay.  Go ahead, Ms. Culbertson.

11                         DIRECT EXAMINATION

12   BY MS. CULBERTSON:

13   Q.   Good morning, Mr. Chan.

14   A.   Good morning.

15   Q.   Where do you currently work?

16   A.   I currently work at a company called Forcepoint.

17   Q.   Okay.  And what is your title there?

18   A.   I am the VP of engineering for the SSE division.

19   Q.   What does SSE stand for?

20   A.   SSE stands for Secure Service Edge.

21   Q.   In 2019, where were you working?

22   A.   I was working at Bitglass.

23   Q.   Bitglass.

24        And when was Bitglass founded?

25   A.   Bitglass was founded in 2013.

1   Q.   Was Bitglass eventually acquired by Forcepoint?

2   A.   Yes.

3   Q.   Okay.  And when did that happen?

4   A.   That happened October of 2021.

5   Q.   Okay.  So you formerly worked for a company known as

6   Bitglass, it's now part of a company called Forcepoint?

7   A.   That is correct.

8   Q.   Okay.  Just for clarity, ease of reference, I'm just going

9   to refer to Bitglass for the rest of my questioning, if that's

10  okay?

11  A.   Yep.

12  Q.   And where are you currently based?

13  A.   Campbell, California.

14  Q.   And what does or did Bitglass do?  What kind of business is

15  it?

16  A.   We provided software for cloud security.

17  Q.   Okay.  And can you expand on that a little bit?  What do

18  you mean by cloud security?

19  A.   So companies who have, you know, moved applications into

20  the cloud, traditionally like email or storage or other

21  applications into the cloud, we provide tools and applications

22  to help them secure those applications with additional policies

23  and procedures that allows them to be more compliant within

24  their industry.

25  Q.   Okay.  And what does your particular job entail at

1    how much data was taken?

2    A.    Yes.

3    Q.    Was it a lot of data, a little data?

4    A.    It was not a lot of data.

5    Q.    Not a lot of data.

6         Was the data that was copied and taken important to

7    Bitglass?

8    A.    Important in the respect with respect to its operational

9    data and it being private data, but it had no value externally

10   other than internal operational use.

11   Q.    So no external market value; is that fair to say?

12   A.    Correct.

13   Q.    Okay.  So you talked a little bit about the vulnerability

14   that allowed this to happen, that essentially a request -- is it

15   fair to say that an external request was able to reach the

16   Instance Metadata Service?

17   A.    That is correct.

18   Q.    And you said the Instance Metadata Service is intended to

19   be private, it's not intended to be accessible externally?

20   A.    That is correct.

21   Q.    Okay.  And are you aware how the Instance Metadata Service

22   was contacted?  Was it --

23   A.    Yes.

24   Q.    -- a particular technology?

25   A.    Because the -- one of the features of our product, which is

1    a cloud security product, is a proxy, right.  And so from a

2    feature standpoint, our customers use our application, and where

3    they would proxy their request through Bitglass so that policies

4    and data retention and things like that can be enforced.  And

5    the instance or instances that the request went through for this

6    vulnerability allowed a -- the proxied request to use that

7    vulnerability and use the instance metadata interface

8    unknowingly.  That is not how it was meant to be done.

9    Q.    Okay.  Not how it was meant to be done.

10        So if I'm understanding what you said in layman's terms,

11   essentially your product -- your application does allow for some

12   Proxy Requests to pass?

13   A.    That is correct.

14   Q.    But it did not intend for Proxy Requests to pass to the

15   Instance Metadata Service?

16   A.    Correct; it was meant to be passed through the application

17   so that policies could be enforced.

18   Q.    Okay.  And once you figured out this problem that external

19   requests were being proxied to the Instance Metadata Service,

20   did you fix it?

21   A.    Yes, we did.

22   Q.    What permissions -- turning back to the s3_logrotate_role

23   that we've been talking about, what permissions were associated

24   with that role specific to those S3 buckets we've been talking

25   about?

1  told you that they came from Ms. Thompson's computer.  Isn't it
2  true that Ms. Thompson couldn't see this data until it was
3  downloaded onto her computer, she could just see the titles of
4  the -- the formatting titles?
5  A.   That is correct.
6  Q.   And you don't even know whether she ever viewed this data,
7  do you?
8  A.   I do not.
9  Q.   And isn't it also true that Ms. Thompson didn't need to
10 decrypt any of this data to view it, if she had viewed it?
11 A.   That is correct.
12 Q.   Now, you said -- you testified earlier that the only way to
13 view this data -- and you -- excuse me, I'm going to paraphrase
14 because it was long, but there was a VPN, a jump box, a
15 multifactor authentication.  Do you remember testifying to that?
16 A.   Yes, I do.
17 Q.   But that wasn't the only way, was it, because Ms. Thompson
18 got this data; right?
19 A.   It was not intended for users to see the data through that
20 method.
21 Q.   Okay.  I'm not asking what was intended, I'm asking, was it
22 the only way.  There was actually two ways, wasn't there?
23 A.   There was, yes.
24 Q.   Now, are -- you talked about -- is it your conclusion that
25 this was an SS -- sorry, I'll say this slower.

1  Q.  So we're going to run through all of these steps, but first

2  I want to talk to you about the concept of anonymization.

3       What kind of records are available when one computer

4  connects to another computer over the Internet?

5  A.  There's information that gets saved when that happens.

6       At a network level, that type of packet information could

7  be logged.  If you're talking about connection information

8  between two computers, especially if you're sending information

9  to, for example, a web server or a different server, that server

10  can see which IP address you're coming from; other information

11  such as, you know, what device you came from, what time, and

12  other things like that.

13  Q.  Are there ways to anonymize or disguise where you're coming

14  from on the Internet?

15  A.  There are.

16  Q.  What are some of those ways?

17  A.  One of the more common ones is a VPN, or a Virtual Private

18  Network.  What that allows you to do is to connect to a VPN

19  server through an encrypted means, usually, and allow your

20  computer to simply forward that traffic to the VPN server, in

21  which that VPN server would then forward your traffic to

22  wherever you're trying to go.

23  Q.  Is there anything illegal about using a VPN?

24  A.  No.

25            MS. MANCA:  Can you display Exhibit 112 without

Case 2:19-cr-00085-RSL Document 342 Filed 06/24/23 Page 117 of 232
Case 2:19-cr-00085-RSL Document 273-7 Filed 06/24/23 Page 93 of 192
Waymon Ho - Direct by Ms. Manca                    June 10, 2022          117

1    then identify where to route it to, and that data will be sent
2    to the recipient.
3    When the recipient receives the data, it will see that it came
4    from a VPN server, but it may not know where it came from
5    originally.
6    So that recipient will send data back to the VPN server, and
7    once the VPN server receives that response, it will know to
8    route it back to the client or host computer.
9    Q.    So what does the server on the far right know about the
10   computer on the far left, in terms of its IP address or
11   identity?
12   A.    It doesn't know anything.  It only knows that it came from
13   a VPN server.
14   Q.    Do you know what iPredator is?
15   A.    Yes.
16   Q.    What is it?
17   A.    It's a type of VPN service.
18   Q.    So where would a VPN service like iPredator be depicted on
19   this diagram?
20   A.    It would be depicted in the middle, in that cloud
21   environment.
22   Q.    How many people are using the same iPredator IP addresses?
23   A.    I don't know the answer to that, but typically, with a VPN
24   server, there are anywhere ranging from dozens to hundreds to
25   thousands per server.

1    A.    Yes.

2    Q.    And there's, in that second line, "I'm like iPredator, TOR,

3    S3 on all of this."  What did you interpret that to mean based

4    on your review of Ms. Thompson's devices?

5    A.    So what I see here is that she is using this method of her

6    device connecting to an iPredator VPN, through that iPredator

7    VPN connection connecting to TOR, and then from there, using TOR

8    to connect to Amazon Web Services.

9              MS. MANCA:  I think that's probably a good place to

10   stop.

11             THE COURT:  We're going the take our lunch break a

12   little earlier because I have some scheduling matters to go over

13   with the lawyers.  Go ahead and take a little extra time.  I'll

14   ask you to be back by 1:20.  So be back at Judge Pechman's

15   courtroom at 1:20.

16                   THE FOLLOWING PROCEEDINGS WERE HELD
                      OUTSIDE THE PRESENCE OF THE JURY:
17

18             THE COURT:  Mr. Friedman, you had a couple of items

19   you wanted to bring up?

20             MR. FRIEDMAN:  Your Honor, I think one has been

21   resolved.

22        What that does leave is, two of the government's witnesses

23   next week will be testifying remotely, and I think both parties

24   agree about that, but we think it would be helpful to have, on

25   the record, Ms. Thompson's agreement or waiver of her right to

1    this means is it's taking a list of all of the IP addresses

2    associated with Amazon Web Services.  This is a document that's

3    publicly accessible and available to the public and provided by

4    Amazon.

5         And what this proxy scanner is doing here is there's a

6    script that will, you know, take the IP addresses.  There's

7    approximately 37 million, and it will scan -- it will run those

8    IP addresses through a scanning script.  And what this scanning

9    script will do is it will search that IP address, either at a

10   specific port number or elsewhere, and it will identify at the

11   very base level if it can talk to the Instance Metadata Service.

12   Q.   Okay.  I'm actually going to stop you there because we're

13   going to unpack that a little bit.

14        But what you just described, where is that on the

15   demonstrative, is that at the top line?

16   A.   Yes.

17   Q.   Okay.  How many IP addresses did Ms. Thompson scan?

18   A.   I'm unsure, but she had access to approximately 37 million.

19   Q.   Where did she find those 37 million IP addresses?

20   A.   They appeared to have been taken from the public-facing

21   Amazon documentation that provides these IP addresses.

22   Q.   So there's a record somewhere of 37 million IP addresses

23   that's publicly available?

24   A.   Yes.

25   Q.   Okay.  And what do all those IP addresses have in common?

1   step, where you're obtaining information about the IAM Role.

2           MS. MANCA:  Can we go to Exhibit 808, please?

3   Q.   (By Ms. Manca)  So this is a different IP address for a

4   different user.  Where is this AMI ID in the whole process we've

5   just talked about?

6   A.   This would be kind of around the first steps where you are

7   just checking to see -- using your proxy scanner to see if you

8   can even talk to the metadata service.

9   Q.   And the next page, this is the second step?

10  A.   Yes.

11  Q.   Getting the IAM info?

12  A.   Yes.

13          MS. MANCA:  Can we go to the third page?

14  Q.   (By Ms. Manca)  This is from aws_commands.  What kind of

15  activity is happening in this data field?

16  A.   So the first line is to --

17          MR. KLEIN:  Your Honor, can we ask them to blow it up

18  further?

19          THE COURT:  Yeah, it's hard to read.

20          MR. KLEIN:  We can't see anything.

21          MS. MANCA:  Boy, I don't know that we can.  The

22  document cam might work.  With these long txt files, it's

23  difficult to zoom in, but we'll do our best.

24          THE COURT:  That's better.

25  Q.   (By Ms. Manca)  So we'll start on this side and move slowly

```
                   UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
   _____

   UNITED STATES OF AMERICA,        )
                                    )
                    Plaintiff,      ) CASE NO. CR19-00159-RSL
                                    )
   v.                               ) Seattle, Washington
                                    )
   PAIGE A. THOMPSON,               ) Jane 13, 2022
                                    ) 10:35 a.m.
                    Defendant.      )
                                    ) JURY TRIAL, Vol. 5 of 9
   _____


                   VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE ROBERT S. LASNIK
                 UNITED STATES DISTRICT JUDGE
   _____

   APPEARANCES:


    For the Plaintiff:      ANDREW C. FRIEDMAN
                            JESSICA M. MANCA
                            TANIA M. CULBERTSON
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101


    For the Defendant:      MOHAMMAD ALI HAMOUDI
                            NANCY TENNEY
                            Federal Public Defender's Office
                            1601 5th Avenue, Suite 700
                            Seattle, WA 98101

                            BRIAN E. KLEIN
                            MELISSA A. MEISTER
                            Waymaker LLP
                            515 S Flower Street, Suite 3500
                            Los Angeles, CA 90071


    Reported by:            Nancy L. Bauer, CRR, RPR
                            Marci Chatelain, CRR, RPR, RMP, CCR
                            Official Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov
```

2

INDEX

EXAMINATION OF                                          PAGE

WAYMON HO            DIRECT EXAMINATION       4
                    continued
                    BY MS. MANCA

                    CROSS-EXAMINATION        20
                    BY MR. KLEIN

                    REDIRECT EXAMINATION     46
                    BY MS. MANCA

                    RECROSS-EXAMINATION      52
                    BY MR. KLEIN

CLINT POPETZ         DIRECT EXAMINATION       60
                    BY MS. CULBERTSON

                    CROSS-EXAMINATION        84
                    BY MR. HAMOUDI

ERIC BRANDWINE       DIRECT EXAMINATION       89
                    BY MS. MANCA

                    CROSS-EXAMINATION        95
                    BY MR. KLEIN

JOHN ROUNDY          DIRECT EXAMINATION       98
                    BY MS. MANCA

                    CROSS-EXAMINATION        113
                    BY MR. KLEIN

                    REDIRECT EXAMINATION     115
                    BY MS. MANCA

GEORGE CHAMBERLIN    DIRECT EXAMINATION       122
                    BY MS. CULBERTSON

                    CROSS-EXAMINATION        151
                    BY MR. KLEIN

Case 2:19-cr-00159-RSL Document 243-5 Filed 06/24/22 Page 28 of 150
Case 2:19-cr-00159-RSL Document 173 Filed 06/14/22 Page 99 of 160
Waymon Ho - Cross by Mr. Klein                           June 13, 2022                28

1    A.    Yes.

2    Q.    And are you aware that both are installed by default on

3    Apple computers, laptops?

4    A.    Yes.

5    Q.    And people use proxy servers all the time, too?

6    A.    That's correct.

7    Q.    And people use Linux all the time?

8    A.    That's correct.

9    Q.    So all the tools you've testified that Ms. Thompson used

10   are tools or programs that people use regularly:  Linux, Curl,

11   SSH, recording commands?

12   A.    Yes.

13   Q.    Now I want to talk for a moment about the demonstrative

14   exhibits or the explanatory exhibits.  Remember, at the

15   beginning of your testimony, which was a while ago because we

16   had a weekend, Friday afternoon, you gave an explanation of

17   certain common terms or certain things that you believe happened

18   in this case, how things worked.  Do you remember that?

19   A.    Yes.

20   Q.    Did you create all those exhibits?

21   A.    I assisted with creating them, but I did not create them

22   personally, no.

23   Q.    But you believe they're accurate?

24   A.    Yes.

25   Q.    Stepping back for a moment, what did you rely on to form

```
1   Q.   Yes.

2   A.   I have.

3   Q.   Did you ever seize any cryptocurrency?

4   A.   We did not seize cryptocurrency, but the private keys were

5   there.

6   Q.   But no cryptocurrency has been seized?

7   A.   Not to my knowledge, no.

8   Q.   Okay.

9        And would running the cryptomining software that you talked

10  about with the prosecutor, would that -- that would not

11  interfere -- sorry.  Let me step back and say it a different

12  way.

13            MR. KLEIN:  Got to find the question, Your Honor.  I'm

14  sorry.

15            THE COURT:  It's okay.

16  Q.   (By Mr. Klein)  As part of your investigation, you ordered

17  Amazon Web Services abuse reports, right?

18  A.   Not me personally, but, yes, through our investigation, we

19  did.

20  Q.   And they showed no mining, correct?

21  A.   I can't speak to that because I didn't review them; other

22  FBI members did.

23  Q.   Are you aware from other FBI members that there was no

24  mining shown?

25  A.   I mean, not to my knowledge.  I don't know.
```

1    Q.    For this case, thank you, yes.

2    A.    So both of the methodologies for both scanning and for

3    cryptocurrency mining are related because, in order to get to

4    the cryptocurrency mining part, that sort of scanning activity

5    has to occur, and then the multiple steps after the fact, you

6    know, authenticating and deploying the miners, that's what makes

7    the cryptocurrency miners relate to this case.

8    Q.    So the path between stealing data and cryptocurrency

9    mining, where does that path diverge?

10   A.    That path diverges kind of at the very end.  So once

11   Ms. Thompson had access after scanning, after getting the role

12   name, after authenticating, and figuring out the permissions,

13   that is where it diverges, whether there's data taken or

14   cryptocurrency miners are deployed, or both, in some cases.

15   Q.    What determines whether there's going to be cryptocurrency

16   mining, data theft, or both?

17   A.    I would say it would be dependent on the permissions of

18   that specific IAM Role.

19   Q.    What is a "credential"?

20   A.    So a credential is used to authorize in a system.

21   Typically, when you think of a credential, you think of it as a

22   combination of a user name and a password.  In other cases, it

23   may be a key and a secret access key.  It may also pertain to,

24   for example, the public key and private key authentication used

25   for SSH.

1   A.    It may, along with some other factors, yes.

2   Q.    What about an increase, higher-than-normal usage on an

3   account?

4   A.    Yes.

5   Q.    So when you're talking about certain instance types that

6   could potentially be indicative of cryptomining, what kind of

7   instances does that generally involve?

8   A.    Instances that have higher-capacity compute power, like P

9   family, "P" as is "Paul," P3; G family, "G" as in "golf."  We

10  will see those used for cryptomining as well; and sometimes C, C

11  family, as in "Charlie," those are general compute, efficient

12  compute instances sometimes are used in cryptomining as well.

13  Q.    I believe you said "P family."  You mentioned "family."  So

14  does that mean these instances come in different configurations

15  or different sizes?  What does that mean?

16  A.    They do.

17        So there's many different types of instances, which is

18  virtual computing power in the cloud, so to speak.  So you

19  launch an instance.  Those instances, depending upon your use

20  case or your workload, you can choose from over 100 different

21  types of instances to be most effective for the job that you

22  want to accomplish.

23        So AWS calls its instances by families.  P is one family,

24  and so it may be, for instance, P316 extra large.  That may

25  refer to the third generation of the P family, and then the

1    top of the instance billing hour, yes.

2    Q.    Okay.  Let's go look at column K.  What does column K show?

3    A.    That's the instance usage and, usually, in instance hours.

4    Q.    And column L?

5    A.    Those would be the charges.

6    Q.    So we see some charges that are highlighted in yellow, and

7    then others that have a minus symbol in front of them.  What do

8    those show?

9    A.    Those would show either credits or refunds back to the

10   customer.

11   Q.    Okay.  So because we saw the account number ending in

12   0924 -- that's Survox's account number -- does this spreadsheet

13   reflect billing information for that customer?

14   A.    Yes.

15   Q.    Having reviewed this spreadsheet, are there indicators that

16   might cause you to suspect anomalous account behavior, as we

17   discussed earlier?

18   A.    Yes.  The "P3."  If the customer would not normally use P3,

19   they are a high-capacity instance, that would be an indicator.

20   And then, potentially, the region, if the region wasn't normally

21   used by the customer, that would be another indicator.

22   Q.    Do you know, did AWS consult with Survox about this usage?

23   A.    Yes.

24   Q.    Why were billing adjustments ultimately made for Survox in

25   these months?

1   A.   AWS verified, through communication with the customer and

2   also through the indicators that I've just discussed, and

3   reached a business decision to reimburse the customer for the

4   unintended use.

5        So this would be -- there was a process for communicating

6   with the customer, verifying that the account has been

7   sanitized, meaning that it's not still compromised, and then we

8   will -- a billing adjustment was made based upon that decision.

9   Q.   Do you know, based on this spreadsheet, about how much was

10  made in billing adjustments, either refunded or credited to

11  Survox?

12  Q.   I'm sorry.  Can you ask that question again?

13  A.   Based on this spreadsheet, do you know about how much was

14  refunded or credited to Survox?

15  A.   Total, with Survox, from about -- close to $60,000 were the

16  billing adjustments.

17  Q.   So when Amazon refunds, for instance, usage, does it have

18  out-of-pocket costs for providing that resource that then is not

19  covered?

20  A.   Yes, we do.

21  Q.   And that's just out-of-pocket costs.  So we're not talking

22  about lost profit; we're just talking about costs to Amazon?

23  A.   That's correct.  That's just how much it costs Amazon to

24  run the resource.

25  Q.   In the case of Survox in March and April of 2019, about how

```
                     UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON AT SEATTLE
     _____

     UNITED STATES OF AMERICA,        )
                                      )
                       Plaintiff,     ) CASE NO. CR19-00159-RSL
                                      )
     v.                               ) Seattle, Washington
                                      )
     PAIGE A. THOMPSON,               ) June 14, 2022
                                      ) 9:05 a.m.
                       Defendant.     )
                                      ) JURY TRIAL, Vol. 6 of 9
     _____

                     VERBATIM REPORT OF PROCEEDINGS
                BEFORE THE HONORABLE ROBERT S. LASNIK
                    UNITED STATES DISTRICT JUDGE
     _____

     APPEARANCES:


       For the Plaintiff:       ANDREW C. FRIEDMAN
                                JESSICA M. MANCA
                                TANIA M. CULBERTSON
                                United States Attorney's Office
                                700 Stewart Street, Suite 5220
                                Seattle, WA 98101


       For the Defendant:       MOHAMMAD ALI HAMOUDI
                                NANCY TENNEY
                                Federal Public Defender's Office
                                1601 5th Avenue, Suite 700
                                Seattle, WA 98101

                                BRIAN E. KLEIN
                                MELISSA A. MEISTER
                                Waymaker LLP
                                515 S Flower Street, Suite 3500
                                Los Angeles, CA 90071


       Reported by:             Nancy L. Bauer, CRR, RPR
                                Marci Chatelain, CRR, RPR, RMP, CCR
                                Official Federal Court Reporter
                                700 Stewart Street, Suite 17205
                                Seattle, WA 98101
                                nancy_bauer@wawd.uscourts.gov
```

Case: 22-9361-00169-4  2520 23  Document 167 34 5  Filed 06/24/22  Page 67 of 193

```
1                    (Off the record.)

2          THE COURT:  Why don't we do this, let's do -- let's

3    bring the jury back about 10 of 11:00, we'll do -- the

4    government will rest its case, the defense will do a couple of

5    virtual witnesses, and depending on how far we get, maybe I'll

6    send the jury home at noon and we'll use this afternoon to go

7    over the legal issue, finalize the issue of the AWS contracts,

8    and finish up the testimony tomorrow, and maybe either do

9    instructions and closings Wednesday, or maybe just do them

10   Thursday, give you a little time to get organized, and maybe

11   even finish up the remote witnesses today and then do -- you

12   have some time to think about the Professor Halderman and

13   whether Ms. Thompson will testify, kind of play it by ear there.

14   But I'll give you tonight to do that for sure.

15         MR. HAMOUDI:  Thank you, Your Honor.

16      I would just -- the Rule 29 also at some point would be

17   handled today, is the Court...

18         THE COURT:  What's Rule 29?

19         MR. HAMOUDI:  Once the government rests, we would file

20   for --

21         THE COURT:  Oh, your motions on the -- the legal

22   motions, yeah.

23         MR. HAMOUDI:  Yeah, just orally -- orally -- I orally

24   have to make a record.

25         THE COURT:  Yeah.  Thank you for not calling them
```

**ER-106**

1   halftime motions.  That's one of my pet peeves.

2      Sure, after they -- after they rest -- well, why don't we

3   do this, Mr. Friedman, go ahead and rest your case, then you can

4   note your motions to dismiss at the end of the government's case

5   and just sort of summarize them, and then we'll take our break.

6      Is the government ready to rest its case?

7          MR. FRIEDMAN:  We are, Your Honor.

8          THE COURT:  All right.  The government has rested its

9   case.

10      Mr. Hamoudi, you want to make your motions under Rule 29?

11          MR. HAMOUDI:  Yes, I do, Your Honor.

12      Your Honor, just based on the evidence that the government

13   has presented, I do want -- I want to raise two Constitutional

14   objections.  One's fair notice and the second is the First

15   Amendment.

16      And in recent years, the Supreme Court has confronted

17   attempts by the government to shoehorn misconduct into

18   ill-fitting federal criminal statutes.  The Supreme Court has

19   repeatedly rejected government's attempts to expansively read

20   criminal statute, to creatively reach conduct the government

21   characterizes as bad faith.

22      And, for example, one of those cases is *Bond v. United*

23   *States*, and that's at 572 U.S. 844.  And that case, the Chemical

24   Weapons Convention Implementation Act was used to reach a wife

25   who attempted to injure her husband's lover by spreading

1    chemicals on a car door, a mailbox, and a doorknob.

2         And more recently, the government attempted to creatively

3    apply the same wire fraud statute here in *Kelly v. United*

4    *States*, and that's 140 S.Ct. 1565.  And in *Kelly*, public

5    officials changed the direction of traffic entering New York

6    City as political retribution, the so-called Bridgegate scandal.

7    And the Supreme Court there reasoned that the loss to the victim

8    of any services was only incidental, and the time and labor from

9    the employees rerouting the traffic were just the implementation

10   costs of this scheme, not the object.  And the court cautioned

11   there, Your Honor, it cautioned allowing the federal government

12   to use the wire fraud statute to accomplish a sweeping expansion

13   of federal criminal jurisdiction.

14        And part of the problem, Your Honor, with creative and

15   novel application of federal criminal liability is that it runs

16   afoul of the fair notice that due process requires.  A statute

17   must give ordinary people notice to say that they can understand

18   clearly what conduct is prohibited and prevent arbitrary and

19   discriminatory enforcement.  If not, the statute is void for

20   vagueness as applied, not -- not facially, but as applied.

21        And as applied to the facts here, Your Honor, the

22   government's theory undermines fair notice.  Nobody anywhere,

23   anywhere in the country has been prosecuted for wire fraud for

24   doing what Ms. Thompson has done in this case, which was nothing

25   more than research, downloading, computers that allowed access

1    to their resources and data.  Her acts are indistinguishable

2    from what academics and researchers do every day right now.  And

3    -- and so that is the conduct at issue.

4         And the other thing is this, Your Honor, unlike the highly

5    regulated commodities markets, the stock market, the SEC, all of

6    these you have to have licenses, you go through -- the

7    government has incredible oversight over these industries.  This

8    is not an industry that is regulated.  It is like the wild west.

9    These strange rules about registering with HackerOne and how you

10   approach people.  Companies are paying people money, they pay

11   money for them to show that the customer's information is not

12   safe or it's been downloaded, and they enter into nondisclosure

13   agreements.

14        You know, researchers come in all shapes and sizes and they

15   come from all stations in life.  And this is the first case,

16   again, where these laws are being applied in a manner that they

17   are, and that in and of itself, we contend, is a notice

18   violation.  There was no case in 2019, a published case that

19   said, you do this, you violate the CFA Act and you violate the

20   wire fraud.

21        Now, I want the Court -- I want to make arguments on the

22   access device fraud and aggravated identity theft because I

23   think there is literally no -- those counts should not be going

24   to the jury, Your Honor.  The government's evidence failed to

25   show that Ms. Thompson knowingly and with the intent to defraud

Case 2:19-cr-00159-RSL Document 265 Filed 06/24/22 Page 1 of 193
Case 22-30015, 02/13/2023, ID: 12673465, DktEntry: 10-4, Page 11 of 138

1

```
               UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,       )
                                ) CASE NO. CR19-00159-RSL
              Plaintiff,         )
                                ) Seattle, Washington
v.                               )
                                ) June 15, 2022
PAIGE A. THOMPSON,               ) 9:07 a.m.
                                )
              Defendant.         ) JURY TRIAL, Vol. 7 of 9
                                )
_____


              VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE ROBERT S. LASNIK
             UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:     ANDREW C. FRIEDMAN
                         JESSICA M. MANCA
                         TANIA M. CULBERTSON
                         United States Attorney's Office
                         700 Stewart Street, Suite 5220
                         Seattle, WA 98101


  For the Defendant:     MOHAMMAD ALI HAMOUDI
                         NANCY TENNEY
                         Federal Public Defender's Office
                         1601 5th Avenue, Suite 700
                         Seattle, WA 98101


                         BRIAN E. KLEIN
                         MELISSA A. MEISTER
                         Waymaker LLP
                         515 S Flower Street, Suite 3500
                         Los Angeles, CA 90071


  Reported by:           Nancy L. Bauer, CRR, RPR
                         Marci Chatelain, CRR, RPR, RMP, CCR
                         Official Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         nancy_bauer@wawd.uscourts.gov
```

INDEX

EXAMINATION OF                                          PAGE

MATTHEW ORTIZ          DIRECT EXAMINATION        11
                       BY MR. KLEIN

                       CROSS-EXAMINATION         14
                       BY MS. MANCA

SETH EDGAR             DIRECT EXAMINATION        16
                       BY MR. KLEIN

                       CROSS-EXAMINATION         20
                       BY MS. CULBERTSON

TIM CARSTENS           DIRECT EXAMINATION        26
                       BY MR. HAMOUDI

                       CROSS-EXAMINATION         33
                       BY MS. MANCA

ALEX HALDERMAN         DIRECT EXAMINATION        34
                       BY MR. KLEIN

                       CROSS-EXAMINATION         76
                       BY MS. MANCA

                       REDIRECT EXAMINATION      95
                       BY MR. KLEIN

                       REDIRECT EXAMINATION      101
                       BY MR. KLEIN

                       RECROSS-EXAMINATION       103
                       BY MS. MANCA

WAYMON HO              DIRECT REBUTTAL           111
                       EXAMINATION
                       BY MS. MANCA

                       REBUTTAL                  114
                       CROSS-EXAMINATION
                       BY MR. KLEIN

                       REDIRECT REBUTTAL         115
                       EXAMINATION
                       BY MS. MANCA

1   say, the Linux operating system.  Really nerdy things.

2   Q.    Did Ms. Thompson seem capable?

3   A.    Absolutely.

4   Q.    What would you say about her potential?

5   A.    I would say that everyone in that group was on an extremely

6   promising path, and most of the people in that group have, in

7   fact, proven that right.  Among the people in that clique, I

8   would rank Paige as one of the more capable.

9   Q.    Did you know if Ms. Thompson was in school?

10  A.    We didn't discuss school much.

11  Q.    Did you know if she graduated high school?

12  A.    I don't believe that she did, but I don't think we've ever

13  talk about it specifically.

14  Q.    Did you come to know Ms. Thompson in person at all?

15  A.    Yes.  After I got a driver's license.  As it happened, we

16  were both in the local area.

17  Q.    And what did you know about her reputation after getting to

18  know her in person?

19  A.    Paige was a lot of fun to hang out with.  She can be, I

20  would say, energetic, excited, can be the life of the room, also

21  can be quiet.  I don't want to say "meek," but maybe -- maybe

22  shy, something of that sort, small, unpresent.  I would say both

23  sides are present.

24  Q.    Was there a time where Ms. Thompson came to have a

25  different handle or name?

1   Q.   And the data that was downloaded?

2   A.   Yes, that's right.

3   Q.   So now I'm going to step away from your background for a

4   moment.  Thank you for sharing that.

5        I want to ask you, at a high level, what was the first

6   thing Paige Thompson did here?

7   A.   Sure.  Yeah, I'd be happy to talk about that.

8        I just want to help, if I can, to put everything in terms

9   that people can understand, because I think maybe some of it

10  seems a little alien and frightening when it's shown just as

11  computer code.

12       But what Paige Thompson did first was she built what I

13  think has been called a proxy scanner, a tool for searching

14  through a range of Internet addresses for computers that were

15  acting as open proxies.

16  Q.   And do you have familiarity with Internet scanning?

17  A.   I do.

18       So within the computer security research community, I'm

19  proud to say that my students and I were, you might say,

20  pioneers in introducing Internet-wide scanning techniques as a

21  tool for defensive computer security.  We built a tool that we

22  called ZMap that is, today, very widely used in security

23  research, which is an Internet-scanning tool similar to what

24  Paige Thompson built herself.

25       But the ZMap tool is an open-source tool.  It's something

Case: 22-10056, 06/24/2023, ID: 12734505, DktEntry: 22, Page 40 of 198

1  around the world and to write about what they found and the

2  characteristics of these different open proxies.

3  Q.   And now I'd like to show you what the defense has marked as

4  Exhibit 1203.

5       Do you recognize this?

6  A.   Yes, I do.

7  Q.   Did you prepare this?

8  A.   Yes.

9       MR. KLEIN:  Your Honor, we'd like to offer this and

10 post it to the jury as a demonstrative.

11      THE COURT:  As a demonstrative exhibit?

12      MS. MANCA:  No objection.

13      THE COURT:  It is admitted for demonstrative purposes

14 and can be displayed now.

15           (Defense Exhibit 1203 admitted.)

16 Q.   (By Mr. Klein)  So, Professor Halderman, I'm going to have

17 you walk the jury through this demonstrative exhibit.

18      Let's start out at a high level.

19      What is a proxy server?

20 A.   Right.  So I want to try to -- I prepared this to try to

21 explain what a proxy server is, specifically an open forward

22 proxy server, because this is what Paige Thompson's scanner was

23 looking for.

24      So a proxy server, in general, is a server that makes

25 requests on a user's behalf to another server, and returns data.

1   and additional steps hadn't been taken to restrict them.  Like

2   you can configure -- when you're setting up a proxy server, you

3   can configure it to be restricted to only be used by specific --

4   by people at specific IP addresses, where you can lock them down

5   with passwords.

6        But you can tell from the commands that Paige -- that we've

7   seen Paige ran and got success, that none of those things had

8   been done to the proxy servers where her commands succeeded.

9   Q.   And what was the AWS default, or what is the AWS default?

10  A.   Well, the AWS default for EC2 instances, really, the

11  default is that you don't have ports open to them at all.  You

12  have to specify a security policy that allows incoming

13  connections at all before commands can get to a server of any

14  kind.

15       And the software at issue, several of the alleged victims

16  have testified that they were using the Apache web server

17  software, which also, by default, does not function as an open

18  forward proxy.  Someone has to change that configuration to

19  allow that.

20  Q.   And was that true back in 2019, based on your review of

21  evidence?

22  A.   Yes.  I've used the Apache software for, probably, 20

23  years, and that's always been true.  I've looked back at old

24  manuals, and, you know, the default has been not to function as

25  a forward proxy.

1    A.    They did.

2    Q.    And do people deliberately run open forward proxies?

3    A.    Yes, some people do.

4    Q.    Why?

5    A.    Well, there are a lot of different reasons you might

6    provide a forward proxy.  Within organizations, sometimes people

7    use proxies to filter Internet access; like, if you want to

8    block access to pornographic sites at a library.

9          Other people provide public open proxies to allow just

10   members of the public to use their computers to circumvent

11   Internet censorship or other kinds of blocking.

12         My wife does research -- she is also a computer science

13   professor, and she does research about measuring Internet

14   censorship in countries like Iran and China.  And one of the

15   techniques that her research group uses for that is to access

16   open proxies that people have set up in other countries, and use

17   them to try to figure out what people there would be blocked

18   from seeing by their governments.

19   Q.    So when you have an open forward proxy, is a password

20   needed?

21   A.    If it's open, then, no.

22   Q.    Any type of authentication needed?

23   A.    Generally, no.

24   Q.    And from what you've seen in evidence, Ms. Thompson never

25   had to guess at a password, use a password, anything like that?

1   A.   So you can see from her proxy scanner tool, you can see

2   from the curl command she executed, she wasn't providing or

3   guessing a password or any other kind of authentication to make

4   use of those proxies.

5   Q.   And let's use Capital One as an example here.

6        Did Capital One configure its web application firewall to

7   be an open proxy?

8   A.   Yes.

9   Q.   And what was the general rule that Capital One's open

10  forward proxy followed?

11  A.   So you can tell by the fact that Paige Thompson's command

12  to use it succeeded, that it was working in this way, that it

13  was configured so that any member of the public could use it to

14  request data from other serves that they specified.

15  Q.   And the web application firewalls for the alleged victims,

16  did Ms. Thompson exploit a bug or a flaw in the code?

17  A.   No.  This is exactly the way that the Apache software is

18  designed to function, if you have that proxy request setting set

19  to "on."

20  Q.   So the web application firewalls worked as they were

21  programmed and configured to perform?

22  A.   That's right.

23  Q.   So now I'm going to talk about step two.

24       MR. KLEIN:  Can we please pull up for, just for

25  Professor Halderman, Exhibit 1204?

1  module, and that must have had the proxy request setting turned

2  to "on," because it was acting as an open forward proxy.

3        So the WAF was configured -- since it was configured as an

4  open forward proxy, it allowed members of the public, including

5  Ms. Thompson, to connect to it and to ask it to retrieve data

6  from other servers.  That included another server operated by

7  Amazon called the Instance Metadata Server, IMS, which is shown

8  as the yellow robot here.

9        So the IMS system, this second system, is used by computers

10  you can have Amazon run for you in order to provide data about

11  their operations and resources and credentials that are made

12  available to them.

13        But by default, the IMS system doesn't really give out any

14  valuable data to anybody, but you can configure it.  As a

15  company that uses AWS, you can configure it to provide more, and

16  that's what Capital One did in this instance, is they configured

17  the IMS system so that it would give out certain credentials in

18  response to requests that were coming from the local EC2

19  instance.  That is, in this case, the web application firewall.

20        So the web application firewall was allowed to ask the IMS

21  for credentials, and any software on the web application

22  firewall was allowed to do that and would receive them.

23        The web application firewall was also configured to act as

24  an open forward proxy.  So anyone in the public could use it to

25  make requests to any other servers, including IMS.

Case: 22-36041 01-16-2023  Document 34-5  Filed 06/24/22  Page 59 of 198

1  do and as it was configured to do.

2  Q.    So now I'm going to talk about that third step on here.  Do

3  you see it, your --

4  A.    Yes.

5  Q.    -- your blue robot.

6       So after Ms. Thompson gets the credentials through these

7  requests, what happens next?

8  A.    Right.

9       So now at that point, there's a third computer system

10  involved, and this is another service that Amazon Web Services

11  provides called "S3."  And you may have -- I remember the

12  government had a colorful demonstrative about this that

13  illustrates it as a children's sandbox bucket or a beach bucket.

14       S3 is just, basically, a service that stores data.  And S3,

15  by default, when you store data in it, there're no what are

16  called roles or credentials that have permission to read that

17  data.  But when you put data in S3, one thing that you can

18  configure is you can configure S3 to tell it to make that data

19  readable by anyone who has -- who's in possession of the

20  credentials for a certain role.

21  Q.    Is that what happened here?

22  A.    And that's right.

23       In the Capital One instance, just as a concrete example,

24  they had certain data that they configured S3 to say that anyone

25  who comes and is holding the ISRM-WAF-Role credentials, you can

Case: 22-936, 08/16/2023, DktEntry: 27.5, Page 134 of 198
Case 2:19-cv-00169-RSL Document 234-5 Filed 06/24/22 Page 84 of 198

1   return this data in response to their requests.

2        They could have configured it in other ways.  They could

3   have locked it down further or not assign those credentials to

4   that data, but the fact is, they did configure it so that in

5   response to a request that was bearing those credentials,

6   bearing this string of letters and numbers, S3 was programmed to

7   return this data on request.

8   Q.    Did IMS care that Ms. Thompson got these credentials?

9   A.    No.  It's just programmed -- if your request is made using

10  these credentials, return the data.  That's its rule.

11  Q.    And could any IP address have done this?

12  A.    I believe so.  I don't think there was anything special

13  about where Ms. Thompson was coming from when she was speaking

14  with S3.

15  Q.    And did you see evidence that she did retrieve data?

16  A.    I did.

17  Q.    And based on your review of the evidence, could

18  Ms. Thompson have told what it was before it was downloaded?

19  A.    I don't think so.  It appears there were file names, but

20  the file names were not particularly descriptive.  She'd have to

21  look at the data, really, to understand what it was or if it was

22  important.

23  Q.    And do people sometimes mislabel file names?

24  A.    Oh, yes, definitely.

25  Q.    Or store old data in them?

1          But also, even that aside, what this really is is a very,

2    very simple command.  It's something that Ms. Thompson could

3    have easily -- almost easily have done in a web browser.

4          And if you're familiar with this command that's at the core

5    of it, which is this curl command that you see, sort of right

6    underneath that spurious number 97 there on the -- I don't know

7    if that's the fourth or fifth line, but the curl command is just

8    something that -- it's a very, very commonly used computer

9    command that tells the computer to make a web request.  And you

10   can tell it to make that web request in different ways.

11         But it's, basically -- in the simple list form, it's like

12   putting a URL into your web browser and hitting "enter."  And

13   this is just a way of doing that from the command line that you

14   can configure and automate in different ways.

15         But curl is on -- I think it ships with every Apple

16   computer.  It probably is on most Windows computers, too.  It's

17   almost an ubiquitous command.

18   Q.    I'm going to cut back to Exhibit 1204.  I want to talk

19   about this third step a little more.

20         That third step here says "S3 buckets," but it also talks

21   about EC2 instances, the virtual computers?

22   A.    Yes.  So for other of the alleged victims, the credentials

23   that they had configured gave access permissions to start EC2

24   instances or control EC2 instances.  So she would have done,

25   essentially, the same thing that's illustrated here, but the

1        And then we can go to step three.  And then Ms. Thompson,

2    or really anyone, could type in the IP address of the IMS

3    system.

4        This is publicly known, and it's in the Amazon

5    documentation, 169.254.169.254.  And then her browser would use

6    that open forward proxy to make a request to IMS.

7        And if you just type in that IP address by itself without

8    the rest of the path, it basically gives you -- it gives you

9    different options.

10       One of those options is latest.  You know, just then take

11   latest, put it onto the end of the path, it gives you several

12   options, one of them is metadata.  You put metadata onto the

13   path, et cetera.  And so you can navigate in your web browser to

14   this full URL just starting with the IP address of the IMS.

15       But, anyway, after constructing that full URL that you see

16   in blue at the top, the same one that Ms. Thompson's curl

17   command enters, if you put that into the web browser and hit

18   enter, the web browser will display this.  This is the

19   credential for that ISRM-WAF-Role, it's just showing up right in

20   the browser.

21       And if you copy and paste the pieces of this and put them

22   into the Amazon -- Amazon Web Services client software, then

23   that client software will allow you to go and execute the

24   different functions that this credential is allowed to do, like

25   accessing the S3 bucket in this example.

1    Q.   So she could have acquired the same credentials through her

2    web browser?

3    A.   That's right; using just these three steps, setting up the

4    proxy server and then simply navigating to that IMS IP address.

5    Q.   And how long did that one, two, three take you?

6    A.   Takes two or three minutes.  I could demonstrate it right

7    now if people had attention for it, but -- but the key thing is

8    that all of this still works in Amazon today.  It still works

9    with the Apache server today.  These aren't bugs in the services

10   that have been corrected and patched as a result of knowing what

11   Ms. Thompson could do; it's just a matter of how each of these

12   computer systems is configured and whether they're configured to

13   allow these different steps to take place.

14   Q.   And you don't have to use a TOR or VPN to do this?

15   A.   No, no.

16   Q.   And she didn't have to use those services to do what she

17   did?

18   A.   No.  And in fact, using TOR or VPN probably would have made

19   her accesses even more visible, even more likely to set off

20   alarm bells at the different entities.  A lot of people are

21   looking for access from TOR or from certain VPNs.

22   Q.   And you saw on some of the exhibits the government went

23   through with the witness, there was a response --

24        MR. KLEIN:  We can pull this down for a second.  Thank

25   you.

Case: 22-35036, 08/06/2023, ID: 12735455, DktEntry: 6, Page 4 of 198

1   Q.   (By Mr. Klein)  There was response to a command from one of

2   her scripts was like unauthorized or forbidden.  What was

3   happening there?

4   A.   Well, when a server is returning and saying it's

5   unauthorized, the connection, the command, is unsuccessful in

6   general.  I'm sure everyone has had this happen to them sometime

7   or other while following a link on the web, you get an error

8   message like that.  It just means the server said no to the

9   request.

10       And reviewing, there was a script that Ms. Thompson ran

11  that appeared to be -- she was investigating what capabilities

12  were allowed by the credentials, by the roles that she -- that

13  the servers had allowed her to access.  And each command that

14  she sent either succeeded because the role had been configured

15  by the customer to allow that action, or it did not succeed, the

16  command didn't go through, because the role said no.

17  Q.   And just so I understand, like when you arrive there, you

18  don't get like a list of what works and doesn't work, this is

19  the -- how you would figure that out even, for anybody who

20  arrived there?

21  A.   That's right.  In general, the computer -- the way Amazon

22  works, you, as a user with a role, are not presented with the

23  policy that says what that role can do.  You can attempt

24  commands and the server can be configured to allow you to

25  proceed or not.

1  Q.   And you didn't see any evidence she like went past -- when

2  there was an unauthorized or forbidden, you didn't see evidence

3  she tried to go past that point?

4  A.   To somehow override those places where it said -- no, I

5  didn't see any evidence of that.

6  Q.   Okay.  Do you recall Mr. Ho talked about an SSRF attack,

7  server-side request forgery attack?

8  A.   Yes.

9  Q.   And do you recall that there was testimony about he thought

10  what happened here was one, and on cross he, Mr. Schmidt of AWS,

11  did not.  Was what happened here a server-side request attack;

12  is that accurate?

13  A.   I don't think that that's technically accurate to classify

14  it as SSRF.

15       SSRF by analogy to cross-site scripting, which we

16  abbreviate as XSS, is a kind of vulnerability that happens at

17  the web application layer.

18       What's happened here is at a different layer of the network

19  stack.  It's not a bug in a web application where it's failing

20  to validate a URL that a user has provided; instead, it's simply

21  that a server has been configured to act as an open proxy.

22       And then we technically have a different classification for

23  an open proxy that maybe someone didn't intend, but you can't

24  tell just by looking at it whether it was intended or not, than

25  we do for a server-side request forgery vulnerability.

Case 2:19-cr-00159-RSL Document 347 Filed 06/24/22 Page 126 of 193

1   Culbertson, you don't have to say what you're going to do right

2   now, you want to talk to the people.  But when you know if

3   you're going to do it, let defense know and let Victoria know.

4       And if you are going to present rebuttal testimony at 1:30,

5   we'll have you put on the record what that testimony will be

6   outside the presence of the jury.  And if there's an objection,

7   I'll rule on that, okay?

8       MR. HAMOUDI:  Your Honor, just for the record, I

9   believe I need to renew my motion for judgment of acquittal on

10   all counts in the second superseding indictment under Rule 29.

11       THE COURT:  Okay.  Thank you.

12   We're all done.  Thank you.

13   See you at 1:30.  That's fine; 1:30 is fine.

14       (Court in recess 12:16 p.m. to 1:33 p.m.)

15       THE COURT:  Okay.  Government rebuttal testimony?

16       MS. MANCA:  Yes, Your Honor.  We would like to call

17   Waymon Ho and John Strand in rebuttal.

18       THE COURT:  In what areas are you offering the

19   testimony to rebut?

20       MS. MANCA:  Yes, Your Honor.

21     As to Waymon Ho, we are offering his testimony regarding

22   Defense Demonstratives 1204 and 1205.

23       THE COURT:  Okay.

24       MS. MANCA:  And then regarding John Stand's, there was

25   testimony regarding systems functioning as intended and whether

Case 2:19-cr-00159-RSL Document 265 Filed 06/24/22 Page 1 of 193
Case 2:24-90160, 05/15/2023, ID: 12720465, DktEntry: 27, Page 127 of 193

1

```
               UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,        )
                                 ) CASE NO. CR19-00159-RSL
               Plaintiff,        )
                                 ) Seattle, Washington
v.                               )
                                 ) June 16, 2022
PAIGE A. THOMPSON,               ) 9:00 a.m.
                                 )
               Defendant.        ) JURY TRIAL, Vol. 8 of 9
                                 )
_____


               VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE ROBERT S. LASNIK
               UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:     ANDREW C. FRIEDMAN
                         JESSICA M. MANCA
                         TANIA M. CULBERTSON
                         United States Attorney's Office
                         700 Stewart Street, Suite 5220
                         Seattle, WA 98101


  For the Defendant:     MOHAMMAD ALI HAMOUDI
                         NANCY TENNEY
                         Federal Public Defender's Office
                         1601 5th Avenue, Suite 700
                         Seattle, WA 98101

                         BRIAN E. KLEIN
                         MELISSA A. MEISTER
                         Waymaker LLP
                         515 S Flower Street, Suite 3500
                         Los Angeles, CA 90071


  Reported by:           Nancy L. Bauer, CRR, RPR
                         Marci Chatelain, CRR, RPR, RMP, CCR
                         Official Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         nancy_bauer@wawd.uscourts.gov
```

1  circumvented.

2      And each of the witness companies was asked the question,

3  like the question asked of Mr. Pelaggi:  "Did Apperian intend

4  for her to have access to its code and all of its data?"  And

5  Mr. Pelaggi gave the answer you knew would be the answer:  "We

6  did not, because these were sensitive, they were protected

7  environments."

8      Ms. Thompson didn't get into these environments because she

9  was given permission or because she was authorized.  She got

10 into these environments because she found a novel vulnerability,

11 one that no one else had realized existed, and she exploited

12 that vulnerability.

13     And you know who really knew that Ms. Thompson wasn't

14 authorized to go in there?  Ms. Thompson knew that herself.  She

15 had worked for AWS.  She listed on her resumé -- it was her last

16 job.  One of the proficiencies she lists is IAM, Identity and

17 Access Management.  She knew how the IAM system worked, she knew

18 what roles were, she knew they were not intended for the general

19 public; they were intended for companies to give employees,

20 perhaps to give machines performing processes, but to be given

21 narrowly to people who needed those; not generally available.

22     And Ms. Thompson told you this time and again.  This is a

23 message she sent, a tweet between -- a direct message on Twitter

24 between her and someone else.  She said, "Then I hack into their

25 EC2 instances, assume role their IAM instance profiles, take

1    over their account and corrupt SSM, deploying my back door,

2    mirror their S3 buckets, and convert any snapshots I want to

3    volumes, and mirror the volumes I want via storage gateway."

4         Ms. Thompson isn't saying that she was authorized to go in

5    there, that this was legitimate.  She's saying she hacked her

6    way in there.  And once she got in there, she says she created

7    back doors, ways to have continued access if her other access

8    failed.

9         For this message she sent to someone else, "Yeah, AWS is

10   great, except when someone steals your IAM instance profile that

11   has full access to the account."  She's not saying she is

12   authorized, she's saying she steals.

13        And you don't have to rely just on Ms. Thompson's words.

14   You can look at her actions.  This exhibit, remember, shows her

15   computer setup.  It shows how she communicated.  She had her

16   computer configured so there was a separate virtual computer

17   inside it to communicate with the outside world, to provide

18   additional distance so if somebody traced back, you would get to

19   that computer, you wouldn't figure out what the main computer

20   was.  Then she went through iPredator, which is a VPN, which

21   provides anonymity, and then she went through TOR, in many

22   instances, another way to get anonymity.  Three layers of

23   anonymity.

24        You've heard a lot from defense during the trial.  "Don't

25   people use VPN for legitimate purposes?"  "Don't people use TOR

**ER-129**

1          First, it has to prove the defendant knowingly devised and

2    intended to devise the scheme or plan to defraud or to obtain

3    money or property; second, that the statements made as part of

4    the scheme were material.  That is, basically, important;

5          Third, that the defendant acted with the intent to defraud;

6    and fourth, that on or about March 22nd of 2019, the defendant

7    used or caused to be used an interstate wire to carry out an

8    essential part of the scheme.

9          The same evidence about what Ms. Thompson was doing proves

10   each of these elements.  First, was there a scheme or plan?  Did

11   Ms. Thompson devise a scheme or plan to defraud?  And she did,

12   because she devised a scheme to obtain money and property by

13   trickery.  Basically, her scheme was to download valuable data

14   from companies.  Sometimes she might come up empty, she might

15   get a company where the information wasn't particularly useful,

16   sometimes she'd hit a home run.  So it was a scheme to download

17   that property, and it was a scheme to obtain the value of

18   computer processing for cryptojacking.  And it was a scheme that

19   based on trickery and deceit.  It starts with tricking the

20   firewall.  It starts with getting the firewall to pass the

21   message to the Instance Metadata Service, and for the Instance

22   Metadata Service to not understand that it is an external

23   request, and then pass that information back.

24         And Mike Fisk used an interesting word when he testified.

25   He said that she was impersonating the firewall.  That's really

1   what's happening.  The Instance Metadata Service thinks it is

2   responding to a firewall, because Ms. Thompson is impersonating

3   the firewall, and so it provides that information.

4        And once she has the credentials, she uses them to gain the

5   data, to gain access to do the cryptojacking.  And in doing

6   that, in using those credentials, she is representing that she

7   is a person who should have those credentials, that she is a

8   legitimate user of those credentials.  She has to be a

9   legitimate user for that to work, and so she is representing

10  that, and that's the trickery, that's the misrepresentation.

11       Second, that the statements made were material, they were

12  important, and you know they were important.  If the first

13  request to the Instance Metadata Service had said, Hi, I'm an

14  external computer, please provide information, that wouldn't

15  have happened -- well, first, the request wouldn't have been

16  made.  You can't communicate.

17       But second, the Instance Metadata Service would not have

18  answered that.  It would not provide that information to an

19  external source.

20       And second, when Ms. Thompson tried to gain access to the

21  companies' environments, if she was communicating that these

22  credentials are being used by someone who is not a legitimate

23  user, by someone who has stolen these credentials, companies

24  would not provide information to that person.  So these are

25  important misrepresentations.

Case: 22-1960, 06/09/2023, DktEntry: 37.6, Page 42 of 104
Case 2:19-cr-00159-RSL Document 346 Filed 06/24/22 Page 44 of 104
Government's closing argument                    June 16, 2022          44

1    Third, the defendant acted with the intent to defraud; that

2    is, did she intend to cheat or deceive these companies?  And the

3    evidence shows she did do that.  She knew she was getting data

4    that she shouldn't get and that she was getting computer

5    resources that she shouldn't get.  There's no question about

6    that.  And Ms. Thompson's own statements, again, tell you that

7    this is the case.

8    Here's her first description of the data that she took from

9    Capital One.  "Jacked, this is the data that I've stolen."

10   Or here is another one.  She said, "Whatever, I'll be

11   employed again soon, and if I had a partner, I could have them

12   take over my cryptojacking enterprise and be a stay at home."

13   Ms. Thompson is acknowledging this is cryptojacking.  It's

14   stealing resources to mine cryptocurrency.  She's not saying

15   someone can take over my legitimate cryptocurrency miners.

16   She's saying "to take over my cryptojacking."

17   Here is another one.  A text, "I, however, hijacked more

18   AWS accounts."  Ms. Thompson knows that she's defrauding these

19   victims.

20   Finally, the fourth element is, was there an interstate

21   wire?  And the interstate wire here sent on March 22nd is the

22   command Ms. Thompson sent to AWS servers to download information

23   from Capital One.  That's the wire that's sent from Seattle to

24   either Oregon or Virginia that begins the download of 100

25   million people's records.  So all of the elements are satisfied

1    and that's as far as you can get from being a white hat hacker.

2         Fundamentally, Ms. Thompson's motivation was not to be a

3    white hat hacker.  It was not to help the companies into which

4    she hacked.  Nothing in the evidence suggests it was.  You

5    haven't seen anything that suggests that benign motive.  What

6    you've seen as evidence is that she wanted data, she wanted

7    money, she wanted to brag.

8         And, in fact, Ms. Thompson didn't just hack herself.  She

9    talked about it with some of her friends.  And this is a message

10   that she sent to a friend.  She had described -- if you go to a

11   little earlier in the chat, she described how to download data,

12   how to scrape S3 buckets and get data from victims, and after

13   doing that, she tells this person, "But, yeah, if you just want

14   to use it to learn how to do some stuff with AWS, go for it.

15   It's not my stuff.  LOL."

16        She's not trying to make things better.  She's trying to

17   make things worse.  She's trying to teach other people how to do

18   what she did.

19        Ladies and gentlemen, all of the evidence in this case

20   shows that Ms. Thompson used her background, she used her

21   knowledge, she used her technological savvy in order to exploit

22   a vulnerability that she figured out.  It was a complicated

23   vulnerability.  No one else had figured it out.  AWS hadn't seen

24   it, so they hadn't figured it out.  No one was aware of it.

25        But Ms. Thompson figured it out, and when she figured it

1          The next event was that the Instance Metadata Service,

2     please, send me available credentials, and per its rules, it

3     provided role credentials in response to requests from the EC2

4     instances.  "Okay."

5          And the next request, here's a credential, please send me

6     data, launch, and instance.  Capital One configured -- all of

7     these companies configured their computers to allow some or all

8     of these events, allow anyone -- Capital One -- possessing role

9     credentials to read data, launch EC2 instances, or perform other

10    actions for which the role has been granted permission.  That's

11    exactly what happened here.

12         And it is important to understand that Professor

13    Halderman's technical opinions went unchallenged.

14         Instruction 18 to 23, which deal with Counts 2 through 7,

15    all require the government to prove without authorization beyond

16    a reasonable doubt.

17         Professor Halderman's testimony, Mr. Fisk's testimony

18    establish that Ms. Thompson's access to Capital One's computers

19    were authorized.

20         Witness after witness testified that this system was overly

21    permissive.  Overly permissive does not mean without

22    authorization.  It is exactly the opposite; too much

23    authorization.

24         Professor Halderman's conclusions, again, the technical

25    opinions went unchallenged.  Here, all of the companies

1   configured their firewalls, the web application firewall
2   granting overly permissive access to Ms. Thompson, who was able
3   to access the systems for all of these companies from outside
4   their network.  Ms. Thompson had no say over the decisions of
5   these configurations.
6        Now, the companies all had different types of data stored
7   in these S3 buckets.
8        Capital One had 1.7 terabytes of data, some of which was
9   sensitive.
10       Apperian, 700,000 file paths, and inside of them were
11  databases that are of great value to them.
12       Bitglass, internal log files, which, I believe, Mr. Chan
13  testified were not worth anything.
14       42Lines, instance information.
15       Enghouse, survey results.
16       We called two additional entities.  Ohio State said it was
17  public data; Michigan State, public data.
18       The government has made much of the companies' intent here,
19  but, again, their intent is irrelevant.  The concept of "without
20  authorization" does not focus on the company's subjective
21  intent, and the proof here, the only proof here that matters is
22  how the computers were configured at the time of access.
23       Instruction 17, which deals with wire fraud, requires the
24  government to prove beyond a reasonable doubt that there was a
25  misrepresentation of a material fact, and that Ms. Thompson had

Case: 21-3621, 06/24/2023, DktEntry: 2-5, Page 136 of 193
Case 2:19-cr-00159-RSL Document 347 Filed 06/24/22 Page 70 of 104
Defendant's closing argument                              June 16, 2022          70

1    the specific intent to deceive and cheat these companies out of

2    money or property.

3        Professor Halderman's testimony that the system operated

4    exactly as it was designed demonstrates that there was no such

5    misrepresentation, there was no trick.  Ms. Thompson used

6    publicly known commands recognized and authorized by AWS

7    computers, because that is how the companies configured them to

8    run the commands.  The computers were not tricked.  They

9    executed commands as they were configured and programmed to do.

10       The testimony and data demonstrate that Ms. Thompson had no

11   idea what sort of data she did find as she was downloading it.

12   There was no specific intent to deceive and cheat any particular

13   company.  And, indeed, there is evidence that once she

14   discovered what she had accessed in Capital One's S3 buckets,

15   she attempted, in some form or fashion, to notify Capital One

16   about the vulnerability.

17       Let's be clear:  In the approximate five months

18   Ms. Thompson possessed Capital One's data, she never shared it,

19   she never made credit cards, she never opened bank accounts, she

20   never took any efforts to sell it.  The same is true as to all

21   of the companies here.

22       There 's strong evidence of her lack of intent.

23       Mr. Schuster, from AWS, provided favorable testimony to our

24   defense.  He spoke about how the business model -- briefly, when

25   the Court inquired -- was about taking things off from physical

1    17th, 2019, Ms. Thompson's access was authorized.

2          On cross-examination, Mr. Fisk admitted that Ms. Thompson

3    was effectively authorized to access their servers and download

4    their data.

5          Initially he said, on direct examination -- or I believe it

6    was cross -- that she stole credentials, stealing credentials.

7    She's not charged with theft.  She's charged with unauthorized

8    access.  And that is why, when I put his own testimony that he

9    gave under oath in a prior proceeding and asked him to answer

10   the question asked in that proceeding, he said -- he testified

11   under oath that she was provided credentials and provided access

12   to data.  And he admitted, following that, that those

13   credentials would be obtained from a public web browser.

14         That evidence is critically important, because not only

15   does it establish that her access was with authorization, but it

16   also establishes, under Instruction 17, Count 1, that this is no

17   false representation of a material fact.

18         The April notification.  Mr. Fisk testified, in April of

19   2019, another Capital One cyber security professional was

20   notified that the system had granted credentials to an external

21   user.  The analyst closed out that notification as well.

22         Professor Halderman agreed, with evidence that he viewed,

23   that this was a loud and proud scan to trigger Capital One's

24   alarms.

25         Intended to notify, technically.  The reason why this is

1    credit card customers that we announced on July 29, 2019.

2         No mention of what Mr. Alexander wrote to the risk

3    committee.  Capital One effectively convicted her in their

4    annual report.

5         But if you look at the law as instructed by Judge Lasnik,

6    instructs you "without authorization," her access was

7    authorized.

8         Again, Ms. Thompson never monetized this data, never

9    disseminated it, never made any use of the data to financially

10   benefit herself or harm Capital One's customers.

11        What Ms. Thompson's sin is -- what Ms. Thompson's sin is,

12   is it appears to be that she spoke about what she did in an

13   ineloquent, facetious, offensive, and arrogant way.  That does

14   not make you a criminal.  A person's statements, even erratic

15   statements suggesting criminality, do not make you a criminal.

16        Look at Instruction 13.  You decide how much weight to give

17   to any particular statement, including the circumstances under

18   which they are made.

19        You heard no evidence from anyone at the other end of

20   Ms. Thompson's statements.  Actions speak louder than words, and

21   Ms. Thompson's actions here, or her lack of actions with the

22   data, are the evidence of intent you should rely on.

23        So after Capital One learns that the data is breached, the

24   FBI is contacted by Capital One, and they acted very quickly.

25   But those actions were only informed by Ms. Thompson's tweets.

Case: 22-10198, 08/19/2022, ID: 12534765, DktEntry: 23-6, Page 94 of 104
Case 2:19-cr-00159-RSL Document 347 Filed 06/24/22 Page 94 of 104
Government's rebuttal argument                    June 16, 2022          94

1          This case involved a complicated series of steps in which

2     Ms. Thompson circumvented the security systems that keep most

3     people out, security systems that involved usernames, passwords,

4     credentials, multifactor authentication.

5          So don't buy into this hypertechnical argument that a

6     machine executing commands by itself is authorization.

7          If someone hacks into a bank account and issues a command

8     to withdraw money, the system will work as it's intended to do.

9     It will withdraw that money, but that won't be authorized.

10         If you even go lower tech for a moment, let's say a person

11    puts their house key under a doormat, right, their spare key,

12    and someone comes along and starts looking under all the

13    doormats on a block, and finds a key and uses it to unlock a

14    back door, when a key fits into the lock and it unlocks the

15    door, the key is doing what it's supposed do, it's unlocking the

16    door in response to the key.  That doesn't make the person's

17    entry into the house authorized.

18         The defense is trying to convince you that it doesn't

19    matter that these companies didn't want their data downloaded,

20    that it didn't matter that they tried to protect it, that it

21    didn't matter that they didn't want these credentials to be used

22    this way, and they didn't know that their web facing

23    applications were talking to an internal resource.  Guess what?

24    It does matter.  It matters a lot.

25         And Dr. Halderman's testimony ignored several critical

Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence
of the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington
January 12, 2022
RAVI SUBRAMANIAN, Clerk
By _____ Deputy

Judge Robert S. Lasnik

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

    Plaintiff

    v.

PAIGE A. THOMPSON,

    Defendant.

NO. CR19-159 RSL

**SECOND SUPERSEDING
INDICTMENT**

The Grand Jury charges that:

## COUNT 1
### (Wire Fraud)

1.    Beginning in or before March 2019, and continuing until on or about July 17, 2019, at Seattle, within the Western District of Washington, and elsewhere, PAIGE A. THOMPSON, with the intent to defraud, devised and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

A.    *Background*

2.    The "Cloud Computing Company" is a company that provides cloud-computing services to individuals, companies, and governments. Cloud computing is the practice of using a network of remote servers hosted on the Internet, commonly referred to as "the cloud," rather than a local computer or server, to store, manage, and process

Second Superseding Indictment - 1
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ER-140**

1  data. The Cloud Computing Company provides services through server farms that are
2  located throughout the world and maintained by the Cloud Computing Company.

3       3.      Capital One Financial Corporation ("Capital One") is a bank holding
4  company that offers credit cards and other services to customers throughout the United
5  States. Capital One supports its services, in part, by renting or contracting for computer
6  servers from the Cloud Computing Company. The servers on which Capital One stores
7  credit card application and other information generally are located in states other than the
8  State of Washington, and they store information regarding customers, and support
9  services, in multiple states. Deposits of Capital One are insured by the Federal Deposit
10 Insurance Corporation.

11      4.      Victim 2 is a state agency of a state that is not the State of Washington.
12 Victim 2 supports its services, in part, by renting or contracting for computer servers
13 from the Cloud Computing Company.

14      5.      Victim 3 is a telecommunications conglomerate located outside the United
15 States that provides services predominantly to customers in Europe, Asia, Africa, and
16 Oceania. Victim 3 supports its services, in part, by renting or contracting for computer
17 servers from the Cloud Computing Company.

18      6.      Victim 4 is a public research university located outside the State of
19 Washington. Victim 4 supports its services, in part, by renting or contracting for
20 computer servers from the Cloud Computing Company.

21      7.      Victim 5 is a technology company that specializes in digital rights
22 management. Victim 5 supports its services, in part, by renting or contracting for
23 computer servers from the Cloud Computing Company.

24      8.      Victim 6 is a technology company that provides data and threat protection
25 services. Victim 6 supports its services, in part, by renting or contracting for computer
26 servers from the Cloud Computing Company.

27      9.      Victim 7 is a technology company that provides interaction-management
28 solutions for customer interactions in call centers and other environments. Victim 7

Second Superseding Indictment - 2
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ER-141**

1  supports its services, in part, by renting or contracting for computer servers from the

2  Cloud Computing Company.

3       10.    Victim 8 is a technology company that provides higher education learning

4  technology to educational institutions and other clients. Victim 8 supports its services, in

5  part, by renting or contracting for computer servers from the Cloud Computing Company

6  B.    *The Essence of the Scheme and Artifice*

7       11.    The object of the scheme was to exploit the fact that certain customers of

8  the Cloud Computing Company had misconfigured web application firewalls on the

9  servers that they rented or contracted from the Cloud Computing Company. The object

10  was to use that misconfiguration to obtain credentials for accounts and roles of those

11  customers that had permission to view and copy data stored by the customers on Cloud

12  Computing Company servers, as well as permission to perform other functions. The

13  object then was to use the stolen credentials to access and copy other data stored by the

14  customers on Cloud Computing Company servers, including data containing valuable

15  personal identifying information. The object was also to use the stolen credentials in

16  other ways for PAIGE A. THOMPSON's own benefit, including by using Cloud

17  Computing Company servers to mine cryptocurrency and thereby obtain something of

18  value.

19  C.    *The Manner and Means of the Scheme and Artifice*

20       12.    It was part of the scheme and artifice that PAIGE A. THOMPSON used,

21  and created, scanners that allowed her to scan the public-facing portion of servers rented

22  or contracted by customers from the Cloud Computing Company, and to identify servers

23  for which web application firewall misconfigurations permitted commands sent from

24  outside the servers to reach and be executed by the servers.

25       13.    It was further part of the scheme and artifice that PAIGE A. THOMPSON

26  transmitted commands to the misconfigured servers that obtained the security credentials

27  for particular accounts and roles belonging to the customers with the misconfigured

28  servers.

Second Superseding Indictment - 3
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

14.     It was further part of the scheme and artifice that PAIGE A. THOMPSON used the accounts and roles for which she had obtained security credentials to obtain lists or directories of folders, or buckets, of data in the Cloud Computing Company customers' storage space at the Cloud Computing Company.

15.     It was further part of the scheme and artifice that PAIGE A. THOMPSON used the accounts and roles for which she had obtained security credentials to copy data, from folders or buckets of data in the Cloud Computing Company customers' storage space at the Cloud Computing Company for which the accounts and roles had requisite permissions, to a server that PAIGE A. THOMPSON maintained at her own residence.

16.     It was further part of the scheme and artifice that, in taking these steps, PAIGE A. THOMPSON implicitly represented that commands to copy data that she sent using the accounts and roles for which she had obtained security credentials were legitimate commands sent by users with permission to send such commands, rather than commands sent by a person who had stolen the security credentials and who lacked authority to use the accounts and roles and send the commands.

17.     It was further part of the scheme and artifice that, in executing the scheme and artifice, PAIGE A. THOMPSON used virtual private networks ("VPNs"), including a VPN offered by the company IPredator, to conceal PAIGE A. THOMPSON's location and identity from the Cloud Computing Company and from victim companies.

18.     It was further part of the scheme and artifice that, in executing the scheme and artifice, PAIGE A. THOMPSON used The Onion Router ("TOR") to conceal PAIGE A. THOMPSON's location and identity from the Cloud Computing Company and from victim companies.

19.     It was further part of the scheme and artifice that PAIGE A. THOMPSON copied data to her own server from servers rented or contracted by Capital One from the Cloud Computing Company, including data that contained information, including personal identifying information, from approximately 100,000,000 customers who had applied for credit cards from Capital One.

Second Superseding Indictment - 4
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ER-143

1      20.    It was further part of the scheme and artifice that PAIGE A. THOMPSON

2 copied and stole data from more than 30 different entities, including Capital One,

3 Victim 2, Victim 3, Victim 4, Victim 5, Victim 6, Victim 7, and Victim 8 that had

4 contracted or rented servers from the Cloud Computing Company.

5      21.    It was further part of the scheme and artifice that PAIGE A. THOMPSON

6 used accounts and roles for which she had obtained security credentials to place programs

7 on certain victims' servers to "mine" cryptocurrency for her own benefit using stolen

8 computing power, a practice often referred to as "cryptojacking." (Cryptocurrency

9 mining is the process by which cryptocurrency transactions are verified and added to the

10 public ledger, *i.e.,* the blockchain. Persons who verify blocks of legitimate transactions,

11 often referred to as "miners," are rewarded with an amount of that cryptocurrency.

12 Successful mining operations consume large amounts of computing power and

13 hardware.) PAIGE A. THOMPSON also used the accounts and roles for which she had

14 obtained security credentials to delete the code, logs, and other records of the

15 cryptocurrency mining software and activity.

16      22.    It was further part of the scheme and artifice that, in placing cryptocurrency

17 mining software on victim servers, and deleting the code, logs, and other records from

18 those servers, PAIGE A. THOMPSON implicitly represented that commands that she

19 issued using the accounts and roles for which she had obtained security credentials were

20 legitimate commands sent by users with permission to send such commands, rather than

21 commands sent by a person who had stolen the security credentials and who lacked

22 authority to use the accounts and roles and send the commands.

23 *C.*   *Execution*

24      23.    On or about March 22, 2019, at Seattle, in the Western District of

25 Washington, and elsewhere, PAIGE A. THOMPSON, for the purpose of executing the

26 scheme and artifice described above, caused to be transmitted by means of wire

27 communication in interstate commerce, from her computer in Seattle to a computer

28 outside the State of Washington, writings, signs, signals, pictures, and sounds, that is, a

Second Superseding Indictment - 5
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ER-144**

1  command to copy data belonging to Capital One from servers, rented and contracted by

2  Capital One from the Cloud Computing Company, to a server belonging to PAIGE A.

3  THOMPSON in Seattle.

4      All in violation of Title 18, United States Code, Section 1343.

5

6  ## COUNT 2
   ### (Computer Fraud and Abuse)

7

8      24.    The allegations set forth in Paragraphs 1-23 of this Second Superseding

9  Indictment are realleged and incorporated into this Count, as if fully set forth herein.

10      25.    Between on or about March 12, 2019, and on or about July 17, 2019, at

11  Seattle, within the Western District of Washington, and elsewhere, PAIGE A.

12  THOMPSON intentionally accessed a computer without authorization, to wit, a computer

13  containing information belonging to Capital One Financial Corporation, and thereby

14  obtained information contained in a financial record of a financial institution and of a

15  card issuer as defined in Section 1602 of Title 15, and information from a protected

16  computer, and the value of the information obtained exceeded $5,000.

17      All in violation of Title 18, United States Code, Section 1030(a)(2)(A) and (C),

18  and (c)(2)(A) and (B)(iii).

19

20  ## COUNTS 3 -5
   ### (Computer Fraud and Abuse)

21

22      26.    The allegations set forth in Paragraphs 1-23 of this Second Superseding

23  Indictment are realleged and incorporated into these Counts, as if fully set forth herein.

24      27.    On or about the dates below, at Seattle, within the Western District of

25  Washington, and elsewhere, PAIGE A. THOMPSON intentionally accessed a computer

26  without authorization, to wit, computers containing information belonging to the entities

27  identified below, and thereby obtained information from a protected computer, and the

28  value of the information obtained exceeded $5,000.

Second Superseding Indictment - 6
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Count | Date | Entity |
|:---:|:---:|:---:|
| 3 | April 5, 2019 | Victim 3 |
| 4 | March 7, 2019 | Victim 5 |
| 5 | March 12, 2019 | Victim 7 |

All in violation of Title 18, United States Code, Section 1030(a)(2)(C), and (c)(2)(A) and (B)(iii).

## COUNTS 6-7
### (Computer Fraud and Abuse)

28.     The allegations set forth in Paragraphs 1-23 of this Second Superseding Indictment are realleged and incorporated into these Counts, as if fully set forth herein.

29.     On or about the dates below, at Seattle, within the Western District of Washington, and elsewhere, PAIGE A. THOMPSON intentionally accessed a computer without authorization, to wit, computers containing information belonging to the entities identified below, and thereby obtained information from a protected computer.

| Count | Date | Entity |
|:---:|:---:|:---:|
| 6 | March 5, 2019 | Victim 6 |
| 7 | March 28, 2019 | Victim 8 |

All in violation of Title 18, United States Code, Section 1030(a)(2)(C), and (c)(2)(A).

## COUNT 8
### (Computer Fraud and Abuse)

30.     The allegations set forth in Paragraphs 1-23 of this Second Superseding Indictment are realleged and incorporated into this Count, as if fully set forth herein.

Second Superseding Indictment - 7
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ER-146**

1   31.   Beginning on or before March 10, 2019, and continuing until on or after

2   August 5, 2019, at Seattle, within the Western District of Washington, and elsewhere,

3   PAIGE A. THOMPSON, knowingly caused the transmission of a program, information,

4   code, and command, that is a program, code, and commands designed to perform

5   cryptocurrency mining and to delete the code, logs, and other records of the

6   cryptocurrency mining software and activity and, as a result of such conduct,

7   intentionally caused damage without authorization to protected computers rented and

8   contracted by Victim 7, Victim 8, and other victims, from the Cloud Computing

9   Company, and the offense caused loss to one or more persons, that is, Victim 7, Victim 8,

10  other victims, and the Cloud Computing Company, during a one-year period, including

11  loss from a related course of conduct, aggregating at least $5,000 in value.

12      All in violation of Title 18, U.S.C. Section 1030(a)(5)(A) and (c)(4)(B)(i).

13

14                          **COUNT 9**
15                     **(Access Device Fraud)**

16  32.   The allegations set forth in Paragraphs 1-23 of this Second Superseding

17  Indictment are realleged and incorporated into this Count, as if fully set forth herein.

18  33.   Beginning on or about March 12, 2019, and continuing until on or about

19  July 17, 2019, at Seattle, within the Western District of Washington, and elsewhere,

20  PAIGE A. THOMPSON, knowingly and with intent to defraud, possessed and attempted

21  to possess counterfeit and unauthorized access devices, said possession affecting

22  interstate and foreign commerce, in that PAIGE A. THOMPSON possessed and

23  attempted to use personal identifying information (PII), including more than 15 Social

24  Security Numbers and more than 15 bank account numbers, stolen during the conduct

25  described in Count 1, to create counterfeit and unauthorized credit and debit cards to be

26  used to conduct transactions in interstate and foreign commerce.

27      All in violation of Title 18, United States Code, Section 1029(a)(3), (b)(1) and

28  (c)(1)(a)(i).

Second Superseding Indictment - 8
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1                           **COUNT 10**

2                  **(Aggravated Identity Theft)**

3       34.     The allegations set forth in Paragraphs 1-23 of this Second Superseding

4 Indictment are realleged and incorporated into this Count, as if fully set forth herein.

5       35.     Beginning on or about March 12, 2019, and continuing until on or about

6 July 17, 2019, at Seattle, within the Western District of Washington, and elsewhere,

7 PAIGE A. THOMPSON, knowingly possessed, without lawful authority, a means of

8 identification of another person during and in relation to a felony violation enumerated in

9 18 U.S.C. § 1028A(c), to wit Wire Fraud, including as charged in Count 1, and Access

10 Device Fraud, as charged in Count 9, knowing that the means of identification belonged

11 to another actual person, to wit, the names and other personal identifying information

12 (PII) of millions of people, including J.B., stolen during the conduct described in

13 Count 1.

14       All in violation of Title 18, United States Code, Section 1028A(a)(1).

15

16            **ASSET FORFEITURE ALLEGATION**

17                    **(COUNT 1)**

18       The allegations contained in Count 1 of this Second Superseding Indictment are

19 hereby realleged and incorporated by reference for the purpose of alleging forfeiture

20 pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28,

21 United States Code, Section 2461(c). Upon conviction of the offense charged in Count 1,

22 the defendant, PAIGE A. THOMPSON, shall forfeit to the United States any property,

23 real or personal, which constitutes or is derived from proceeds traceable to such offense,

24 including but not limited to a sum of money representing the proceeds the defendant

25 obtained from the offense.

26 //

27 //

28 \//

Second Superseding Indictment - 9
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

**(COUNTS 2-8)**

The allegations contained in Counts 2 through 8 of this Second Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1030(i). Upon conviction of an offense charged in Counts 2 through 8, the defendant, PAIGE A. THOMPSON, shall forfeit to the United States any property constituting, or derived from, proceeds the defendant obtained, directly or indirectly, as the result of such offense, and shall also forfeit the defendant's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such offense, including but not limited to a sum of money representing the proceeds the defendant obtained from the offense.

**(COUNT 9)**

The allegations contained in Count 9 of this Second Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1029(c)(1)(C). Upon conviction of the offense charged in Count 9, the defendant, PAIGE A. THOMPSON, shall forfeit to the United States any property constituting, or derived from, proceeds the defendant obtained, directly or indirectly, as the result of such offense, and shall also forfeit the defendant's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such offense, including but not limited to a judgment for a sum of money representing the proceeds the defendant obtained from the offense.

**(Substitute Assets)**

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

Second Superseding Indictment - 10
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ER-149**

1      c. has been placed beyond the jurisdiction of the Court;

2      d. has been substantially diminished in value; or

3      e. has been commingled with other property which cannot be divided without

4         difficulty;

5  it is the intent of the United States to seek the forfeiture of any other property of the

6  defendant, up to the value of the above-described forfeitable property, pursuant to Title

7  21, United States Code, Section 853(p).

8

9                             A TRUE BILL:

10                            DATED: 12 January 2022

11                            *Signature of foreperson redacted*

12                            *pursuant to the policy of the Judicial*
                              *Conference of the United States*

13

14                            FOREPERSON

15

16

17 NICHOLAS W. BROWN

18 United States Attorney

19

20

21 ANDREW C. FRIEDMAN
   Assistant United States Attorney

22

23

24 JESSICA M. MANCA

25 Assistant United States Attorney

26

27

28

Second Superseding Indictment - 11
*United States v. Paige A. Thompson,* CR19-159 RSL
USAO #2019R00675

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,                )   No. CR19-159-RSL
                                          )
                    Plaintiff,            )
                                          )
          v.                              )   AMENDED NOTICE OF CRIMINAL
                                          )   APPEAL
                                          )
PAIGE A. THOMPSON,                        )
                                          )
                    Defendant.            )
_____)

Paige Thompson, through undersigned counsel, respectfully submits this amended notice of appeal to include her appeal of the District Court's Preliminary Order of Forfeiture (Dkt. 399) and Order of Restitution (Dkt. 400), both of which were filed on December 6, 2022, after counsel for Ms. Thompson and counsel for the government filed their respective appeal and cross-appeal to the Ninth Circuit. *See* Ninth Cir. Nos. 22-30168 & 22-30179. All other issues on appeal remain. *See* Dkt. 389.

Undersigned counsel confirms that all required transcripts have been ordered. Furthermore, counsel is not requesting an extension or amendment to the existing briefing schedule in the Ninth Circuit.

DATED this 21st day of December 2022.

Respectfully submitted,

s/ *Vicki Lai*
Chief Appellate Attorney
Attorney for Paige Thompson

AMENDED NOTICE OF CRIMINAL APPEAL
(*United States v. Thompson*, CR19-159-RSL) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

**ER-151**

Query    Reports    Utilities    Help    Log Out

APPEAL,BOND,CLOSED,JEEPS,PASSPORT

# U.S. District Court
# United States District Court for the Western District of Washington (Seattle)
# CRIMINAL DOCKET FOR CASE #: 2:19-cr-00159-RSL-1

| | |
|---|---|
| Case title: USA v. Thompson | Date Filed: 08/28/2019 |
| Other court case number: 22-70057 9th Circuit Court of Appeals | Date Terminated: 10/04/2022 |
| Magistrate judge case number: 2:19-mj-00344-MAT | |

Assigned to: Judge Robert S. Lasnik

Appeals court case numbers: 22-30168 9th Circuit Court of Appeals, 22-30179 9th Circuit Court of Appeals

## Defendant (1)

**Paige A Thompson**
*TERMINATED: 10/04/2022*
*also known as*
erratic
*TERMINATED: 10/04/2022*

represented by **Christopher M Sanders**
PACIFICA LAW GROUP LLP
1191 SECOND AVENUE
SUITE 2000
SEATTLE, WA 98101
206-245-1700
Email:
christopher.sanders@pacificalawgroup.com
*TERMINATED: 06/29/2022*
*LEAD ATTORNEY*
*Designation: Public Defender or
Community Defender Appointment*

**Emily R Stierwalt**
WAYMAKER LLP
515 S FLOWER ST
STE 3500
LOS ANGELES, CA 90071
424-652-7800
Fax: 424-652-7850
Email: estierwalt@waymakerlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Admission Pro Hac Vice*

**Melissa A Meister**
WAYMAKER LLP
515 S FLOWER ST
STE 3500

**ER-152**

LOS ANGELES, CA 90071
424-652-7800
Email: mmeister@waymakerlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Admission Pro Hac Vice*

**Brian E. Klein**
WAYMAKER LLP
515 S FLOWER ST
STE 3500
LOS ANGELES, CA 90071
424-652-7800
Fax: 424-652-7850
Email: bklein@waymakerlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Mohammad Ali Hamoudi**
HERRMANN LAW GROUP
505 FIFTH AVENUE SOUTH STE 330
SEATTLE, WA 98104
206-625-9104
Email: mo@hlg.lawyer
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or
Community Defender Appointment*

**Nancy Tenney**
FEDERAL PUBLIC DEFENDER'S
OFFICE (SEA)
1601 5TH AVE
STE 700 WESTLAKE CENTER OFFICE
TOWER
SEATTLE, WA 98101
206-553-1100
Fax: 206-553-0120
Email: nancy_tenney@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or
Community Defender Appointment*

| Pending Counts | Disposition |
|---|---|
| Wire Fraud - 18:1343 (1) | DISMISSED |
| Wire Fraud - 18:1343 (1s) | DISMISSED |
| Wire Fraud - 18:1343 (1ss) | Time served; $100.00 special assessment; fine waived; restitution to be determined |
| Computer Fraud and Abuse - 18:1030(a)(2) (A) and (C), and (c)(2)(A) and (B)(iii) | DISMISSED |

**ER-153**

(2)

Computer Fraud and Abuse - 18:1030(a)(2)
(A) and (C), and (c)(2)(A) and (B)(iii)
(2s)

DISMISSED

5 years of probation with standard and special conditions, which shall include participation in the location monitoring program for a period of 3 years and completion of 50 hours of community service per year for the duration of the probationary period; $100.00 special assessment; fine waived; restitution to be determined

Computer Fraud and Abuse - 18:1030(a)(2)
(A) and (C) and (c)(2)(A) and (B)(iii)
(2ss)

Computer Fraud and Abuse - 18:1030(a)(2)
(C), and (c)(2)(A) and (B)(iii)
(3s-5s)

DISMISSED

Computer Fraud and Abuse - 18:1030(a)(2)
(C) and (c)(2)(A) and (B)(iii)
(3ss)

DISMISSED ON GOVERNMENT'S MOTION

5 years of probation with standard and special conditions, which shall include participation in the location monitoring program for a period of 3 years and completion of 50 hours of community service per year for the duration of the probationary period; $100.00 special assessment; fine waived; restitution to be determined

Computer Fraud and Abuse - 18:1030(a)(2)
(C) and (c)(2)(A) and (B)(iii)
(4ss-5ss)

Computer Fraud and Abuse - 18:1030(a)(2)
(C), and (c)(2)(A)
(6s-7s)

DISMISSED

1 year of probation with standard and special conditions, which shall include participation in the location monitoring program and completion of 50 hours of community service per year for the duration of the probationary period; $25.00 special assessment per count; fine waived; restitution to be determined

Computer Fraud and Abuse - 18:1030(a)(2)
(C) and (c)(2)(A)
(6ss-7ss)

Computer Fraud and Abuse - 18:1030(a)(5)
(A) and (c)(4)(B)(i)
(8s)

DISMISSED

Computer Fraud and Abuse - 18:1030(a)(5)
(A) and (c)(4)(B)(i)
(8ss)

5 years of probation with standard and special conditions, which shall include participation in the location monitoring program for a period of 3 years and completion of 50 hours of community service per year for the duration of the probationary period; $100.00 special

assessment; fine waived; restitution to be determined

Access Device Fraud - 18:1029(a)(3), (b)(1) and (c)(1)(a)(i)
(9s)

DISMISSED

Access Device Fraud - 18:1029(a)(3), (b)(1) and (c)(1)(a)(i)
(9ss)

FINDING OF NOT GUILTY

Aggravated Identity Theft - 18:1028A(a)(1)
(10s)

DISMISSED

Aggravated Identity Theft - 18:1028A(a)(1)
(10ss)

FINDING OF NOT GUILTY

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                        **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                               **Disposition**

Computer Fraud and Abuse - 18:1030(a)(2)
(A) and (C), and (c)(2)(A) and (B)(iii)

---

**Movant**

**Capital One Bank (USA) NA**                 represented by  **Alexandra Swain**
*Capital One Financial Corp. (Capital One)*                   DEBEVOISE & PLIMPTON LLP (SF)
*TERMINATED: 10/04/2022*                                      650 CALIFORNIA ST
                                                              SAN FRANCISCO, CA 94108
                                                              415-738-5700
                                                              Email: apswain@debevoise.com
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*
                                                              *Designation: Admission Pro Hac Vice*

                                                              **James J Pastore , Jr**
                                                              DEBEVOISE & PLIMPTON (NY)
                                                              66 HUDSON BLVD
                                                              NEW YORK, NY 10001
                                                              212-909-6000
                                                              Email: jjpastore@debevoise.com
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

*Designation: Admission Pro Hac Vice*

**John Gleeson**
DEBEVOISE & PLIMPTON (NY)
66 HUDSON BLVD
NEW YORK, NY 10001
212-909-6000
Email: jgleeson@debevoise.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Admission Pro Hac Vice*

**Thomas B W Hall**
CAPITAL ONE FINANCIAL CORP
15070 CAPITAL ONE DR
RICHMOND, VA 23228
804-385-5727
Email: thomas.hall2@capitalone.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Admission Pro Hac Vice*

**Aravind Swaminathan**
ORRICK HERRINGTON & SUTCLIFFE
LLP (SEA)
401 UNION ST
STE 3300
SEATTLE, WA 98101
206-839-4800
Email: aswaminathan@orrick.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Movant**

**Amazon Web Services, Inc.**
*TERMINATED: 10/04/2022*

represented by **Janie Yoo Miller**
FENWICK & WEST (SF)
555 CALIFORNIA ST
12TH FL
SAN FRANCISCO, CA 94104
310-434-5400
Fax: 650-938-5200
Email: jmiller@fenwick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Admission Pro Hac Vice*

**Tyler G Newby**
FENWICK & WEST (SF)
555 CALIFORNIA ST

**ER-156**

12TH FL
SAN FRANCISCO, CA 94104
415-875-2300
Email: tnewby@fenwick.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Admission Pro Hac Vice*

**Brian D Buckley**
FENWICK & WEST (WA)
1191 SECOND AVE
10TH FLOOR
SEATTLE, WA 98101
206-389-4529
Fax: 206-389-4511
Email: bbuckley@fenwick.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Plaintiff**

USA                              represented by **Andrew C Friedman**
US ATTORNEY'S OFFICE (SEA)
700 STEWART ST
STE 5220
SEATTLE, WA 98101-1271
206-553-7970
Email: Andrew.Friedman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Jessica Murphy Manca**
US ATTORNEY'S OFFICE (SEA)
700 STEWART ST
STE 5220
SEATTLE, WA 98101-1271
206-553-7970
Email: Jessica.Manca@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Krista Kay Bush**
UNITED STATES ATTORNEY'S OFFICE
700 STEWART STREET
STE 5220
SEATTLE, WA 98101
206-553-4665
Email: krista.bush@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Steven Masada**
UNITED STATES ATTORNEY'S OFFICE

700 STEWART STREET
STE 5220
SEATTLE, WA 98101
206-553-7970
Email: ECF-crm.usawaw@usdoj.gov
*TERMINATED: 11/05/2021*
*Designation: Assistant US Attorney*

**Tania M. Culbertson**
UNITED STATES ATTORNEY'S OFFICE
700 STEWART STREET
STE 5220
SEATTLE, WA 98101
206-553-4737
Email: Tania.Culbertson@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/29/2019 | 1 | COMPLAINT as to Paige A Thompson (1). (AQ) [2:19-mj-00344-MAT] (Entered: 07/29/2019) |
| 07/29/2019 | | PC Arrest of Paige A Thompson on 7/29/2019. (AQ) [2:19-mj-00344-MAT] (Entered: 07/29/2019) |
| 07/29/2019 | 3 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER appointing Christopher Sanders for Paige A Thompson. On the basis of the defendant's sworn financial statement, the court finds that he/she is financially unable to retain counsel. It is hereby ORDERED that the Federal Public Defender for the Western District of Washington be and hereby is appointed to represent the defendant pursuant to Title 18 United States Code 3006A. Approved by Hon. Mary Alice Theiler. *(No.pdf image attached)* (AQ)[2:19-mj-00344-MAT] (Entered: 07/29/2019) |
| 07/29/2019 | 4 | Minute Entry for proceedings held before Hon. Mary Alice Theiler- CRD: *A. Quach*; AUSA: *Steven Masada, Andrew Friedman*; Def Cnsl: *Christopher Sanders*; PTS: *Lorraine Bolle*; Court Reporter: *Digital Recording*; Time of Hearing: *2:00pm*; Courtroom: *12B*; **INITIAL APPEARANCE** as to Paige A Thompson held on 7/29/2019. Defendant present in custody. Financial affidavit reviewed. Counsel appointed. Agent sworn and signs complaint. Court signs complaint. Defendant advised of rights, charges, and penalties. Government moves for detention. Hearing scheduled. Defendant remanded to custody.<br><br>Detention Hearing set for 8/1/2019 at 10:00 AM in Courtroom 12B before Hon. Michelle L. Peterson.<br>Preliminary Examination set for 8/12/2019 at 01:00 PM in Courtroom 12B before Hon. Brian A Tsuchida. (AQ) [2:19-mj-00344-MAT] (Entered: 07/29/2019) |
| 07/29/2019 | 5 | MOTION for Detention by USA as to Paige A Thompson (AQ) [2:19-mj-00344-MAT] (Entered: 07/29/2019) |
| 07/30/2019 | 7 | NOTICE OF ATTORNEY APPEARANCE: Mohammad Ali Hamoudi appearing for Paige A Thompson (Hamoudi, Mohammad Ali) [2:19-mj-00344-MAT] (Entered: 07/30/2019) |
| 07/30/2019 | 8 | NOTICE OF RESCHEDULED HEARING TIME as to Paige A Thompson. The Hearing time has been changed: Detention Hearing is reset for 8/1/2019 at 09:30 AM |

| | | |
|---|---|---|
| | | in Courtroom 12B before Hon. Michelle L. Peterson. (TF)(cc: USPO, PTS, USMO) [2:19-mj-00344-MAT] (Entered: 07/30/2019) |
| 07/31/2019 | 9 | WAIVER of Preliminary Hearing, by Paige A Thompson. Hearing set for 8/12/2019. (Hamoudi, Mohammad Ali) [2:19-mj-00344-MAT] (Entered: 07/31/2019) |
| 07/31/2019 | 10 | NOTICE of Stricken Preliminary Hearing on 8/12/2019; as to Paige A Thompson. (TF) [2:19-mj-00344-MAT] (Entered: 07/31/2019) |
| 07/31/2019 | 11 | NOTICE OF RESCHEDULED HEARING as to Paige A Thompson. Based upon the request of defense counsel and with no objection from the Government, the Detention Hearing is reset for 8/15/2019 at 11:00 AM in Courtroom 12B before Hon. Michelle L. Peterson. (TF)(cc: USPO, PTS, USMO) [2:19-mj-00344-MAT] (Entered: 07/31/2019) |
| 08/13/2019 | 13 | MEMORANDUM by USA as to Paige A Thompson re 5 MOTION for Detention filed by USA (Attachments: # 1 Exhibit)(Friedman, Andrew) [2:19-mj-00344-MAT] (Entered: 08/13/2019) |
| 08/14/2019 | 14 | MOTION to Seal Document *United States' Supplemental Memorandum* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 8/16/2019, (Friedman, Andrew) [2:19-mj-00344-MAT] (Entered: 08/14/2019) |
| 08/14/2019 | 15 | **SEALED DOCUMENT** *United States' Supplemental Memorandum in Support of Motion for Detention* by USA as to Paige A Thompson, re 14 MOTION to Seal Document *United States' Supplemental Memorandum*. (Friedman, Andrew) [2:19-mj-00344-MAT] (Entered: 08/14/2019) |
| 08/14/2019 | 16 | NOTICE OF RESCHEDULED HEARING as to Paige A Thompson. Upon the request of the parties, the Detention Hearing is reset for 8/22/2019 at 11:00 AM in Courtroom 12B before Hon. Michelle L. Peterson. (TF)(cc: USPO, PTS, USMO) [2:19-mj-00344-MAT] (Entered: 08/14/2019) |
| 08/14/2019 | 17 | NOTICE OF RESCHEDULED HEARING as to Paige A Thompson. Upon the request of the parties, the Detention Hearing is reset for 8/23/2019 at 11:00 AM in Courtroom 12B before Hon. Michelle L. Peterson. (TF)(cc: USPO, PTS, USMO) [2:19-mj-00344-MAT] (Entered: 08/14/2019) |
| 08/20/2019 | 18 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 8/30/2019, (Hamoudi, Mohammad Ali) [2:19-mj-00344-MAT] (Entered: 08/20/2019) |
| 08/20/2019 | 19 | RESPONSE, by Paige A Thompson, to 5 MOTION for Detention. (Attachments: # 1 Eakes Declaration, # 2 ACLU Letter, # 3 AWS Letter)(Hamoudi, Mohammad Ali) [2:19-mj-00344-MAT] (Entered: 08/20/2019) |
| 08/20/2019 | 20 | **SEALED DOCUMENT** *Exhibit A* by Paige A Thompson, re 19 Response to Motion, filed under seal in accordance with LCrR 55. (Attachments: # 1 Exhibit B)(Hamoudi, Mohammad Ali) [2:19-mj-00344-MAT] (Entered: 08/20/2019) |
| 08/21/2019 | 21 | ORDER Granting 18 Motion to File Overlength Response to Government's Memorandum in Support of Motion for Detention as to Paige A Thompson (1) signed by Hon. Michelle L. Peterson. (TF) [2:19-mj-00344-MAT] (Entered: 08/22/2019) |
| 08/22/2019 | 22 | ORDER signed by Hon. Michelle L. Peterson, re: Govt's 14 Motion to Seal; as to Paige A Thompson (1). (TF) [2:19-mj-00344-MAT] (Entered: 08/22/2019) |
| 08/22/2019 | 23 | MOTION for Leave to File Over-length Motions and Briefs *Reply Memorandum* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 8/30/2019, |

| | | |
|---|---|---|
| | | (Masada, Steven) [2:19-mj-00344-MAT] (Entered: 08/22/2019) |
| 08/22/2019 | 24 | REPLY, by USA as to Paige A Thompson, TO RESPONSE to 5 MOTION for Detention (Masada, Steven) [2:19-mj-00344-MAT] (Entered: 08/22/2019) |
| 08/22/2019 | 25 | MOTION to Seal Document *Exhibit 8 to Reply to Memorandum for Detention* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 8/30/2019, (Masada, Steven) [2:19-mj-00344-MAT] (Entered: 08/22/2019) |
| 08/22/2019 | 26 | **SEALED DOCUMENT** *Exhibit 8 to Reply to Memorandum for Detention* by USA as to Paige A Thompson, re 25 MOTION to Seal Document *Exhibit 8 to Reply to Memorandum for Detention*. (Masada, Steven) [2:19-mj-00344-MAT] (Entered: 08/22/2019) |
| 08/22/2019 | 29 | ORDER Granting Govt's 23 Motion to File a Response in Excess of 12 Pages signed by Hon. Michelle L. Peterson, as to Paige A Thompson (1). (TF) [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/23/2019 | 27 | EXHIBIT *4, Memorandum* by Paige A Thompson re 19 Response to Motion (Attachments: # 1 Exhibit 5, Letter)(Hamoudi, Mohammad Ali) [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/23/2019 | 28 | SUPPLEMENT *FILING IN SUPPORT OF MOTION FOR DETENTION* by USA as to Paige A Thompson re 5 MOTION for Detention (Attachments: # 1 ~~Complaint~~ Exhibit 9) (Friedman, Andrew) Modified on 8/23/2019 (PS). [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/23/2019 | | NOTICE of Docket Text Modification as to defendant Paige A Thompson re 28 Supplement : Per counsel request, amended text to correctly identify attachment #1 as Exhibit. (PS) [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/23/2019 | 30 | ORDER TO SEAL signed by Hon. Michelle L. Peterson, re: 25 Motion to Seal; as to Paige A Thompson (1) (TF) [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/23/2019 | 31 | Minute Entry for proceedings held before Hon. Michelle L. Peterson- CRD: *tfarrell*; AUSA: *Andrew Friedman, Steven Masada*; Def Cnsl: *Mohammad Hamoudi*; PTS: *Ben Beetham*; Court Reporter: *Digital Recording*; Time of Hearing: *11:00am*; Courtroom: *12B*; **DETENTION HEARING** as to Paige A Thompson held on 8/23/2019. Defendant present in custody. Court reviews record. Gov't moves for detention. Counsel for defense argues for release. For reasons stated on the record, deft ORDERED detained and remanded to custody. (TF) [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/23/2019 | 32 | DETENTION ORDER as to Paige A Thompson re 5 MOTION for Detention by Hon. Michelle L. Peterson. (cc: PTS, USMO) (TF) [2:19-mj-00344-MAT] (Entered: 08/23/2019) |
| 08/28/2019 | 33 | INDICTMENT as to Paige A Thompson (1) counts 1, 2. (Attachments: # 1 Status Sheet) (AQ) (Entered: 08/28/2019) |
| 08/28/2019 | 34 | **SEALED Signature Page** to 33 Indictment as to Paige A Thompson. (AQ) (Entered: 08/28/2019) |
| 08/28/2019 | 35 | ORDER CONTINUING DETENTION as to Paige A Thompson by Hon. Michelle L. Peterson. cc: USMO; (AQ) (Entered: 08/28/2019) |
| 08/30/2019 | 36 | Letter scheduling arraignment for defendant Paige A Thompson. Arraignment set for 9/5/2019 at 09:00 AM in Courtroom 12B before Hon. Brian A Tsuchida. (Masada, Steven) (Entered: 08/30/2019) |

| 08/30/2019 | 37 | NOTICE of Related Case 19-0148 filed by attorney Andrew C Friedman. (Friedman, Andrew) (Entered: 08/30/2019) |
|---|---|---|
| 09/05/2019 | 38 | Minute Entry for proceedings held before Hon. Brian A Tsuchida- CRD: *K. Peter*; AUSA: *Andrew Friedman*; Def Cnsl: *Mohammad Hamoudi & Christopher Sanders*; Court Reporter: *Digital Recording*; Time of Hearing: *9:00am*; Courtroom: *12B*; **ARRAIGNMENT** as to Paige A Thompson (1) Count 1,2 held on 9/5/2019. Defendant advised of charges and penalties. Defendant pleads NOT GUILTY to all charges. Defendant remanded to custody.<br><br>Motions due by 9/26/2019, *Proposed Trial Exhibits Due By:11/4/2019.*<br>Jury Trial is set for 11/4/2019 at 09:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. (KMP) (Entered: 09/05/2019) |
| 09/05/2019 | 39 | Unopposed MOTION FOR BRIEFING SCHEDULE by Paige A Thompson. (Attachments: # 1 Proposed Order)(Hamoudi, Mohammad Ali) (Entered: 09/05/2019) |
| 09/05/2019 | 40 | NOTICE OF ATTORNEY APPEARANCE: Nancy Tenney appearing for Paige A Thompson (Tenney, Nancy) (Entered: 09/05/2019) |
| 09/06/2019 | 41 | ORDER granting Defendant's 39 Motion for Briefing Schedule; as to Paige A Thompson (1): Counsel for Ms. Thompson may file an opening brief by 9/13/2019, the government may respond by 9/20/2019, and the defense may reply by 9/23/2019. Signed by Judge Robert S. Lasnik. (MW) (Entered: 09/06/2019) |
| 09/10/2019 | 42 | NOTICE OF ATTORNEY APPEARANCE: Brian E. Klein appearing for Paige A Thompson (Klein, Brian) (Entered: 09/10/2019) |
| 09/13/2019 | 43 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 9/27/2019, (Tenney, Nancy) (Entered: 09/13/2019) |
| 09/13/2019 | 44 | MOTION for Review of Detention Order by Paige A Thompson. Oral Argument Requested. (Attachments: # 1 Exhibit 1Transcript Detention Hearing, # 2 Exhibit 2 Support Letters, # 3 Exhibit 3 Declaration, # 4 Exhibit 6 ACLU Letter, # 5 Exhibit 7 AWS Letter, # 6 Proposed Order) Noting Date 9/27/2019, (Tenney, Nancy) (Entered: 09/13/2019) |
| 09/13/2019 | 45 | **SEALED DOCUMENT** *Exhibit 4 Goldenberg Report* by Paige A Thompson, re 44 MOTION for Review of Detention Order , filed under seal in accordance with LCrR 55. (Attachments: # 1 Exhibit 5 SCS Letter)(Tenney, Nancy) (Entered: 09/13/2019) |
| 09/16/2019 | 46 | **SEALED DOCUMENT** *Exhibit 4 (Goldenberg Report) & Exhibit 5 (SCS Letters) (Corrected)* by Paige A Thompson, re 45 Sealed Document,, filed under seal in accordance with LCrR 55. (Tenney, Nancy) (Entered: 09/16/2019) |
| 09/18/2019 | 47 | MINUTE ORDER as to Paige A Thompson re: 44 MOTION for Review of Detention Order (In-court Hearing set for 10/4/2019 at 11:00 AM in Courtroom 15106 before Judge Robert S. Lasnik.) (KERR) (Entered: 09/18/2019) |
| 09/20/2019 | 48 | MOTION for Leave to File Over-length Motions and Briefs *Opposition to Defendant's Appeal of Detention Order* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 9/20/2019, (Friedman, Andrew) (Entered: 09/20/2019) |
| 09/20/2019 | 49 | RESPONSE, by USA as to Paige A Thompson, to 44 MOTION for Review of Detention Order . (Attachments: # 1 Exhibit)(Friedman, Andrew) (Entered: 09/20/2019) |
| 09/23/2019 | 50 | MOTION to Seal Document by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 10/4/2019, (Hamoudi, Mohammad Ali) (Entered: 09/23/2019) |

| | | |
|---|---|---|
| 09/23/2019 | 51 | **SEALED DOCUMENT** *SUPPLEMENTAL MEMORANDUM* by Paige A Thompson, re 50 MOTION to Seal Document . (Hamoudi, Mohammad Ali) (Entered: 09/23/2019) |
| 09/23/2019 | 52 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 10/4/2019, (Hamoudi, Mohammad Ali) (Entered: 09/23/2019) |
| 09/23/2019 | 53 | REPLY, by Paige A Thompson, TO RESPONSE to 44 MOTION for Review of Detention Order (Attachments: # 1 Exhbit 8, Declaration of Patricia Stordeur)(Hamoudi, Mohammad Ali) (Entered: 09/23/2019) |
| 09/24/2019 | 54 | ORDER granting United States' 48 Motion for Leave to File Over-length Response as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (Entered: 09/24/2019) |
| 09/27/2019 | 55 | ORDER granting Defendant's 43 Motion for Leave to File Over-length Motion as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (Entered: 09/27/2019) |
| 09/27/2019 | 56 | ORDER granting 50 Motion to Seal Document as to Paige A Thompson (1), signed by Judge Robert S. Lasnik. (KERR) (Entered: 09/27/2019) |
| 09/27/2019 | 57 | ORDER granting 52 Motion for Leave to File Over-length Reply to Response to Motion to Review and Revoke Detention Order as to Paige A Thompson (1), signed by Judge Robert S. Lasnik. (KERR) (Entered: 09/27/2019) |
| 10/02/2019 | 58 | SUPPLEMENT by Paige A Thompson re 44 MOTION for Review of Detention Order (Hamoudi, Mohammad Ali) (Entered: 10/02/2019) |
| 10/04/2019 | 59 | Minute Entry for proceedings held before Judge Robert S. Lasnik- CRD: *Kerry Simonds*; AUSA: *Andrew Friedman, Steven Masada*; Def Cnsl: *Mohammad Hamoudi, Brian Klein*; USPO: *Ben Beetham*; Court Reporter: *Nickie Drury*; Time of Hearing: *11:15 a.m.*; Courtroom: *15106*; **DETENTION HEARING** as to Paige A Thompson held on 10/4/2019 re: 44 Motion for Review of Detention Order. After hearing from counsel and for reasons stated on the record, the Court denies the motion at this time. The Court directs USPO Beetham to look into the specific halfway house and report back about bed availability, defendant's safety, and the community's safety. Once the report is reviewed, the clerk will schedule a follow-up hearing. Defendant remanded to custody. (KERR) (Entered: 10/04/2019) |
| 10/08/2019 | 60 | STIPULATED MOTION *TO CONTINUE TRIAL DATE AND PRETRIAL MOTIONS DEADLINE* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order, # 2 Waiver of Speedy Trial) Noting Date 10/8/2019, (Masada, Steven) (Entered: 10/08/2019) |
| 10/09/2019 | 61 | MINUTE ORDER as to Paige A Thompson re: 44 MOTION for Review of Detention Order (In-court Hearing set for 11/4/2019 at 2:00 PM in Courtroom 15106 before Judge Robert S. Lasnik.) (KERR) (Entered: 10/09/2019) |
| 10/09/2019 | 62 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Detention Review Hearing held on 10/4/2019 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov. |

| | | |
|---|---|---|
| | | To purchase a copy of the transcript, contact court reporter Nickoline Drury, nickoline_drury@wawd.uscourts.gov, 206-370-8508.<br><br>Release of Transcript Restriction set for 1/7/2020, (ND) (Entered: 10/09/2019) |
| 10/11/2019 | 63 | ORDER CONTINUING TRIAL DATE as to Paige A Thompson re parties' 60 Stipulated Motion to Continue Trial Dateand Pretrial Motions Deadline. Signed by Judge Robert S. Lasnik. ( **Jury Trial is CONTINUED to 3/2/2020 at 9:00 AM.** Pretrial Motions due by 1/13/2020. ) (SWT)(cc: PTS/USPO, USMO) (Entered: 10/11/2019) |
| 10/25/2019 | 65 | Stipulated MOTION FOR PROTECTIVE ORDER by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 10/25/2019, (Masada, Steven) (Entered: 10/25/2019) |
| 10/30/2019 | 66 | PROTECTIVE ORDER re Parties' 65 Stipulated Motion as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (Entered: 10/30/2019) |
| 11/04/2019 | 67 | Minute Entry for proceedings held before Judge Robert S. Lasnik- CRD: *Kerry Simonds*; AUSA: *Andrew Friedman, Steven Masada*; Def Cnsl: *Mohammad Homoudi, Brian Klein*; USPO: *Jerrod Akins for Ben Beetham*; Court Reporter: *Nancy Bauer*; Time of Hearing: *2:00 p.m.*; Courtroom: *15106*; **DETENTION HEARING** held on 11/4/2019 re: 44 MOTION for Review of Detention Order filed by Paige A Thompson. The Court hears from counsel, USPO Akins, and the Defendant. For reasons stated on the record, Defendant placed on bond. Status Hearing set for 12/4/2019 at 1:30 PM in Courtroom 15106 before Judge Robert S. Lasnik. (KERR) (Entered: 11/04/2019) |
| 11/04/2019 | 68 | Appearance Bond Entered as to Paige A Thompson (1). Defendant placed on Pretrial Supervision with added conditions. (cc: PTS/USPO/USMO) (KERR) (Entered: 11/04/2019) |
| 11/04/2019 | 69 | Receipt for Surrender of Passport as to Paige A Thompson. Passport issued by USA. (KMP) (Entered: 11/04/2019) |
| 11/07/2019 | 70 | NOTICE OF CHANGE OF ADDRESS by Brian E. Klein (Klein, Brian) Modified Address on 11/7/2019 (DS). (Entered: 11/07/2019) |
| 11/07/2019 | 71 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of the status conference held on 11/4/2019 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov, 206-370-8506.<br><br>Release of Transcript Restriction set for 2/5/2020, (NB) (Entered: 11/07/2019) |
| 12/04/2019 | 72 | Minute Entry for proceedings held before Judge Robert S. Lasnik- CRD: *Kerry Simonds*; AUSA: *Andrew Friedman, Steven Masada*; Def Cnsl: *Mohammad Hamoudi and Brian Klein*; USPO/PTS: *Ben Beetham*; Court Reporter: *Debbie Zurn*; Time of Hearing: *1:30 p.m.*; Courtroom: *15106*; **STATUS HEARING** as to Paige A Thompson held on 12/4/2019. After hearing from the parties,the Court amends the appearance bond as |

| | | |
|---|---|---|
| | | recommended by Officer Beetham. The defendant shall be allowed to use a flip phone with no internet or data capability, as directed by Pretrial Services. Defendant remains on bond. (KERR) (Entered: 12/04/2019) |
| 12/04/2019 | 73 | Amended Appearance Bond Entered as to Paige A Thompson (1). Defendant continued on Pretrial Supervision with conditions. (cc: PTS/USPO/USMO) (KERR) (Entered: 12/04/2019) |
| 12/05/2019 | 74 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Status Hearing held on 12/4/2019 before Judge Robert S. Lasnik.

Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.

To purchase a copy of the transcript, contact court reporter Debbie Zurn, debbie_zurn@wawd.uscourts.gov, 206-370-8504.

Release of Transcript Restriction set for 3/4/2020, (DZ) (Entered: 12/05/2019) |
| 12/05/2019 | 75 | STIPULATION AND PROPOSED ORDER *Stipulated Motion for Protective Order* by parties (Klein, Brian) (Entered: 12/05/2019) |
| 12/06/2019 | 76 | PROPOSED ORDER (Unsigned) re 75 Stipulation *for Protective Order* (Klein, Brian) (Entered: 12/06/2019) |
| 12/06/2019 | 77 | PROTECTIVE ORDER re the parties' 75 Stipulated Motion, by Judge Robert S. Lasnik. (KERR) (Entered: 12/06/2019) |
| 01/28/2020 | 78 | STIPULATED MOTION *TO CONTINUE TRIAL DATE AND PRETRIAL MOTIONS DEADLINES* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 1/28/2020, (Masada, Steven) (Entered: 01/28/2020) |
| 01/29/2020 | 79 | WAIVER of Speedy Trial by Paige A Thompson (Tenney, Nancy) (Entered: 01/29/2020) |
| 02/05/2020 | 80 | ORDER granting Parties' 78 STIPULATED MOTION *TO CONTINUE TRIAL DATE AND PRETRIAL MOTIONS* as to Paige A Thompson: Jury Trial continued to 10/19/2020 before Judge Robert S. Lasnik, Pretrial motions due by 8/24/2020. Signed by Judge Robert S. Lasnik. (MW)(cc: PTS/USPO, USMO) (Entered: 02/05/2020) |
| 06/04/2020 | 82 | Stipulated MOTION to Continue Trial *Date and Pretrial Motions Dateline* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 6/4/2020, (Friedman, Andrew) (Entered: 06/04/2020) |
| 06/11/2020 | 83 | WAIVER of Speedy Trial by Paige A Thompson (Hamoudi, Mohammad Ali) (Entered: 06/11/2020) |
| 06/11/2020 | 84 | ORDER CONTINUING TRIAL DATE AND PRETRIAL MOTIONS DEADLINE as to Paige A Thompson: The trial in this matter is continued to 2/8/2021, at 9:00 a.m.; Pre-trial motions are due no later than 11/20/2020. Signed by Judge Robert S. Lasnik.(MW) (cc: USMO) (Entered: 06/11/2020) |
| 07/13/2020 | 85 | PROPOSED ORDER (Unsigned) re 76 Proposed Order (Unsigned), 75 Stipulation *PROPOSED AMENDED STIPULATED PROTECTIVE ORDER* (Klein, Brian) (Entered: |

| | | |
|---|---|---|
| | | 07/13/2020) |
| 07/21/2020 | 86 | STIPULATED MOTION *FOR AMENDED PROTECTIVE ORDER* by Paige A Thompson. (Attachments: # 1 Proposed Order [PROPOSED] AMENDED STIPULATED PROTECTIVE ORDER) Noting Date 7/21/2020, (Klein, Brian) (Entered: 07/21/2020) |
| 07/24/2020 | 87 | AMENDED STIPULATED PROTECTIVE ORDER re Parties' 86 Stipulated Motion; as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (Entered: 07/24/2020) |
| 08/12/2020 | 88 | PRETRIAL PETITION/ORDER endorsing the United States Probation Officer's actions as to Paige A Thompson by Judge Robert S. Lasnik. (LH)(cc: USMO, PTS) (Entered: 08/12/2020) |
| 11/25/2020 | 89 | Stipulated MOTION to Continue Trial *and Pretrial Motions Deadline* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 11/25/2020, (Tenney, Nancy) (Entered: 11/25/2020) |
| 11/25/2020 | 90 | WAIVER of Speedy Trial by Paige A Thompson (Tenney, Nancy) (Entered: 11/25/2020) |
| 11/30/2020 | 91 | ORDER granting Defendant's 89 Unopposed Motion to Continue Trial as to Paige A Thompson (1). Jury Trial is continued to 6/7/2021 before Judge Robert S. Lasnik. Pretrial Motions are now due by 2/18/2021. Signed by Judge Robert S. Lasnik. (LH) (cc: USMO) (Entered: 11/30/2020) |
| 01/25/2021 | 92 | NOTICE *of Change of Firm Name* by Paige A Thompson (Klein, Brian) (Entered: 01/25/2021) |
| 01/27/2021 | 93 | Unopposed MOTION to Continue Trial *and Pretrial Motions Deadline* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/27/2021, (Hamoudi, Mohammad Ali) (Entered: 01/27/2021) |
| 01/27/2021 | 94 | WAIVER of Speedy Trial by Paige A Thompson (Hamoudi, Mohammad Ali) (Entered: 01/27/2021) |
| 02/02/2021 | 95 | ORDER as to Paige A Thompson granting defendant's 93 Unopposed MOTION to Continue Trial and Pretrial Motions Deadline. Jury Trial is continued to 7/12/2021 at 09:00 AM before Judge Robert S. Lasnik. Pretrial Motions due by 3/12/2021. Signed by Judge Robert S. Lasnik. (PM)(cc: PTS/USPO, USMO) (Entered: 02/02/2021) |
| 02/05/2021 | 96 | REPORT ON DEFENDANT UNDER PRETRIAL SERVICES SUPERVISION/ORDER as to Paige A Thompson by Judge Robert S. Lasnik. (LH) (cc: PTS) (Entered: 02/05/2021) |
| 02/24/2021 | 97 | Unopposed MOTION to Continue Trial *and Pretrial Motions Deadline* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 2/24/2021, (Tenney, Nancy) (Entered: 02/24/2021) |
| 02/24/2021 | 98 | WAIVER of Speedy Trial by Paige A Thompson (Tenney, Nancy) (Entered: 02/24/2021) |
| 03/05/2021 | 99 | APPLICATION OF ATTORNEY Melissa A. Meister FOR LEAVE TO APPEAR PRO HAC VICE for Defendant Paige A Thompson (Fee Paid) Receipt No. AWAWDC-6987508 (Tenney, Nancy) (Entered: 03/05/2021) |
| 03/05/2021 | 100 | ORDER re 99 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Melissa A Meister for Defendant Paige A Thompson, by Clerk William M McCool. No document associated with this docket entry, text only. *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be* |

| | | |
|---|---|---|
| | | *present on any date scheduled by the court, pursuant to LCR 83.1(d).*(DS) (Entered: 03/05/2021) |
| 03/09/2021 | 101 | ORDER granting Defendant's 97 Motion to Continue Trial as to Paige A Thompson (1): The trial date shall be continued from July 12, 2021, to October 18, 2021, and pretrial motions are to be filed no later than June 18, 2021, and shall be noted for consideration no earlier than the fourth Friday after they are filed. Signed by Judge Robert S. Lasnik. (MW) (cc: USMO) (Entered: 03/09/2021) |
| 06/17/2021 | 102 | SUPERSEDING INDICTMENT as to Paige A Thompson (1) counts 1s, 2s, 3s-5s, 6s-7s, 8s, 9s, 10s. (Attachments: # 1 Status Sheet) (AQ) (Entered: 06/17/2021) |
| 06/17/2021 | 103 | **SEALED Signature Page** to 102 Superseding Indictment as to Paige A Thompson. (AQ) (Entered: 06/17/2021) |
| 06/17/2021 | 104 | ORDER CONTINUING CONDITIONS OF RELEASE SUPERSEDING INDICTMENT as to Paige A Thompson by Hon. Brian A Tsuchida. cc: USMO; (AQ) (Entered: 06/17/2021) |
| 06/18/2021 | 105 | Letter scheduling arraignment for defendant Paige A Thompson. Arraignment set for 6/25/2021 at 11:00 AM ~~in BELL - US District Court, Bellingham~~ before Hon. Paula L McCandlis via Zoom video conference. (Masada, Steven) Modified on 6/21/2021 to correct location. NEF regenerated. (KMP) (Entered: 06/18/2021) |
| 06/25/2021 | 106 | Minute Entry for proceedings held before Hon. Paula L McCandlis via Zoom video conference - CRD: *K. Peter*; AUSA: *Andrew Friedman*; Def Cnsl: *Mohammad Hamoudi, Brian Klein*; Court Reporter: *Zoom Recording*; Time of Hearing: *11:00am*; **ARRAIGNMENT** as to Paige A Thompson (1) Count 1s,2s,3s-5s,6s-7s,8s,9s,10s held on 6/25/2021. Defendant present on bond and consents to appear by video conference. Defendant advised of charges and penalties in the superseding indictment. Defendant pleads NOT GUILTY to all charges. Defense Counsel requests discovery pursuant to Local Rule. Defendant remains on bond.<br><br>Jury Trial remains as set for 10/18/2021 at 09:00 AM before Judge Robert S. Lasnik. Pretrial Motions due by 6/18/2021. (KMP) (Entered: 06/25/2021) |
| 06/29/2021 | 107 | Unopposed MOTION to Continue Trial *and Pretrial Motions Deadline* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/29/2021, (Tenney, Nancy) (Entered: 06/29/2021) |
| 06/29/2021 | 108 | WAIVER of Speedy Trial by Paige A Thompson (Tenney, Nancy) (Entered: 06/29/2021) |
| 07/01/2021 | 109 | ORDER granting Defendant's 107 Unopposed Motion to Continue Trial as to Paige A Thompson. Jury Trial is continued to 3/14/2022 before Judge Robert S. Lasnik. Pretrial Motions are now due by 12/2/2021. Signed by Judge Robert S. Lasnik. (LH) (cc: USMO) (Entered: 07/01/2021) |
| 10/04/2021 | 110 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 10/4/2021, (Hamoudi, Mohammad Ali) (Entered: 10/04/2021) |
| 10/04/2021 | 111 | MOTION Early Return of Trial Subpoena by Paige A Thompson. (Attachments: # 1 Exhibit A Subpoena, # 2 Proposed Order) Noting Date 11/19/2021 ~~11/12/2021~~, (Hamoudi, Mohammad Ali) Modified noting date on 11/2/2021 (LH). (Entered: 10/04/2021) |
| 11/01/2021 | 113 | NOTICE *OF APPEARANCE by Third Party Movant* by Capital One Bank (USA) NA as to Paige A Thompson (Swaminathan, Aravind) (Entered: 11/01/2021) |

| | | |
|---|---|---|
| 11/01/2021 | 114 | STIPULATED MOTION *FOR EXTENSION TO RESPOND TO DEFENDANTS MOTION FOR EARLY RETURN OF TRIAL SUBPOENA AND ADJUSTMENT OF THE NOTING DATE* by Capital One Bank (USA) NA as to Paige A Thompson Noting Date 11/1/2021, (Swaminathan, Aravind) (Entered: 11/01/2021) |
| 11/02/2021 | 115 | ORDER as to Paige A Thompson granting Parties' 114 Stipulated Motion. Defendant's 111 MOTION for Early Return of Trial Subpoena is re-noted for 11/19/2021. Capital One's response is due 11/8/2021. Defendant's reply is due 11/19/2021. Signed by Judge Robert S. Lasnik. (LH) (Entered: 11/02/2021) |
| 11/05/2021 | 116 | NOTICE OF ATTORNEY APPEARANCE Jessica Murphy Manca appearing for USA. (Manca, Jessica) (Entered: 11/05/2021) |
| 11/05/2021 | 117 | NOTICE OF WITHDRAWAL OF COUNSEL: Attorney Steven Masada for Plaintiff USA. (Masada, Steven) (Entered: 11/05/2021) |
| 11/08/2021 | 118 | RESPONSE, by Capital One Bank (USA) NA as to Paige A Thompson, to 111 MOTION Early Return of Trial Subpoena . (Swaminathan, Aravind) (Entered: 11/08/2021) |
| 11/08/2021 | 119 | DECLARATION of James Pastore in Support re 118 Response in Opposition by Capital One Bank (USA) NA as to Paige A Thompson re 111 MOTION Early Return of Trial Subpoena filed by Paige A Thompson (Attachments: # 1 Exhibit A to Pastore Declaration, # 2 Exhibit B to Pastore Declaration, # 3 Exhibit C to Pastore Declaration, # 4 Exhibit D to Pastore Declaration, # 5 Exhibit E to Pastore Declaration)(Swaminathan, Aravind) (Entered: 11/08/2021) |
| 11/19/2021 | 120 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 11/19/2021, (Tenney, Nancy) (Entered: 11/19/2021) |
| 11/19/2021 | 121 | REPLY, by Paige A Thompson, TO RESPONSE to 111 MOTION Early Return of Trial Subpoena (Attachments: # 1 Exhibit B)(Tenney, Nancy) (Entered: 11/19/2021) |
| 12/02/2021 | 122 | MOTION to Dismiss Count(s) *1, 9, and 10* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date ~~12/10/2021~~ 1/14/2022 (Hamoudi, Mohammad Ali) Modified on 12/2/2021 to reflect correct noting date (KERR). (Entered: 12/02/2021) |
| 12/02/2021 | | Reset Motion Noting Date as to Paige A Thompson re 122 MOTION to Dismiss Counts *1, 9, and 10* : Motion re-noted for 1/14/2022 per Dkt. # 109. (KERR) (Entered: 12/02/2021) |
| 12/02/2021 | 123 | MOTION to Dismiss Count(s) *2 - 8* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/14/2022, (Hamoudi, Mohammad Ali) (Entered: 12/02/2021) |
| 12/02/2021 | 124 | MOTION Strike Allegation of Count One and Sever Count 8 by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/14/2022, (Hamoudi, Mohammad Ali) (Entered: 12/02/2021) |
| 12/02/2021 | 125 | MOTION for a Pretrial Hearing Regarding the Admissibility of Expert Testimony by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 1/14/2022, (Manca, Jessica) (Entered: 12/02/2021) |
| 12/06/2021 | 126 | NOTICE *OF INTENT TO PRESENT EXPERT EVIDENCE OF A MENTAL CONDITION PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12.2(b)* by Paige A Thompson (Hamoudi, Mohammad Ali) (Entered: 12/06/2021) |
| 12/17/2021 | 127 | MOTION to Compel *Capital One Data* by Paige A Thompson. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order) Noting Date 1/7/2022 ~~12/31/2021~~, (Hamoudi, Mohammad Ali) Modified noting date on 1/5/2022 (LH). (Entered: 12/17/2021) |

| | | |
|---|---|---|
| 12/17/2021 | 128 | RESPONSE, by Paige A Thompson, to 125 MOTION for a Pretrial Hearing Regarding the Admissibility of Expert Testimony . (Hamoudi, Mohammad Ali) (Entered: 12/17/2021) |
| 12/21/2021 | 129 | STIPULATED MOTION *AND [PROPOSED] NON-WAIVER ORDER UNDER FEDERAL RULE OF EVIDENCE 502* by Capital One Bank (USA) NA as to Paige A Thompson (Attachments: # 1 Exhibit A) Noting Date 12/21/2021, (Swaminathan, Aravind) (Entered: 12/21/2021) |
| 12/22/2021 | 130 | LETTER from Aravind Swaminathan regarding December 22, 2021, letter from co-counsel for Capital One, John Gleeson and James Pastore of Debevoise & Plimpton as to defendant Paige A Thompson (Attachments: # 1 Exhibit A)(Swaminathan, Aravind) (Entered: 12/22/2021) |
| 12/23/2021 | 131 | RESPONSE, by USA as to Paige A Thompson, to 122 MOTION to Dismiss Count(s) *1, 9, and 10*. (Attachments: # 1 Exhibit A)(Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 132 | **SEALED DOCUMENT** *Exhibit A* by USA as to Paige A Thompson, re 131 Response to Motion, filed under seal in accordance with LCrR 55. (Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 133 | MOTION to Seal Document *Exhibit A of United States' Opposition to Defendant's Motion to Dismiss Counts 1,9, and 10 of the Superseding Indictment* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 12/31/2021, (Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 134 | MOTION for Leave to File Over-length Motions and Briefs by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 12/23/2021, (Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 135 | RESPONSE, by USA as to Paige A Thompson, to 123 MOTION to Dismiss Count(s) *2 - 8*. (Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 136 | MOTION for Leave to File Over-length Motions and Briefs by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 12/23/2021, (Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 137 | MOTION to Seal Document *Exhibits A & B* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 12/31/2021, (Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 138 | RESPONSE, by USA as to Paige A Thompson, to 124 MOTION Strike Allegation of Count One and Sever Count 8 . (Attachments: # 1 Exhibit A & B)(Manca, Jessica) (Entered: 12/23/2021) |
| 12/23/2021 | 139 | **SEALED DOCUMENT** *Exhibits A & B* by USA as to Paige A Thompson, re 138 Response to Motion, filed under seal in accordance with LCrR 55. (Attachments: # 1 Exhibit)(Manca, Jessica) (Entered: 12/23/2021) |
| 12/27/2021 | 140 | APPLICATION OF ATTORNEY James J. Pastore FOR LEAVE TO APPEAR PRO HAC VICE for Movant Capital One Bank (USA) NA (Fee Paid) Receipt No. AWAWDC-7383910 (Swaminathan, Aravind) (Entered: 12/27/2021) |
| 12/27/2021 | 141 | APPLICATION OF ATTORNEY John Gleeson FOR LEAVE TO APPEAR PRO HAC VICE for Movant Capital One Bank (USA) NA (Fee Paid) Receipt No. AWAWDC-7383921 (Swaminathan, Aravind) (Entered: 12/27/2021) |
| 12/27/2021 | 142 | ORDER re 140 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney James J Pastore, Jr for Capital One Bank (USA) NA, by Clerk Ravi |

| | | Subramanian. No document associated with this docket entry, text only. |
|---|---|---|
| | | *NOTE TO COUNSEL: Local counsel agrees to **sign all filings** and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).*(DS) (Entered: 12/27/2021) |
| 12/27/2021 | 143 | ORDER re 141 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney John Gleeson for Capital One Bank (USA) NA, by Clerk Ravi Subramanian. No document associated with this docket entry, text only. |
| | | *NOTE TO COUNSEL: Local counsel agrees to **sign all filings** and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).*(DS) (Entered: 12/27/2021) |
| 12/29/2021 | 144 | ORDER granting Parties' 129 Stipulated Motion and Non-Waiver Order Under Federal Rule of Evidence 502; as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (cc: USMO) (Entered: 12/29/2021) |
| 12/29/2021 | 145 | RESPONSE, by USA as to Paige A Thompson, to 127 MOTION to Compel *Capital One Data*. (Attachments: # 1 Exhibit, # 2 Exhibit)(Friedman, Andrew) (Entered: 12/29/2021) |
| 12/31/2021 | 146 | STIPULATED MOTION *to Extend Noting Date for Defense to File Reply* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 12/31/2021, (Hamoudi, Mohammad Ali) (Entered: 12/31/2021) |
| 12/31/2021 | 147 | MOTION for Victim Rights by Capital One Bank (USA) NA as to Paige A Thompson. Noted by Clerk for 1/21/2022 ~~1/14/2022~~. (Gleeson, John) Modified to add noting date on 1/3/2022 (LH). Modified noting date on 1/10/2022 (LH). (Entered: 12/31/2021) |
| 01/03/2022 | 148 | STIPULATED MOTION *for Entry of Protective Order* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/3/2022, (Hamoudi, Mohammad Ali) (Entered: 01/03/2022) |
| 01/03/2022 | | Set Motion Noting Date for 1/14/2022 re 147 MOTION for Victim Rights. (LH) (Entered: 01/03/2022) |
| 01/04/2022 | 149 | MOTION for Early Return of Trial Subpoena by Paige A Thompson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order) Noting Date 1/20/2022, (Hamoudi, Mohammad Ali) (Entered: 01/04/2022) |
| 01/05/2022 | 151 | ORDER granting Parties' 146 Stipulated Motion. The noting date for the defense to reply to the government's response to the 127 motion to compel is extended to January 7, 2022. Signed by Judge Robert S. Lasnik. (LH) (Entered: 01/05/2022) |
| 01/05/2022 | 152 | STIPULATED PROTECTIVE ORDER re Parties' 148 Stipulated Motion. Signed by Judge Robert S. Lasnik. (LH) (Entered: 01/05/2022) |
| 01/07/2022 | 153 | STIPULATED MOTION *to Extend Noting Date* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/7/2022, (Hamoudi, Mohammad Ali) (Entered: 01/07/2022) |
| 01/07/2022 | 154 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/7/2022, (Hamoudi, Mohammad Ali) (Entered: 01/07/2022) |
| 01/07/2022 | 155 | REPLY, by Paige A Thompson, TO RESPONSE to 127 MOTION to Compel *Capital One Data* (Attachments: # 1 Exhibit 3 AUSA Letter, # 2 Exhibit 4 Capital One Pleading) |

**ER-169**

| | | (Hamoudi, Mohammad Ali) (Entered: 01/07/2022) |
|---|---|---|
| 01/10/2022 | 156 | REPLY, by USA as to Paige A Thompson, TO RESPONSE to 125 MOTION for a Pretrial Hearing Regarding the Admissibility of Expert Testimony (Manca, Jessica) (Entered: 01/10/2022) |
| 01/10/2022 | 157 | ORDER granting Parties' 153 Stipulated Motion to Extend Noting Date re 147 MOTION for Victim Rights. Defendant's response to the motion is due by January 14, 2022, and Capital One's reply is due by January 21, 2022. Signed by Judge Robert S. Lasnik. (LH) (Entered: 01/10/2022) |
| 01/10/2022 | 158 | REPLY, by Paige A Thompson, TO RESPONSE to 122 MOTION to Dismiss Count(s) *1, 9, and 10* (Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/10/2022 | 159 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/10/2022, (Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/10/2022 | 160 | REPLY, by Paige A Thompson, TO RESPONSE to 123 MOTION to Dismiss Count(s) *2 - 8* (Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/10/2022 | 161 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/10/2022, (Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/10/2022 | 162 | MOTION to Seal Document *Exhibits to Reply* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/10/2022, (Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/10/2022 | 163 | REPLY, by Paige A Thompson, TO RESPONSE to 124 MOTION Strike Allegation of Count One and Sever Count 8 (Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/10/2022 | 164 | **SEALED DOCUMENT** *Exhibits 1, 2, 3, 4* by Paige A Thompson, re 162 MOTION to Seal Document *Exhibits to Reply*, 163 Reply to Response to Motion. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4)(Hamoudi, Mohammad Ali) (Entered: 01/10/2022) |
| 01/11/2022 | 165 | NOTICE *of Supplemental Authority re dkt. 125* by Paige A Thompson (Attachments: # 1 Exhibit)(Hamoudi, Mohammad Ali) Modified to create linkage on 1/12/2022 (LH). (Entered: 01/11/2022) |
| 01/12/2022 | 166 | SECOND SUPERSEDING INDICTMENT as to Paige A Thompson (1) counts 1ss, 2ss, 3ss-5ss, 6ss-7ss, 8ss, 9ss, 10ss. (Attachments: # 1 Status Sheet) (SNP) (Entered: 01/12/2022) |
| 01/12/2022 | 167 | **SEALED Signature Page** to 166 Second Superseding Indictment as to Paige A Thompson. (SNP) (Entered: 01/12/2022) |
| 01/12/2022 | 168 | ORDER CONTINUING CONDITIONS OF RELEASE as to Paige A Thompson by Hon. Mary Alice Theiler. (cc: USMO) (SNP) (Entered: 01/12/2022) |
| 01/13/2022 | 169 | Letter scheduling arraignment for defendant Paige A Thompson. Arraignment set for 1/20/2022 at 09:00 AM in Courtroom 12B before Hon. Michelle L. Peterson. (Friedman, Andrew) (Entered: 01/13/2022) |
| 01/14/2022 | 170 | MOTION *to Seal Notice of Possible Conflicts* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 1/28/2022, (Friedman, Andrew) (Entered: 01/14/2022) |
| 01/14/2022 | 171 | **SEALED DOCUMENT** *Notice of Possible Conflicts* by USA as to Paige A Thompson, re 170 MOTION *to Seal Notice of Possible Conflicts*. (Friedman, Andrew) (Entered: |

| | | 01/14/2022 |
|---|---|---|
| 01/14/2022 | <u>172</u> | RESPONSE, by Paige A Thompson, to <u>147</u> MOTION for Victim Rights. (Hamoudi, Mohammad Ali) (Entered: 01/14/2022) |
| 01/14/2022 | <u>173</u> | NOTICE *OF APPEARANCE by Third-Party/Movant Amazon Web Services, Inc.* by Amazon Web Services, Inc. ~~USA~~ as to Paige A Thompson (Buckley, Brian) Modified to correct filing party on 1/18/2022 (LH). (Entered: 01/14/2022) |
| 01/14/2022 | <u>174</u> | MOTION *to Seal Exhibit A to Supplemental Filing Relating to Defendant's <u>124</u> Motion to Strike Cryptojacking Allegations and to Sever Count 8* by USA as to Paige A Thompson (Attachments: # <u>1</u> Proposed Order) Noting Date 1/28/2022, (Friedman, Andrew) Modified to create linkage on 1/18/2022 (LH). (Entered: 01/14/2022) |
| 01/14/2022 | <u>175</u> | SUPPLEMENT *Filing Relating to Defendant's <u>124</u> Motion to Strike Cryptojacking Allegations and Sever Count 8* by USA as to Paige A Thompson (Friedman, Andrew) Modified to create linkage on 1/18/2022 (LH). Modified to note Paragraph 2 is stricken per <u>229</u> Order on 3/21/2022 (LH). (Entered: 01/14/2022) |
| 01/14/2022 | <u>176</u> | **SEALED DOCUMENT** *Exhibit A* by USA as to Paige A Thompson, re <u>174</u> MOTION *to Seal Exhibit A to Supplemental Filing Relating to Defendant's <u>124</u> Motion to Strike Cryptojacking Allegations and to Sever Count 8*. (Friedman, Andrew) Modified to create linkage on 1/18/2022 (LH). (Entered: 01/14/2022) |
| 01/18/2022 | | NOTICE of Docket Text Modification as to defendant Paige A Thompson re <u>173</u> Notice: Added Amazon Web Services, Inc. as a movant (third party) to the case. (LH) (Entered: 01/18/2022) |
| 01/18/2022 | <u>177</u> | ORDER granting USA's <u>170</u> Motion to Seal Notice of Possible Conflicts. Signed by Judge Robert S. Lasnik. (LH) (Entered: 01/18/2022) |
| 01/18/2022 | <u>178</u> | APPLICATION OF ATTORNEY Tyler G. Newby FOR LEAVE TO APPEAR PRO HAC VICE for Movant Amazon Web Services, Inc. (Fee Paid) Receipt No. AWAWDC-7407249 (Buckley, Brian) (Entered: 01/18/2022) |
| 01/18/2022 | <u>179</u> | RESPONSE, by Amazon Web Services, Inc. as to Paige A Thompson, to <u>149</u> MOTION for Early Return of Trial Subpoena . (Buckley, Brian) (Entered: 01/18/2022) |
| 01/18/2022 | <u>180</u> | DECLARATION of Tyler G. Newby by Amazon Web Services, Inc. as to Paige A Thompson re <u>149</u> MOTION for Early Return of Trial Subpoena filed by Paige A Thompson (Buckley, Brian) (Entered: 01/18/2022) |
| 01/18/2022 | <u>181</u> | DECLARATION of Brian Buckley by Amazon Web Services, Inc. as to Paige A Thompson re <u>149</u> MOTION for Early Return of Trial Subpoena filed by Paige A Thompson (Buckley, Brian) (Entered: 01/18/2022) |
| 01/19/2022 | 182 | ORDER re <u>178</u> Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Tyler Newby for Movant Amazon Web Services, Inc. by Clerk Ravi Subramanian. No document associated with this docket entry, text only.<br><br>*NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 01/19/2022) |
| 01/20/2022 | 183 | Minute Entry for proceedings held before Hon. Michelle L. Peterson- CRD: *tfarrell*; AUSA: *Jessica Manca*; Def Cnsl: *Mohammad Hamoudi, Brian Klein, Chris Sanders*; Court Reporter: *Zoom video recording*; Time of Hearing: *9:00am*; Courtroom: *via Zoom video*; **ARRAIGNMENT** as to Paige A Thompson (1) Count 1ss,2ss,3ss-5ss,6ss- |

| | | |
|---|---|---|
| | | 7ss,8ss,9ss,10ss held on 1/20/2022. Defendant present on bond via Zoom video. Deft consents to video hearing and waives in-person appearance. Defendant advised of charges and penalties. Defendant pleads NOT GUILTY to all charges. Defense Counsel requests discovery pursuant to Local Rule. Defendant remains on bond.<br><br>Jury Trial remains set for 3/14/2022 at 09:00 AM in Courtroom 15106 before Judge Robert S. Lasnik.(TF) (Entered: 01/20/2022) |
| 01/20/2022 | 184 | MOTION Strike Government's Surreply (Dkt. No. 175 ) by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/20/2022, (Hamoudi, Mohammad Ali) Modified to create linkage on 1/21/2022 (LH). (Entered: 01/20/2022) |
| 01/20/2022 | 185 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 1/20/2022, (Hamoudi, Mohammad Ali) (Entered: 01/20/2022) |
| 01/20/2022 | 186 | REPLY, by Paige A Thompson, TO RESPONSE to 149 MOTION for Early Return of Trial Subpoena (Hamoudi, Mohammad Ali) (Entered: 01/20/2022) |
| 01/21/2022 | 187 | NOTICE OF ATTORNEY APPEARANCE Tania M. Culbertson appearing for USA. (Culbertson, Tania) (Entered: 01/21/2022) |
| 01/21/2022 | 188 | REPLY, by Capital One Bank (USA) NA as to Paige A Thompson, TO RESPONSE to 147 MOTION for Victim Rights (Gleeson, John) (Entered: 01/21/2022) |
| 01/25/2022 | 189 | NOTICE *of Supplemental Authority re Dkt 122* by Paige A Thompson (Attachments: # 1 US v. Saini)(Hamoudi, Mohammad Ali) (Entered: 01/25/2022) |
| 01/27/2022 | 190 | MOTION *United States' Motion for Examination of Defendant Under Federal Rule of Criminal Procedure 12.2(c) and Motion to Compel* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F) Noting Date 2/4/2022, (Friedman, Andrew) (Entered: 01/27/2022) |
| 02/03/2022 | 191 | Redacted RESPONSE, by Paige A Thompson, to 190 MOTION *United States' Motion for Examination of Defendant Under Federal Rule of Criminal Procedure 12.2(c) and Motion to Compel*. (Attachments: # 1 Exhibit 1 Detention Hearing 8/23/19, # 2 Exhibit 2 Detention Hearing 10/4/19)(Hamoudi, Mohammad Ali) Modified on 2/4/2022 to indicate redaction (LH). (Entered: 02/03/2022) |
| 02/03/2022 | 192 | **SEALED DOCUMENT** *Exhibit 3* by Paige A Thompson, re 191 Response to Motion,, filed under seal in accordance with LCrR 55. (Hamoudi, Mohammad Ali) (Entered: 02/03/2022) |
| 02/03/2022 | 193 | **SEALED DOCUMENT** *Unredacted Response to Motion* by Paige A Thompson, filed under seal in accordance with LCrR 55. (Hamoudi, Mohammad Ali) (Entered: 02/03/2022) |
| 02/04/2022 | 194 | MOTION for Leave to File Over-length Motions and Briefs by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 2/4/2022, (Manca, Jessica) (Entered: 02/04/2022) |
| 02/04/2022 | 195 | REPLY, by USA as to Paige A Thompson, TO RESPONSE to 190 MOTION *United States' Motion for Examination of Defendant Under Federal Rule of Criminal Procedure 12.2(c) and Motion to Compel* (Attachments: # 1 Exhibit)(Manca, Jessica) (Entered: 02/04/2022) |
| 02/08/2022 | 197 | MINUTE ORDER as to Paige A. Thompson by Judge Robert S. Lasnik. Status Conference set for Friday, 2/11/2022 at 11:00 AM before Judge Robert S. Lasnik. The |

| | | |
|---|---|---|
| | | hearing will be conducted via Zoom. (AD) (cc: USPO) (Entered: 02/08/2022) |
| 02/11/2022 | 198 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Ashleigh Drecktrah*; AUSA: *Andrew Friedman, Jessica Manca*; Def Cnsl: *Mohammad Hamoudi, Brian Klein, Nancy Tenney, Christopher Sanders, Melissa Meister*; Court Reporter: *Nickie Drury*; **STATUS HEARING** as to Paige A. Thompson held via Zoom on 2/11/2022. Defendant on bond, appearing by video. The court and counsel discuss the status of the case, pending motions, and trial date. The parties estimate a 3-week trial. The court sets oral argument for Tuesday, 3/15/2022 at 09:30 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (AD) (Entered: 02/11/2022) |
| 02/11/2022 | 199 | TRANSCRIPT REQUEST ~~DESIGNATION~~ for proceedings held on 2/11/2022 by Defendant Paige A Thompson. Requesting Attorney: Mohammad Ali Hamoudi. (Hamoudi, Mohammad Ali) Modified on 3/7/2022 corrected title of document (EN). (Entered: 02/11/2022) |
| 02/11/2022 | 200 | MINUTE ORDER as to Paige A. Thompson by Judge Robert S. Lasnik. Defendant's Appearance Bond entered 12/4/2019, is modified to remove the location monitoring condition. All other conditions of the Appearance Bond remain in full force and effect. (cc: USPO); (AD) (Entered: 02/11/2022) |
| 02/18/2022 | 201 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Status Hearing held on 2/11/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Nickoline Drury, nickoline_drury@wawd.uscourts.gov, 206-370-8508.<br><br>Release of Transcript Restriction set for 5/19/2022, (ND) (Entered: 02/18/2022) |
| 02/28/2022 | 202 | ORDER as to Paige A Thompson denying Defendant's 122 Motion to Dismiss Count(s) 1, 9, and 10. Defendant's motion for a bill of particulars (Dkt. # 122 ) is GRANTED in part and DENIED in part. The government is ordered to provide the bill of particulars specified in this Order by March 11, 2022. Signed by Judge Robert S. Lasnik. (LH) (Entered: 02/28/2022) |
| 02/28/2022 | 203 | ORDER as to Paige A Thompson granting USA's 133 Motion to Seal *Exhibit A of United States' Opposition to Defendant's Motion to Dismiss Counts 1,9, and 10 of the Superseding Indictment*. Signed by Judge Robert S. Lasnik. (LH) (Entered: 02/28/2022) |
| 03/02/2022 | 204 | WAIVER of Speedy Trial by Paige A Thompson (Hamoudi, Mohammad Ali) (Entered: 03/02/2022) |
| 03/07/2022 | 205 | ORDER CONTINUING TRIAL DATE as to Paige A Thompson by Judge Robert S. Lasnik. Jury Trial is continued to 6/7/2022 before Judge Robert S. Lasnik. (LH) (cc: PTS/USPO, USMO) (Entered: 03/08/2022) |
| 03/10/2022 | 206 | MOTION to Seal Document *Exhibit 1* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 3/18/2022, (Hamoudi, Mohammad Ali) (Entered: 03/10/2022) |

| 03/10/2022 | 207 | MOTION For Brady Order by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 3/18/2022, (Hamoudi, Mohammad Ali) (Entered: 03/10/2022) |
|---|---|---|
| 03/10/2022 | 208 | **SEALED DOCUMENT** *Exhibit 1* by Paige A Thompson, re 206 MOTION to Seal Document *Exhibit 1*, 207 MOTION For Brady Order . (Hamoudi, Mohammad Ali) (Entered: 03/10/2022) |
| 03/11/2022 | 209 | MOTION to Seal Bill of Particulars by USA as to Paige A Thompson (Attachments: # 1 Proposed Order, # 2 Email receipt) Noted by Clerk for 3/25/2022. (LH) (Filing received via email 3/11/2022, during CM/ECF outage) (Entered: 03/11/2022) |
| 03/11/2022 | 210 | **SEALED DOCUMENT** Bill of Particulars re 209 Motion to Seal, by USA as to Paige A Thompson. (Attachments: # 1 Exhibit 1, # 2 Email receipt) (LH) (Filing received via email 3/11/2022, during CM/ECF outage) (Entered: 03/11/2022) |
| 03/11/2022 | 211 | Defendant's ADDENDUM to the Substantive Pretrial Motions by Paige A Thompson re 123 MOTION to Dismiss Count(s) *2 - 8*, 122 MOTION to Dismiss Count(s) *1, 9, and 10*. (Attachments: # 1 Email Receipt)(SR) (Filing received via email 3/11/2022, during CM/ECF outage) (Entered: 03/11/2022) |
| 03/15/2022 | 212 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Ashleigh Drecktrah*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Brian Klein, Melissa Meister*; Court Reporter: *Sheri Schelbert*; **MOTION HEARING** as to Paige A. Thompson held on 3/15/2022. The court hears from counsel on Defendant's Motion to Dismiss Counts 2-8 (Dkt. # 123 ), Defendant's Motion to Strike Allegations of Count 1 and Sever Count 8 (Dkt. # 124 ), United States' Motion for a Pretrial Hearing re: Admissibility of Expert Testimony (Dkt. # 125 , and United States' Motion for Examination of Defendant (Dkt. # 190 ). The court excuses Government counsel and the public. The court and counsel discuss Defendant's ex parte motion (Dkt. # 196 ). Government counsel rejoins the hearing. For the reasons stated on the record, the court grants United States' Motion to Seal Bill of Particulars (Dkt. # 209 ) and directs the Government to file a sealed and a redacted version of its Bill of Particulars. Written order to be issued on pending motions. Defendant remains on bond. (AD) (Entered: 03/15/2022) |
| 03/15/2022 | 213 | EXHIBIT *6 re 03.15.22 Pretrial Hearing* by USA as to Paige A Thompson (Manca, Jessica) (Entered: 03/15/2022) |
| 03/15/2022 | 214 | MOTION to Seal Document *Exhibits 1 and 2 re 03.15.22 Pretrial Hearing* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2) Noting Date 3/25/2022, (Manca, Jessica) (Entered: 03/15/2022) |
| 03/15/2022 | 215 | **SEALED DOCUMENT** *Exhibits 1 and 2* by USA as to Paige A Thompson, re 214 MOTION to Seal Document *Exhibits 1 and 2 re 03.15.22 Pretrial Hearing*. (Attachments: # 1 Exhibit 2)(Manca, Jessica) (Entered: 03/15/2022) |
| 03/15/2022 | 216 | **SEALED DOCUMENT** *Ex 5* by Paige A Thompson, re 162 MOTION to Seal Document *Exhibits to Reply*, 163 Reply to Response to Motion. (Hamoudi, Mohammad Ali) (Entered: 03/15/2022) |
| 03/16/2022 | 217 | NOTICE *of Supplemental Authority* by Paige A Thompson (Hamoudi, Mohammad Ali) (Entered: 03/16/2022) |
| 03/17/2022 | 218 | RESPONSE, by USA as to Paige A Thompson, to 207 MOTION For Brady Order . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 ~~SEALED Exhibit 5~~, # 6 Exhibit 6)(Manca, Jessica) Modified on 3/17/2022 - Exhibit 5 Sealed at USAO's request. USAO to follow with praecipe to substitute. (AQ). Modified on |

| | | |
|---|---|---|
| | | 3/23/2022 to reflect Exhibit 5 is stricken, at the direction of chambers (AD). (Entered: 03/17/2022) |
| 03/17/2022 | 219 | Praecipe *to File Corrected Exhibit 5* re 218 Response by USA as to Paige A Thompson (Attachments: # 1 Exhibit 5)(Manca, Jessica) Modified to create linkage on 3/18/2022 (LH). (Entered: 03/17/2022) |
| 03/18/2022 | 221 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 3/15/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Sheri Schelbert, sheri_schelbert@wawd.uscourts.gov Release of Transcript Restriction set for 6/16/2022, (Schelbert, Sheri) (Entered: 03/18/2022) |
| 03/18/2022 | 222 | REPLY, by Paige A Thompson, TO RESPONSE to 207 MOTION For Brady Order (Hamoudi, Mohammad Ali) (Entered: 03/18/2022) |
| 03/21/2022 | 223 | ORDER denying Government's 125 Motion for a Pretrial Hearing, as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (Entered: 03/21/2022) |
| 03/21/2022 | 224 | ORDER as to Paige A Thompson: Defendant's Motion to File Overlength Motion for Early Return of Trial Subpoena to Capital One Bank (USA), N.A./Capital One Financial Corp. (Dkt. # 110 ) is GRANTED. Defendant's Motion for Early Return of Trial Subpoena to Capital One Bank (USA), N.A./Capital One Financial Corp. (Dkt. # 111 ) is DENIED. Capital Ones request for the Court to order defendant to provide Capital One the *ex parte* sealed affidavit (Dkt. # 118 ) is DENIED. Defendant's Motion to File Overlength Reply Re Defense Motion for Early Return of Trial Subpoena to Capital One Bank (USA), N.A./Capital One Financial Corp. (Dkt # 120 ) is GRANTED. Signed by Judge Robert S. Lasnik. (LH) (Entered: 03/21/2022) |
| 03/21/2022 | 225 | ORDER granting Defendant's 127 Motion to Compel Capital One Date; denying Capital One's 147 Motion for Victim Rights; granting Defendant's 154 Motion for Leave to File Over-length Motions and Briefs. Signed by Judge Robert S. Lasnik. (MW) (cc: USMO (AS)) (Entered: 03/21/2022) |
| 03/21/2022 | 226 | ORDER as to Paige A Thompson: Defendant's motion to dismiss Counts 2 through 8 of the indictment (Dkt. # 123 ) is DENIED. The government's motion to file an overlength response (Dkt. # 134 ) is GRANTED. Defendant's motion to file an overlength reply (Dkt # 159 ) is GRANTED. Signed by Judge Robert S. Lasnik. (LH) (Entered: 03/21/2022) |
| 03/21/2022 | 227 | ORDER denying Defendant's 149 Motion for Early Return of Trial Subpoena; granting Defendant's 185 Motion for Leave to File Over-length Motions and Briefs; as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (cc: USMO) (Entered: 03/21/2022) |
| 03/21/2022 | 228 | ORDER granting in part and denying in part Government's 190 Motion for Examination of Defendant and to Compel; granting Government's 194 Motion for Leave to File Over- |

| | | |
|---|---|---|
| | | length Motions and Briefs; as to Paige A Thompson (1). Signed by Judge Robert S. Lasnik. (MW) (cc: USMO) (Entered: 03/21/2022) |
| 03/21/2022 | 229 | ORDER Denying Motion to Strike and Sever. Defendant's Motion to Strike the Crypto Mining Allegations of Count One and to Sever Count Eight of the Indictment (Dkt. # 124 ) is DENIED. The government's Motion to File a Brief in Excess of Twelve Pages (Dkt. # 136 ) is GRANTED. Defendant's Motion to File Overlength Reply Re Defense Motion to Strike Count 1 and Sever Count 8 (Dkt. # 161 ) is GRANTED. Defendant's Motion to Seal Exhibits to Defendant's Reply to Government's Response to Motion to Strike Count 1 and Sever Count 8 (Dkt. # 162 ) is GRANTED. The government's Motion to Seal Exhibit A to Supplemental Filing Relating to Defendant's Motion to Strike Cryptojacking Allegations and to Sever Count 8 (Dkt. # 174 ) is GRANTED. Defendant's Motion to Strike Government's Surreply (Dkt. # 184 ) is GRANTED IN PART. Paragraph 2 of the government's surreply (Dkt. # 175 ) is stricken. Signed by Judge Robert S. Lasnik. (LH) (Entered: 03/21/2022) |
| 03/21/2022 | 230 | ORDER granting United States' 137 Motion to Seal Document; as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 03/22/2022) |
| 03/23/2022 | | NOTICE of Docket Text Modification as to defendant Paige A. Thompson re United States' 218 Response: Exhibit 5 (Dkt. # 218-5) stricken at the direction of chambers. Corrected version filed at Dkt. # 219 . (AD) (Entered: 03/23/2022) |
| 03/23/2022 | 231 | ORDER granting Defendant's 206 Motion to Seal Document and granting Defendant's 207 Motion for *Brady* Order as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 03/23/2022) |
| 03/28/2022 | 233 | USCA CASE NUMBER (22-70057) re Petition for Writ of Mandamus. (RE) (Entered: 03/29/2022) |
| 03/28/2022 | 234 | ORDER OF USCA (22-70057) re Petition for Writ of Mandamus. The district courts March 21, 2022 order challenged in this petition for a writ of mandamus is temporarily stayed pending resolution of the petition. We sua sponte continue disposition of this petition until Tuesday, April 5, 2022. See 18 U.S.C. § 3771(d)(3). This petition raises issues that warrant an answer. See Fed. R. App. P. 21(b). Real party in interest Paige A. Thompson shall file an answer no later than Wednesday March 30, 2022. Real party in interest the United States of America may also file an answer no later than Wednesday, March 30, 2022. The district court may also address the petition if it so desires. Petitioner may file a reply in support of the petition no later than 9:00 am Pacific Time on Friday, April 1, 2022. The Clerk shall serve a copy of this order on the district court and District Judge Lasnik. (RE) (Entered: 03/29/2022) |
| 03/29/2022 | 232 | NOTICE *of Filing of Redacted 210 Bill of Particulars* by USA as to Paige A Thompson (Attachments: # 1 Exhibit 1)(Friedman, Andrew) Modified to create linkage on 3/30/2022 (LH). (Entered: 03/29/2022) |
| 04/01/2022 | 235 | ORDER OF USCA (22-70057) re Petition for Writ of Mandamus. This is a petition for a writ of mandamus filed pursuant to the Crime Victims Rights Act (CVRA), 18 U.S.C. § 3771. In reviewing CVRA mandamus petitions, we are not required to balance the factors outlined in Bauman v. United States District Court, 557 F.2d 650 (9th Cir. 1977). See Kenna v. U.S. Dist. Court, 435 F.3d 1011, 1017 (9th Cir. 2006). Rather, this court must issue the writ whenever we find that the district courts order reflects an abuse of discretion or legal error. Id. On March 21, 2022, the district court granted defendants motion to compel the production of Capital One Bank (USA), N.A.s data in possession of the government pursuant to Federal Rule of Criminal Procedure 16. This petition challenges the district courts March 21, 2022 order. The district court did not abuse its discretion or commit legal error in granting the motion to compel. The information sought |

| | | |
|---|---|---|
| | | by defendant meets the standard for government disclosure. See Fed. R. Crim. Proc. 16(a)(1)(E). Furthermore, in ordering production of the requested data, the district court appropriately addressed the victims rights to protection, dignity and privacy by subjecting the data to existing protective orders filed in the case and imposing additional security safeguards on storing the copy of the data. See Fed. R. Crim. Proc. 16(d)(1). Finding no abuse of discretion or legal error, the petition for a writ of mandamus pursuant to 18 U.S.C. § 3771 is denied. **DENIED.** (RE) (Entered: 04/04/2022) |
| 04/13/2022 | 236 | ORDER re USA's 214 Motion to Seal Document, as to Paige A Thompson. It is hereby ORDERED that the Government hereby requests that Exhibits 1 and 2 to 03.15.22 Pretrial Hearing shall remain sealed. Signed by Judge Robert S. Lasnik. (LH) (Entered: 04/13/2022) |
| 04/14/2022 | 237 | Unopposed MOTION Entry of Protective Order by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 4/14/2022, (Hamoudi, Mohammad Ali) (Entered: 04/14/2022) |
| 04/15/2022 | 238 | PROTECTIVE ORDER re Defendant's 237 Unopposed Motion Entry of Protective Order, as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 04/15/2022) |
| 04/22/2022 | 239 | NOTICE OF CHANGE OF ADDRESS by Brian E. Klein (Klein, Brian) (Entered: 04/22/2022) |
| 05/05/2022 | 240 | MOTION for Reconsideration *of Order Denying Motion to Dismiss Counts 2-8* by Paige A Thompson. Noting Date 5/5/2022, (Hamoudi, Mohammad Ali) (Entered: 05/05/2022) |
| 05/13/2022 | 242 | Redacted MOTION to Exclude *Rule 404(b) Evidence or Testimony* by Paige A Thompson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Proposed Order) Noting Date 5/27/2022, (Hamoudi, Mohammad Ali) Modified title on 5/13/2022 (LH). (Entered: 05/13/2022) |
| 05/13/2022 | 243 | MOTION to Seal Document *Motion Exclude 404(b) Evidence or Testimony* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 5/13/2022, (Hamoudi, Mohammad Ali) (Entered: 05/13/2022) |
| 05/13/2022 | 244 | **SEALED DOCUMENT** *Motion Exclude 404(b) Evidence or Testimony* by Paige A Thompson, re 243 MOTION to Seal Document *Motion Exclude 404(b) Evidence or Testimony*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Proposed Order)(Hamoudi, Mohammad Ali) (Entered: 05/13/2022) |
| 05/17/2022 | 246 | MINUTE ORDER as to Paige A Thompson authorized by Judge Robert S. Lasnik. Status Hearing set for 5/25/2022 at 11:00 AM before Judge Robert S. Lasnik. Hearing will be held via Zoom videoconference. (cc: USPO) (VE) (Entered: 05/17/2022) |
| 05/20/2022 | 247 | MOTION for Leave to File Overlength Brief by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 5/20/2022, (Manca, Jessica) (Entered: 05/20/2022) |
| 05/20/2022 | 248 | MOTION to Seal Document - *Exhibit 1* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 5/20/2022, (Manca, Jessica) (Entered: 05/20/2022) |
| 05/20/2022 | 249 | RESPONSE, by USA as to Paige A Thompson, to 242 MOTION to Exclude *Rule 404(b) Evidence or Testimony*. (Friedman, Andrew) (Entered: 05/20/2022) |
| 05/20/2022 | 250 | **SEALED DOCUMENT** *Exhibit 1 to Government's Opposition to Defendant's Motion to Exclude Evidence Under Rule 404(b)* by USA as to Paige A Thompson, re 248 MOTION to Seal Document - *Exhibit 1*, 249 Response to Motion. (Attachments: # 1 Exhibit 1) (Manca, Jessica) (Entered: 05/20/2022) |

| | | |
|---|---|---|
| 05/23/2022 | 251 | NOTICE *of Intent to Address Conflict Waiver and Authencity of Technological Records* by USA as to Paige A Thompson (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Friedman, Andrew) (Entered: 05/23/2022) |
| 05/24/2022 | 252 | SUPPLEMENT *Authority* by Paige A Thompson (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hamoudi, Mohammad Ali) (Entered: 05/24/2022) |
| 05/24/2022 | 253 | WITNESS LIST by USA as to Paige A Thompson (Manca, Jessica) (Entered: 05/24/2022) |
| 05/24/2022 | 254 | EXHIBIT LIST by USA as to Paige A Thompson (Manca, Jessica) (Entered: 05/24/2022) |
| 05/24/2022 | 255 | **SEALED DOCUMENT** TRIAL BRIEF by USA as to Paige A Thompson (Manca, Jessica) Modified on 5/25/2022 to seal document at request of filer; filer will re-file a redacted version of the document (KB). (Entered: 05/24/2022) |
| 05/24/2022 | 256 | Proposed Jury Instructions by USA as to Paige A Thompson (Manca, Jessica) (Entered: 05/24/2022) |
| 05/24/2022 | 257 | PROPOSED JURY VERDICT FORM by USA as to Paige A Thompson (Manca, Jessica) (Entered: 05/24/2022) |
| 05/24/2022 | 258 | Proposed Voir Dire by USA as to Paige A Thompson (Manca, Jessica) (Entered: 05/24/2022) |
| 05/24/2022 | 259 | Proposed Jury Instructions by USA as to Paige A Thompson - *Forfeiture* (Manca, Jessica) (Entered: 05/24/2022) |
| 05/24/2022 | 260 | PROPOSED JURY VERDICT FORM by USA as to Paige A Thompson (Manca, Jessica) (Entered: 05/24/2022) |
| 05/25/2022 | 261 | NOTICE OF ATTORNEY APPEARANCE Krista Kay Bush appearing for USA. *For the Purpose of Forfeiture* (Bush, Krista) (Entered: 05/25/2022) |
| 05/25/2022 | 262 | ORDER granting Defendant's 243 Motion to Seal Defendant's *Motion Exclude 404(b) Evidence or Testimony* as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 05/25/2022) |
| 05/25/2022 | 263 | ORDER granting USA's 248 Motion to Seal *Exhibit 1* as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 05/25/2022) |
| 05/25/2022 | 264 | ORDER granting USA's 247 Motion for Leave to File Overlength Brief as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 05/25/2022) |
| 05/25/2022 | 265 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nickie Drury*; **STATUS HEARING** as to Paige A Thompson held on 5/25/2022 via Zoom videoconference. Defendant waives her in-person presence and consents to proceed by videoconference. The Court and counsel discuss the length of trial. The trial date of Tuesday, 6/7/2022 at 9:00 AM is confirmed. The Court and counsel discuss whether to inquire of potential jurors regarding their vaccination status. The Court reserves its decision on that issue pending further input from counsel. The Court will summon 50 to 55 jurors for jury selection and will seat three alternate jurors. The Court and counsel discuss a possible written juror questionnaire. The Court will address (1) the possible conflict arising from the fact that one or more of Defendant's counsel may be potential victims of the crimes with which Defendant is charged and (2) any issues regarding the authenticity of various business and electronic records for which the government has provided notice pursuant to FRE 902 at a hearing to be held Thursday, |

| | | |
|---|---|---|
| | | 6/2/2022 at 10:30 AM in Courtroom 15106. Out-of-district counsel may participate via Zoom videoconference. Defendant remains on bond. (VE) (Entered: 05/25/2022) |
| 05/25/2022 | | NOTICE of Docket Text Modification as to defendant Paige A Thompson re 255 Trial Brief: Modified on 05/25/22 to administratively seal document at request of filer; filer to re-file a redacted version of the document. (KB) (Entered: 05/25/2022) |
| 05/25/2022 | 266 | MOTION *to Seal Government's Trial Brief and Publish Redacted Trial Brief* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 5/25/2022, (Manca, Jessica) (Entered: 05/25/2022) |
| 05/25/2022 | 267 | ~~SEALED DOCUMENT~~ REDACTED DOCUMENT *Government's Trial Brief* by USA as to Paige A Thompson, re 266 MOTION *to Seal Government's Trial Brief and Publish Redacted Trial Brief.* (Manca, Jessica) Modified on 5/26/2022 to unseal document at request of filer (KB). (Entered: 05/25/2022) |
| 05/25/2022 | 268 | STIPULATED MOTION *for an Order Directing the Release of Testing Data* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 5/25/2022, (Culbertson, Tania) (Entered: 05/25/2022) |
| 05/26/2022 | | NOTICE of Docket Text Modification as to defendant Paige A Thompson re 267 Redacted Document: Modified on 5/26/2022 to unseal document at request of filer; modified docket text to indicate that this is a Redacted Document. NEF regenerated. (KB) (Entered: 05/26/2022) |
| 05/26/2022 | 269 | ORDER granting Parties' 268 Stipulated Motion for the Release of Testing Data as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 05/26/2022) |
| 05/26/2022 | 270 | APPLICATION OF ATTORNEY Thomas B. W. Hall FOR LEAVE TO APPEAR PRO HAC VICE for Movant Capital One Bank (USA) NA (Fee Paid) Receipt No. AWAWDC-7569546 (Swaminathan, Aravind) (Entered: 05/26/2022) |
| 05/27/2022 | 271 | ORDER denying Defendant's 240 MOTION for Reconsideration *of Order Denying Motion to Dismiss Counts 2-8* as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 05/27/2022) |
| 05/27/2022 | 272 | MOTION in Limine *to Exclude Terms* by Paige A Thompson. (Attachments: # 1 Proposed Order)(Hamoudi, Mohammad Ali) (Entered: 05/27/2022) |
| 05/27/2022 | 273 | **SEALED DOCUMENT** *Exhibits A and B* by Paige A Thompson, re 272 MOTION in Limine *to Exclude Terms*, filed under seal in accordance with LCrR 55. (Attachments: # 1 Exhibit B)(Hamoudi, Mohammad Ali) (Entered: 05/27/2022) |
| 05/27/2022 | 274 | REPLY, by Paige A Thompson, TO RESPONSE to 242 MOTION to Exclude *Rule 404(b) Evidence or Testimony* (Hamoudi, Mohammad Ali) (Entered: 05/27/2022) |
| 05/27/2022 | 275 | WITNESS LIST by Paige A Thompson (Tenney, Nancy) (Entered: 05/27/2022) |
| 05/27/2022 | 276 | MOTION Request Permission to File Jury Instructions on May 31, 2022 by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/3/2022, (Tenney, Nancy) (Entered: 05/27/2022) |
| 05/27/2022 | 277 | TRIAL BRIEF by Paige A Thompson (Tenney, Nancy) (Entered: 05/27/2022) |
| 05/27/2022 | 278 | Redacted EXHIBIT LIST *Redacted* by Paige A Thompson (Tenney, Nancy) Modified title on 5/31/2022 (LH). (Entered: 05/27/2022) |
| 05/27/2022 | 279 | MOTION to Seal Document *Exhibit List* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 5/27/2022, (Tenney, Nancy) (Entered: 05/27/2022) |

| 05/27/2022 | 280 | **SEALED DOCUMENT** *Exhibit List* by Paige A Thompson, re 279 MOTION to Seal Document *Exhibit List*. (Tenney, Nancy) (Entered: 05/27/2022) |
|---|---|---|
| 05/27/2022 | 281 | Proposed Voir Dire by Paige A Thompson (Tenney, Nancy) (Entered: 05/27/2022) |
| 05/27/2022 | 282 | MOTION in Limine by USA as to Paige A Thompson (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) Noting Date 6/7/2022, (Manca, Jessica) (Entered: 05/27/2022) |
| 05/27/2022 | 283 | **SEALED DOCUMENT** *Exhibit 3* by USA as to Paige A Thompson, re 282 MOTION in Limine , filed under seal in accordance with LCrR 55. (Attachments: # 1 Exhibit 3) (Manca, Jessica) (Entered: 05/27/2022) |
| 05/30/2022 | 284 | RESPONSE, by USA as to Paige A Thompson, to 272 MOTION in Limine *to Exclude Terms*. (Culbertson, Tania) (Entered: 05/30/2022) |
| 05/31/2022 | 285 | ORDER re 270 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Thomas B W Hall for Movant Capital One Bank (USA) NA by Clerk Ravi Subramanian. No document associated with this docket entry, text only. <br><br> *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 05/31/2022) |
| 05/31/2022 | 286 | Proposed Jury Instructions by Paige A Thompson (Tenney, Nancy) (Entered: 05/31/2022) |
| 06/01/2022 | 287 | MINUTE ORDER as to Paige A Thompson authorized by Judge Robert S. Lasnik. The status hearing scheduled for Thursday, 6/2/2022 at 10:30 AM is STRICKEN. (cc: USPO) (VE) (Entered: 06/01/2022) |
| 06/02/2022 | 288 | ORDER denying Defendant's 242 Motion to Exclude *Rule 404(b) Evidence or Testimony* as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 06/02/2022) |
| 06/02/2022 | 289 | APPLICATION OF ATTORNEY Emily R. Stierwalt FOR LEAVE TO APPEAR PRO HAC VICE for Defendant Paige A Thompson (Fee Paid) Receipt No. AWAWDC-7577536 (Tenney, Nancy) (Entered: 06/02/2022) |
| 06/02/2022 | 290 | Redacted RESPONSE, by Paige A Thompson, to 282 MOTION in Limine . (Hamoudi, Mohammad Ali) Modified title on 6/3/2022 (LH). (Entered: 06/02/2022) |
| 06/03/2022 | 291 | MOTION to Seal Document *Opposition to Government's Motions In Limine* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/3/2022, (Hamoudi, Mohammad Ali) (Entered: 06/03/2022) |
| 06/03/2022 | 292 | **SEALED DOCUMENT** *Opposition to Government's 282 Motions In Limine* by Paige A Thompson, re 291 MOTION to Seal Document *Opposition to Government's Motions In Limine*. (Hamoudi, Mohammad Ali) Modified to create linkage on 6/6/2022 (LH). (Entered: 06/03/2022) |
| 06/03/2022 | 293 | ORDER re 289 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Emily R Stierwalt for Defendant Paige A Thompson by Clerk Ravi Subramanian. No document associated with this docket entry, text only. <br><br> *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 06/03/2022) |

| 06/03/2022 | 294 | ORDER granting Defendant's 291 Motion to Seal Document. Signed by Judge Robert S. Lasnik. (LH) (Entered: 06/03/2022) |
| --- | --- | --- |
| 06/03/2022 | 295 | APPLICATION OF ATTORNEY Alexandra Swain FOR LEAVE TO APPEAR PRO HAC VICE for Movant Capital One Bank (USA) NA (Fee Paid) Receipt No. AWAWDC-7579685 (Swaminathan, Aravind) (Entered: 06/03/2022) |
| 06/03/2022 | 296 | MOTION to Seal Document *Exhibits A-O* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/3/2022, (Hamoudi, Mohammad Ali) (Entered: 06/03/2022) |
| 06/03/2022 | 297 | MOTION to Compel by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/3/2022, (Hamoudi, Mohammad Ali) (Entered: 06/03/2022) |
| 06/03/2022 | 298 | **SEALED DOCUMENT** *Exhibits A-O* by Paige A Thompson, re 296 MOTION to Seal Document *Exhibits A-O*, 297 MOTION to Compel . (Hamoudi, Mohammad Ali) (Entered: 06/03/2022) |
| 06/05/2022 | 299 | Objection by USA as to Paige A Thompson re 286 Proposed Jury Instructions filed by Paige A Thompson (Culbertson, Tania) (Entered: 06/05/2022) |
| 06/05/2022 | 300 | MOTION to Seal Document by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/17/2022, (Hamoudi, Mohammad Ali) (Entered: 06/05/2022) |
| 06/05/2022 | 301 | SUPPLEMENT by Paige A Thompson re 292 Sealed Opposition ~~Document~~ re 282 Motions in Limine (Hamoudi, Mohammad Ali) Modified to create linkage on 6/6/2022 (LH). (Entered: 06/05/2022) |
| 06/05/2022 | 302 | **SEALED DOCUMENT** *Exhibit* by Paige A Thompson, re 300 MOTION to Seal Document , 301 Supplement. (Hamoudi, Mohammad Ali) (Entered: 06/05/2022) |
| 06/06/2022 | 303 | ORDER re 295 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Alexandra Swain for Movant Capital One Bank (USA) NA by Clerk Ravi Subramanian. No document associated with this docket entry, text only. *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 06/06/2022) |
| 06/06/2022 | 304 | RESPONSE, by USA as to Paige A Thompson, to 297 MOTION to Compel . (Attachments: # 1 Exhibit 1)(Culbertson, Tania) (Entered: 06/06/2022) |
| 06/06/2022 | 305 | SUPPLEMENT *to Trial Brief* by USA as to Paige A Thompson re 255 Trial Brief (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Culbertson, Tania) (Entered: 06/06/2022) |
| 06/06/2022 | 306 | EXHIBIT LIST *Amended Exhibit List* by USA as to Paige A Thompson (Manca, Jessica) (Entered: 06/06/2022) |
| 06/06/2022 | 307 | SUPPLEMENT *to Government's Consolidated 282 Motions in Limine* by USA as to Paige A Thompson re 301 Supplement (Culbertson, Tania) Modified to create linkage on 6/7/2022 (LH). (Entered: 06/06/2022) |
| 06/06/2022 | 308 | MOTION to Quash *Defendant's Trial Subpoena* by Amazon Web Services, Inc. as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 6/17/2022, (Buckley, Brian) (Entered: 06/06/2022) |
| 06/06/2022 | 309 | DECLARATION of Tyler G. Newby by Amazon Web Services, Inc. as to Paige A Thompson re 308 MOTION to Quash *Defendant's Trial Subpoena* filed by Amazon Web |

| | | |
|---|---|---|
| | | Services, Inc. (Attachments: # 1 Exhibit A)(Buckley, Brian) (Entered: 06/06/2022) |
| 06/07/2022 | 310 | APPLICATION OF ATTORNEY Janie Yoo Miller FOR LEAVE TO APPEAR PRO HAC VICE for Movant Amazon Web Services, Inc. (Fee Paid) Receipt No. AWAWDC-7583036 (Buckley, Brian) (Entered: 06/07/2022) |
| 06/07/2022 | 311 | ORDER re 310 Application for Leave to Appear Pro Hac Vice. The Court ADMITS Attorney Janie Yoo Miller for Movant Amazon Web Services, Inc. by Clerk Ravi Subramanian. No document associated with this docket entry, text only. <br><br> *NOTE TO COUNSEL: Local counsel agrees to* **sign all filings** *and to be prepared to handle the matter, including the trial thereof, in the event the applicant is unable to be present on any date scheduled by the court, pursuant to LCR 83.1(d).* (JWC) (Entered: 06/07/2022) |
| 06/07/2022 | 312 | **SEALED DOCUMENT** PLAINTIFF'S PROPOSED TRIAL EXHIBITS by USA as to Paige A Thompson. (Attachments: # 1 Exhibit 101-122, # 2 Exhibit 201-252, # 3 Exhibit 301-310, # 4 Exhibit 401-415, # 5 Exhibit 416-438, # 6 Exhibit 439-462, # 7 Exhibit 501-554, # 8 Exhibit 601-623, # 9 Exhibit 624-677, # 10 Exhibit 701-752, # 11 Exhibit 760-810, # 12 Exhibit 811-908, # 13 Exhibit 909-950)(Friedman, Andrew) (Entered: 06/07/2022) |
| 06/07/2022 | 313 | ORDER granting in part and denying in part Government's 282 Motions in Limine; as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 06/07/2022) |
| 06/07/2022 | 314 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer*; **JURY TRIAL - Day 1** as to Paige A Thompson held on 6/7/2022. Voir dire commences. The jury is sworn and empaneled. 266 MOTION *to Seal Government's Trial Brief and Publish Redacted Trial Brief* filed by USA, 276 MOTION Request Permission to File Jury Instructions on May 31, 2022 filed by Paige A Thompson, 279 MOTION to Seal Document *Exhibit List* filed by Paige A Thompson, 296 MOTION to Seal Document *Exhibits A-O* filed by Paige A Thompson, and 300 MOTION to Seal Document filed by Paige A Thompson are GRANTED. Jury Trial to resume on 6/8/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/07/2022) |
| 06/07/2022 | 315 | Jury Peremptory Challenges as to Paige A Thompson (This filing includes sealed documents) (Attachments: # 1 **SEALED** Unredacted Peremptory Challenges) (VE) (Entered: 06/07/2022) |
| 06/08/2022 | 316 | ORDER denying Defendant's 272 Motion in Limine as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 06/08/2022) |
| 06/08/2022 | 317 | ORDER denying Defendant's 297 Motion to Compel Unredacted Emails as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 06/08/2022) |
| 06/08/2022 | 318 | STIPULATION *Regarding Cell Phone Image* by parties (Friedman, Andrew) (Entered: 06/08/2022) |
| 06/08/2022 | 319 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 2** as to Paige A Thompson held on 6/8/2022. Government's motion to dismiss Count 3ss is GRANTED. The Court addresses Defendant's objections to certain of the Government's PowerPoint slides to be used in opening statement. The Court preliminarily instructs the jury. Counsel |

| | | |
|---|---|---|
| | | present opening statements. Steve Schuster, Kat Valentine and Michael Fisk are sworn and testify. Exhibits Admitted: 101, 102, 103, 104, 105, 106, 107, 108, 201, 202, 203, 204, 209, 913, 952, 954, 1010 and 1011. Exhibit Refused: 1101. Jury Trial to resume on 6/9/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/08/2022) |
| 06/09/2022 | | DISMISSAL OF COUNT 3ss on Government Motion as to Paige A Thompson. (LH) (Entered: 06/09/2022) |
| 06/09/2022 | 320 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 3** as to Paige A Thompson held on 6/9/2022. Testimony of Michael Fisk resumes and concludes. Special Agent Zacharey Hansen, Special Agent Joel Martini and Joseph Baleda are sworn and testify. Exhibits Admitted: 111, 205, 206, 207, 210, 251, 252, 301-310, 401-420, 431, 433-439, 450-462, 501-506, 521-525, 711-713, 955, 1008, 1009 and 1013. Jury Trial to resume on 6/10/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/09/2022) |
| 06/10/2022 | 321 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 4** as to Paige A Thompson held on 6/10/2022. Matthew Pelaggi, Christopher Chan, Vincent Kenney and Waymon Ho are sworn and testify. Exhibits Admitted: 109, 110, 112, 113, 114 (illustrative only), 116-120 (illustrative only), 122 (illustrative only), 602-612, 621-624, 640-647, 670, 671-677, 701, 710, 720, 721, 730, 740, 750, 751, 752, 760, 780, 781, 782, 800-812, 850, 851, 852, 853, 854, 855 and 1015. The Court rules on the permissible scope of expert testimony as stated on the record. Outside the presence of counsel for the government, and in sealed proceedings, defense counsel addresses the Court. Jury Trial to resume on 6/13/2022 at 10:30 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/10/2022) |
| 06/12/2022 | 322 | MOTION to Quash *Defendant's May 26, 2022 Trial Subpoena* by Amazon Web Services, Inc. as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 6/24/2022, (Buckley, Brian) (Entered: 06/12/2022) |
| 06/12/2022 | 323 | DECLARATION of Tyler G. Newby by Amazon Web Services, Inc. as to Paige A Thompson re 322 MOTION to Quash *Defendant's May 26, 2022 Trial Subpoena* filed by Amazon Web Services, Inc. (Attachments: # 1 [REDACTED] Exhibit A, # 2 [REDACTED] Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Buckley, Brian) (Entered: 06/12/2022) |
| 06/13/2022 | 324 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 5** as to Paige A Thompson held on 6/13/2022. Testimony of Waymon Ho resumes and concludes. Clint Popetz and Eric Brandwine are sworn and testify via Zoom videoconference. John Roundy and George Chamberlin are sworn and testify. Exhibits Admitted: 731, 741, 901, 902, 903, 904, 905-910, 914-922, 923-927 (illustrative only), 928, 929 (illustrative only), 930, 931 (illustrative only), 956 and 1100. Jury Trial to resume on 6/14/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/13/2022) |

| 06/13/2022 | 325 | MEMORANDUM *Regarding Proposed Defense Testimony* by Paige A Thompson (Tenney, Nancy) (Entered: 06/13/2022) |
|---|---|---|
| 06/14/2022 | 326 | SUPPLEMENT by Paige A Thompson re 325 Memorandum (Attachments: # 1 Letter) (Hamoudi, Mohammad Ali) (Entered: 06/14/2022) |
| 06/14/2022 | 327 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 6** as to Paige A Thompson held on 6/14/2022. Agent Kenneth Henderson and John Strand are sworn and testify. Government rests. The Court hears argument on Defendant's motion for judgment of acquittal as to all counts pursuant to Federal Rule of Criminal Procedure 29. Eric Brandwine is recalled and testifies via Zoom videoconference. Diane Lye is sworn and testifies via Zoom videoconference. Exhibit Admitted: 715 (illustrative only). Jury Trial to resume on 6/15/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/14/2022) |
| 06/15/2022 | 328 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 7** as to Paige A Thompson held on 6/15/2022. Matthew Ortiz and Seth Edgar are sworn and testify via Zoom videoconference. Tim Carstens and Alex Halderman are sworn and testify. Defendant rests. Defendant makes renewed motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Waymon Ho is sworn and testifies in rebuttal. Exhibits Admitted: 1203-1206 (illustrative only) and 1207. Government rests. Objections and exceptions to the Court's proposed jury instructions are noted for the record. Jury Trial to resume on 6/16/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/15/2022) |
| 06/16/2022 | 329 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer, Marci Chatelain*; **JURY TRIAL - Day 8** as to Paige A Thompson held on 6/16/2022. Defendant's further exceptions and objections to the Court's proposed jury instructions are noted for the record. The Court instructs the jury. Counsel present closing arguments. The alternate jurors are excused. At 1:15 p.m., the jury commences deliberations. After inspection and approval by counsel, all admitted exhibits are provided to the jury. At 4:25 p.m., the jury is excused to return on 6/17/2022 at 9:00 AM to resume deliberations. Defendant remains on bond. (VE) (Entered: 06/16/2022) |
| 06/16/2022 | 330 | COURT'S INSTRUCTIONS TO THE JURY (VE) (Entered: 06/16/2022) |
| 06/17/2022 | 331 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Christopher Sanders, Nancy Tenney, Melissa Meister, Brian Klein*; Court Reporter: *Nancy Bauer*; **JURY TRIAL - Day 9** as to Paige A Thompson held on 6/17/2022. At 9:03 a.m., the jury returns and resumes deliberations. At 4:42 p.m., the jury returns with verdicts finding Defendant GUILTY on Counts 1ss, 2ss, 4ss, 5ss, 6ss, 7ss and 8ss, and NOT GUILTY on Counts 9ss and 10ss. Defendant waives her right to a jury for purposes of forfeiture, with forfeiture to be determined at the time of sentencing. The Court orders the preparation of a Presentence Report. Sentencing set for 9/15/2022 at 9:00 AM before Judge Robert S. Lasnik. Defendant remains on bond. (VE) (Entered: 06/17/2022) |

| 06/17/2022 | 332 | INQUIRIES FROM THE JURY AND THE COURT'S RESPONSES as to Paige A Thompson (This filing includes sealed documents) (Attachments: # 1 **SEALED** Inquiries from the Jury and the Court's Responses (Foreperson name unredacted)) (VE) (Entered: 06/17/2022) |
|---|---|---|
| 06/17/2022 | 333 | TRIAL WITNESS LIST (VE) (Entered: 06/17/2022) |
| 06/17/2022 | 334 | TRIAL EXHIBIT LIST (VE) (Entered: 06/17/2022) |
| 06/17/2022 | 335 | JURY VERDICT as to Paige A Thompson (This filing includes sealed documents) (Attachments: # 1 **SEALED** Jury Verdict (Foreperson name unredacted)) (cc: USPO, PTS) (VE) (Entered: 06/17/2022) |
| 06/17/2022 | | RETURN OF EXHIBITS -- All original exhibits admitted at trial returned to counsel pursuant to Local Rule 79(g). (VE) (Entered: 06/17/2022) |
| 06/22/2022 | 336 | Unopposed MOTION for Extension of Time *to Extend Rule 29, Rule 33 and Rule 34 Due Dates* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 6/22/2022, (Hamoudi, Mohammad Ali) (Entered: 06/22/2022) |
| 06/23/2022 | 337 | WITHDRAWAL of Motion by Paige A Thompson re 336 Unopposed MOTION for Extension of Time *to Extend Rule 29, Rule 33 and Rule 34 Due Dates* (Hamoudi, Mohammad Ali) (Entered: 06/23/2022) |
| 06/23/2022 | 338 | Unopposed MOTION for Extension of Time *Extend Rule 29, 33, 34 Due Dates* by Paige A Thompson. Noting Date 6/23/2022, (Hamoudi, Mohammad Ali) (Entered: 06/23/2022) |
| 06/24/2022 | 339 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial, Vol. 1 of 9 held on 6/7/2022 before Judge Robert S. Lasnik. Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov. To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov. Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | 340 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 2 of 9 held on 6/8/2022 before Judge Robert S. Lasnik. Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov. To purchase a copy of the transcript, contact court reporter Nancy Bauer, |

| | | |
|---|---|---|
| | | nancy_bauer@wawd.uscourts.gov.

Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | 341 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 3 of 9 held on 6/9/2022 before Judge Robert S. Lasnik.

Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.

To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.

Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | 342 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 4 of 9 held on 6/10/2022 before Judge Robert S. Lasnik.

Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.

To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.

Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | 343 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 5 of 9 held on 6/13/2022 before Judge Robert S. Lasnik.

Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.

To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.

Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |

| 06/24/2022 | <u>344</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 6 of 9 held on 6/14/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at <u>www.wawd.uscourts.gov</u>.<br><br>To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.<br><br>Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
|---|---|---|
| 06/24/2022 | <u>345</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 7 of 9 held on 6/15/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at <u>www.wawd.uscourts.gov</u>.<br><br>To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.<br><br>Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | <u>346</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 8 of 9 held on 6/16/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at <u>www.wawd.uscourts.gov</u>.<br><br>To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.<br><br>Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | <u>347</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury trial, Vol. 9 of 9 held on 6/17/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request |

| | | |
|---|---|---|
| | | Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov.<br><br>Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/24/2022 | 348 | NOTICE OF FILING OF the jury trial master index held 6/7/2022 through 6/17/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Nancy Bauer, nancy_bauer@wawd.uscourts.gov, 206-370-8506.<br><br>Release of Transcript Restriction set for 9/22/2022, (NB) (Entered: 06/24/2022) |
| 06/29/2022 | 349 | NOTICE OF WITHDRAWAL OF COUNSEL: Attorney Christopher Sanders for Defendant Paige A Thompson. (Sanders, Christopher) (Entered: 06/29/2022) |
| 06/30/2022 | 350 | Unopposed MOTION for Extension of Time *to file Joint Certification of Counsel RE: Admitted Exhibits* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 6/30/2022, (Manca, Jessica) (Entered: 06/30/2022) |
| 07/01/2022 | 351 | ORDER granting Government's 350 Unopposed Motion for Extension of Time. The Joint Certification shall be filed on or before 7/31/2022. Signed by Judge Robert S. Lasnik. (LH) (Entered: 07/01/2022) |
| 07/01/2022 | 352 | ORDER granting Defendant's 338 Unopposed Motion for Extension of Time. Rule 29, Rule 33 and Rule 34 motion due dates are extended to 8/3/2022, Response due 8/24/2022, and Reply due 9/2/2022. Signed by Judge Robert S. Lasnik. (LH) (Entered: 07/01/2022) |
| 07/28/2022 | 353 | MOTION *to Seal and Redact Admitted Trial Exhibits* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order, # 2 Appendix A) Noting Date 8/5/2022 ~~7/28/2022~~, (Friedman, Andrew) Modified noting date on 7/29/2022 (LH). (Entered: 07/28/2022) |
| 07/28/2022 | 354 | Unopposed MOTION for Extension of Time *to File Joint Certification of Counsel Regarding Admitted Trial Exhibits* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 7/28/2022, (Friedman, Andrew) (Entered: 07/28/2022) |
| 07/29/2022 | 355 | NOTICE by USA as to Paige A Thompson that the following is RE-NOTED: 353 MOTION *to Seal and Redact Admitted Trial Exhibits* ; Noting Date 8/5/2022, |

**ER-188**

| | | |
|---|---|---|
| | | (Attachments: # 1 Proposed Order, # 2 Appendix A)(Friedman, Andrew) (Entered: 07/29/2022) |
| 07/29/2022 | | Reset Motion Noting Date as to Paige A Thompson for 8/5/2022 re 353 MOTION *to Seal and Redact Admitted Trial Exhibits*, pursuant to LCrR 12(b)(6). (LH) (Entered: 07/29/2022) |
| 07/29/2022 | 356 | ORDER as to Paige A Thompson granting Government's 354 Unopposed Motion for Extension of Time. The Joint Certification shall be filed no later than seven days after the Court rules on the United States' 353 motion to seal and redact trial exhibits. Signed by Judge Robert S. Lasnik. (LH) (Entered: 07/29/2022) |
| 07/29/2022 | 357 | Unopposed MOTION for Extension of Time *to File Rule 29, 33, 34 Motions* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 7/29/2022, (Hamoudi, Mohammad Ali) (Entered: 07/29/2022) |
| 08/03/2022 | 358 | ORDER granting Defendant's 357 Unopposed Motion for Extension of Time. IT IS ORDERED that Rule 29, Rule 33 and Rule 34 motion due dates be extended to 8/5/2022, Response due 8/26/2022, and Reply due 9/4/2022. Signed by Judge Robert S. Lasnik. (SB) (Entered: 08/03/2022) |
| 08/04/2022 | 359 | RESPONSE, by Paige A Thompson, to 353 MOTION *to Seal and Redact Admitted Trial Exhibits*. (Hamoudi, Mohammad Ali) (Entered: 08/04/2022) |
| 08/05/2022 | 360 | MOTION for New Trial by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 9/9/2022 ~~8/19/2022~~, (Hamoudi, Mohammad Ali) Modified noting date on 8/24/2022 (LH). (Entered: 08/05/2022) |
| 08/05/2022 | 361 | REPLY, by USA as to Paige A Thompson, TO RESPONSE to 353 MOTION *to Seal and Redact Admitted Trial Exhibits* (Manca, Jessica) (Entered: 08/05/2022) |
| 08/24/2022 | | Per the direction of chambers and to align with the Order at dkt. 358 , the noting date for the 360 MOTION for New Trial is re-set for 9/9/2022. (LH) (Entered: 08/24/2022) |
| 08/26/2022 | 362 | MINUTE ORDER as to Paige A Thompson authorized by Judge Robert S. Lasnik. Sentencing is rescheduled for 10/4/2022 at 10:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. (VE) (Entered: 08/26/2022) |
| 08/26/2022 | 363 | RESPONSE, by USA as to Paige A Thompson, to 360 MOTION for New Trial . (Culbertson, Tania) (Entered: 08/26/2022) |
| 08/29/2022 | 364 | STIPULATED MOTION *Extend Time to File Reply* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 8/29/2022, (Hamoudi, Mohammad Ali) (Entered: 08/29/2022) |
| 08/30/2022 | 365 | ORDER granting Parties' 364 Stipulated Motion. Defense's reply to the 360 Motion for New Trial is now due by 9/4/2022. Signed by Judge Robert S. Lasnik. (LH) (Entered: 08/30/2022) |
| 09/09/2022 | 366 | MOTION for Leave to File Over-length Motions and Briefs by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 9/9/2022, (Hamoudi, Mohammad Ali) (Entered: 09/09/2022) |
| 09/09/2022 | 367 | MOTION to Seal Document *Reply Exhibits* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 9/9/2022, (Hamoudi, Mohammad Ali) (Entered: 09/09/2022) |
| 09/09/2022 | 368 | REPLY, by Paige A Thompson, TO RESPONSE to 360 MOTION for New Trial (Hamoudi, Mohammad Ali) (Entered: 09/09/2022) |

| 09/09/2022 | 369 | **SEALED DOCUMENT** *Exhibits to Reply* by Paige A Thompson, re 367 MOTION to Seal Document *Reply Exhibits*, 368 Reply to Response to Motion. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5)(Hamoudi, Mohammad Ali) (Entered: 09/09/2022) |
|---|---|---|
| 09/19/2022 | 370 | ORDER granting in part and denying in part Government's 353 Motion to Seal and Redact Admitted Trial Exhibits as to Paige A Thompson. Signed by Judge Robert S. Lasnik. (LH) (Entered: 09/19/2022) |
| 09/27/2022 | 373 | ADMITTED TRIAL EXHIBITS by USA as to Paige A Thompson (Attachments: # 1 Exhibit 100 series, # 2 Exhibit 201-251, # 3 Exhibit 301-310, # 4 Exhibit 401-420, # 5 Exhibit 431-439, # 6 Exhibit 450-462, # 7 Exhibit 501-525, # 8 Exhibit 602-673, # 9 Exhibit 701-782, # 10 Exhibit 800-854, # 11 Exhibit 913-955, # 12 Exhibit 204-252 Redacted, # 13 Exhibit 455-608 Redacted, # 14 Exhibit 640-647 Redacted, # 15 Exhibit 674-804 Redacted, # 16 Exhibit 806-812 Redacted, # 17 Exhibit 901-904 Redacted, # 18 Exhibit 914-956, # 19 Exhibit 1008-1206 Defense Exhibits)(Friedman, Andrew) (Entered: 09/27/2022) |
| 09/27/2022 | 374 | **SEALED ADMITTED TRIAL EXHIBITS** by USA as to Paige A Thompson, re 370 Order on Motion for Miscellaneous Relief, 373 Admitted Trial Exhibits,, (Attachments: # 1 Exhibit 807-956)(Friedman, Andrew) (Entered: 09/27/2022) |
| 09/27/2022 | 376 | MOTION to Seal Document by USA as to Paige A Thompson (Attachments: # 1 Proposed Order) Noting Date 10/7/2022, (Manca, Jessica) (Entered: 09/27/2022) |
| 09/27/2022 | 377 | SENTENCING MEMORANDUM by USA as to Paige A Thompson (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Manca, Jessica) (Entered: 09/27/2022) |
| 09/27/2022 | 378 | **SEALED DOCUMENT** *Exhibit 4* by USA as to Paige A Thompson, re 376 MOTION to Seal Document , 377 Sentencing Memorandum. (Manca, Jessica) (Entered: 09/27/2022) |
| 09/27/2022 | 379 | MOTION to Seal Document *Defendant's Exhibit 4* by Paige A Thompson. (Attachments: # 1 Proposed Order) Noting Date 9/27/2022, (Hamoudi, Mohammad Ali) (Entered: 09/27/2022) |
| 09/27/2022 | 380 | SENTENCING MEMORANDUM by Paige A Thompson (Attachments: # 1 Exhibit 3 Support Letters, # 2 Exhibit 5 Cap 1 Dossier, # 3 Exhibit 6 Cap 1 Email, # 4 Exhibit 7 42 Lines Email)(Hamoudi, Mohammad Ali) (Entered: 09/27/2022) |
| 09/27/2022 | 381 | **SEALED DOCUMENT** *Exhibit 1 and 2* by Paige A Thompson, re 380 Sentencing Memorandum, filed under seal in accordance with LCrR 55. (Attachments: # 1 Exhibit 2) (Hamoudi, Mohammad Ali) (Entered: 09/27/2022) |
| 09/27/2022 | 382 | **SEALED DOCUMENT** *Exhibit 4* by Paige A Thompson, re 379 MOTION to Seal Document *Defendant's Exhibit 4*, 380 Sentencing Memorandum. (Hamoudi, Mohammad Ali) (Entered: 09/27/2022) |
| 10/03/2022 | 383 | MOTION for Forfeiture of Property - *Combined Preliminary Order of Forfeiture and Order of Forfeiture* by USA as to Paige A Thompson (Attachments: # 1 Proposed Order - Combined Preliminary Order of Forfeiture and Order of Forfeiture) Noting Date 10/4/2022, (Bush, Krista) (Entered: 10/03/2022) |
| 10/04/2022 | 384 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Andrew Friedman, Jessica Manca, Tania Culbertson*; Def Cnsl: *Mohammad Hamoudi, Brian Klein*; USPO: *Amelia Whaley*; Court Reporter: *Debbie Zurn*; **SENTENCING** held on 10/4/2022 for Paige A Thompson (1). Defendant's 360 MOTION for New Trial is denied. Order to follow. Defendant's 366 MOTION for Leave |

**ER-190**

to File Over-length Brief, <u>367</u> MOTION to Seal Reply Exhibits, and <u>379</u> MOTION to Seal Exhibit 4 are granted. Government's <u>376</u> MOTION to Seal Document and <u>383</u> MOTION for Forfeiture of Property are granted, with the dollar amount and items to be forfeited to be determined. Defendant is sentenced to time served on Count 1ss with no supervised release to follow on this count; 5 years of probation on Counts 2ss, 4ss, 5ss and 8ss; and 1 year of probation on Counts 6ss and 7ss. All counts are to run concurrently. Defendant is subject to the standard and special conditions of probation as set forth in the Judgment, which shall include participation in the location monitoring program with radio frequency technology for a period of 3 years and completion of 50 hours of community service each year for the next 5 years as approved by U.S. Probation. Defendant shall pay a $100.00 special assessment for each felony count and a $25.00 special assessment for each misdemeanor count, for a total of $550.00. Fine waived. Restitution to be determined. Restitution Hearing and Hearing on Forfeiture set for 12/1/2022 at 9:00 AM in Courtroom 15106 before Judge Robert S. Lasnik. (VE) (Entered: 10/04/2022)

| | | |
|---|---|---|
| 10/04/2022 | <u>385</u> | JUDGMENT as to Paige A Thompson by Judge Robert S. Lasnik. (cc: USPO, PTS, FLU, Fin., USMO, Sea Tac Det) (VE) (Main Document 385 replaced on 10/4/2022) (VE). (Entered: 10/04/2022) |
| 10/04/2022 | <u>386</u> | NOTICE of Corrected Image/Document as to Paige A Thompson re <u>385</u> Judgment. There is no change to the Judgment. Judgment has been rescanned to correct scanning deficiency on the bottom of pages 4 and 5. (Service of corrected image is attached.) (VE) (Entered: 10/04/2022) |
| 10/05/2022 | <u>387</u> | ORDER denying Defendant's <u>360</u> MOTION for New Trial as to Paige A Thompson. Defendant's motion to file overlength reply (Dkt. # <u>366</u> ) is GRANTED. Defendant's motion to seal (Dkt. # <u>367</u> ) is GRANTED. Signed by Judge Robert S. Lasnik. (LH) (Entered: 10/05/2022) |
| 10/06/2022 | <u>388</u> | TRANSCRIPT REQUEST by Plaintiff USA for proceedings held on 10/04/2022 re 384 Sentencing,,,,,,, Set Hearings,,,,,,. Requesting Attorney: Jessica Murphy Manca. Posting of this Transcript Order form does not constitute an official request for transcript(s). If you have not already done so, you MUST contact the individual court reporter(s), Debbie Zurn (debbie_zurn@wawd.uscourts.gov, 206-370-8504) to make payment arrangements and secure your desired delivery time. (Manca, Jessica) (Entered: 10/06/2022) |
| 10/07/2022 | <u>389</u> | NOTICE OF APPEAL (22-30168) by Paige A Thompson. Filing Fee:. (cc: USCA) (Hamoudi, Mohammad Ali) Modified on 10/11/2022 to add CCA#. (RE) (Entered: 10/07/2022) |
| 10/07/2022 | <u>391</u> | TIME SCHEDULE ORDER/ USCA CASE NUMBER (22-30168) as to <u>389</u> Notice of Appeal filed by Paige A Thompson. (RE) (Entered: 10/11/2022) |
| 10/10/2022 | <u>390</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Sentencing Hearing held on 10/4/2022 before Judge Robert S. Lasnik. Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov. |

| | | |
|---|---|---|
| | | To purchase a copy of the transcript, contact court reporter Debbie Zurn, debbie_zurn@wawd.uscourts.gov, 206-370-8504.<br><br>Release of Transcript Restriction set for 1/9/2023, (DZ) (Entered: 10/10/2022) |
| 11/03/2022 | 392 | NOTICE OF Cross APPEALS (22-30168, 22-30179) by USA as to Paige A Thompson. Filing Fee:. (cc: USCA) (Culbertson, Tania) Modified on 11/4/2022 to add CCA#. (RE) (Entered: 11/03/2022) |
| 11/04/2022 | 393 | TIME SCHEDULE ORDER/USCA CASE NUMBER (22-30168, 22-30179) as to 392 Notice of Appeal filed by USA. (RE) (Entered: 11/04/2022) |
| 11/18/2022 | 394 | WAIVER *OF PRESENCE* by defendant Paige A Thompson (Hamoudi, Mohammad Ali) (Entered: 11/18/2022) |
| 11/23/2022 | 395 | MEMORANDUM *Regarding Restitution and Forfeiture* by USA as to Paige A Thompson (Manca, Jessica) (Entered: 11/23/2022) |
| 11/23/2022 | 396 | RESPONSE, by Paige A Thompson, to 383 MOTION for Forfeiture of Property - *Combined Preliminary Order of Forfeiture and Order of Forfeiture.* (Hamoudi, Mohammad Ali) (Entered: 11/23/2022) |
| 12/01/2022 | 397 | MINUTE ENTRY for proceedings held before Judge Robert S. Lasnik - CRD: *Victoria Ericksen*; AUSA: *Jessica Manca, Andrew Friedman, Tania Culbertson, Krista Bush*; Def Cnsl: *Melissa Meister, Mohammad Hamoudi, Brian Klein*; Court Reporter: *Sheri Schelbert*; **RESTITUTION HEARING** as to Paige A Thompson held on 12/1/2022 via Zoom videoconference. The Court hears argument of counsel and takes this matter under advisement. (VE) (Entered: 12/01/2022) |
| 12/01/2022 | 398 | MEMORANDUM by USA as to Paige A Thompson (Friedman, Andrew) (Entered: 12/01/2022) |
| 12/06/2022 | 399 | COMBINED PRELIMINARY ORDER OF FORFEITURE AND ORDER OF FORFEITURE as to Paige A Thompson by Judge Robert S. Lasnik. (LH) (cc: USMO (AF)) (Entered: 12/06/2022) |
| 12/06/2022 | 400 | ORDER OF RESTITUTION as to Paige A Thompson by Judge Robert S. Lasnik. (LH) (cc: Finance) (Entered: 12/06/2022) |
| 12/07/2022 | 401 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Restitution Hearing held on 12/1/2022 before Judge Robert S. Lasnik.<br><br>Parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Information regarding the policy can be found on the court's website at www.wawd.uscourts.gov.<br><br>To purchase a copy of the transcript, contact court reporter Sheri Schelbert, sheri_schelbert@wawd.uscourts.gov Release of Transcript Restriction set for 3/7/2023, (Schelbert, Sheri) (Entered: 12/07/2022) |
| 12/20/2022 | 402 | AMENDED Notice of Appeal (22-30168) as to 389 Notice of Appeal by Defendant Paige A Thompson. (cc: USCA) (Lai, Vicki) (Entered: 12/20/2022) |

| 01/10/2023 | 403 | DECLARATION of Publication (www.forfeiture.gov: December 8, 2022 to January 6, 2023) by USA as to Paige A Thompson re 399 Preliminary Order of Forfeiture (Bush, Krista) (Entered: 01/10/2023) |
| --- | --- | --- |
| 05/15/2023 | 404 | ORDER/REQUEST FOR SUMMONS AND MODIFICATION OF CONDITIONS OR TERM OF SUPERVISION (12D) as to Paige A Thompson by Judge Robert S. Lasnik. Initial Appearance on Revocation Proceedings set for 6/2/2023 at 10:00 AM in Courtroom 12B before Hon. Brian A Tsuchida. (LH) (cc: USMO, USPO, Counsel, Mag Team) (Entered: 05/15/2023) |

| PACER Service Center | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 05/22/2023 09:17:15 | | | |
| **PACER Login:** | fpdus0299 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cr-00159-RSL |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

**ER-193**